**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

THE LUZERNE COUNTY RETIREMENT
BOARD,

      Plaintiff,

          v.

THOMAS MAKOWSKI, et al.,

      Defendants.

CIVIL ACTION NO. 3:CV-03-1803

(JUDGE CAPUTO)

## TABLE OF CONTENTS

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.    Factual History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
          A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
          B.    The Luzerne County Retirement Fund . . . . . . . . . . . . . . . . . . . . . . . 4
          C.    The Joyce-Williamson Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . 6
          D.    The Joyce and Williamson Campaign Contributions . . . . . . . . . . . . 13
          E.    The Safeco Investments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
          F.    The Provident Annuities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
          G.    The Manulife Annuity Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
          H.    The FSI Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
          I.    The Wells Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
          J.    Rochdale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
          K.    LPL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
          L.    The Fund's Accountants – Snyder & Clemente . . . . . . . . . . . . . . . . 35
          M.    The Fund's Auditors – Zavada & Associates . . . . . . . . . . . . . . . . . . 36
          N.    The Fund's Actuaries – The Hay Group . . . . . . . . . . . . . . . . . . . . . . 38
          O.    ASCO's Annual Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
          P.    The Retirement Office . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
          Q.    The Annual Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
          R.    Alleged Concealment of the Scheme . . . . . . . . . . . . . . . . . . . . . . . . 43
          S.    Urban and Flood Elected; Investigation Commences . . . . . . . . . . . 44
          T.    The Board Terminates ASCO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
              1.    The September 5, 2002 Board Meeting . . . . . . . . . . . . . . . . 47
              2.    The September 17, 2002 Board Meeting . . . . . . . . . . . . . . . 49
              3.    The October 1, 2002 Board Meeting . . . . . . . . . . . . . . . . . . . 51
          U.    The Board Liquidates the Fund's Investments . . . . . . . . . . . . . . . . . 52
          V.    Solicitor Hassey's Letters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
          W.    Schnader, Harrison's Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . 55
          X.    The County Sues the Board . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

II. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
    A. The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
    B. The Motions to Dismiss the Complaint . . . . . . . . . . . . . . . . . . . . . . . 59
    C. Counterclaims and Crossclaims . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
    D. Stipulations of Dismissal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
    E. The Motions to Dismiss the Counterclaims and Crossclaims . . . . . . 61
    F. Flood Dropped as a Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
    G. The Instant Motions for Summary Judgment . . . . . . . . . . . . . . . . . . 62

LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

I. Defendants' Motions for Summary Judgment – Plaintiff's Federal Claims . . 64
    A. RICO Claims (Counts III, IV and VI) . . . . . . . . . . . . . . . . . . . . . . . . . 64
        1. RICO – In General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
        2. Conducting/Participating in a RICO Enterprise (Count III) . . 65
            a. PSLRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
                i. Are the Annuities "Securities"? . . . . . . . . . . . . . 67
                ii. Rule 151 Safe Harbor . . . . . . . . . . . . . . . . . . . . 82
                iii. Section 3(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . 83
                iv. Are the Annuities "Investment Contracts"? . . . . 83
                v. Actionable Securities Fraud . . . . . . . . . . . . . . . 86
                vi. Conclusion as to PSLRA . . . . . . . . . . . . . . . . . .91
            b. Scheme to Defraud . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
                i. Bribery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
                ii. Failure to Disclose a Conflict of Interest . . . . . 100
                iii. Conclusion as to Scheme to Defraud . . . . . . . 113
            c. Conclusion as to Count III . . . . . . . . . . . . . . . . . . . . 113
        3. RICO Conspiracy Claims (Counts IV and VI) . . . . . . . . . . . 114
            a. Count IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115
            b. Count VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115
    B. Violation of the Investment Advisors Act (Count VII) . . . . . . . . . . . . 116
        1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116
        2. Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116
        3. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
II. State Law Claims, Counterclaims and Third-party Claims . . . . . . . . . . . 119

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

**MEMORANDUM**

Presently before the Court are eleven (11) motions for summary judgment. (Docs. 390, 391, 400, 403, 406, 409, 414, 419, 420, 426, 427.)  Defendants Nationwide Life Insurance Company (Doc. 390), Manufacturers Life Insurance Company (U.S.A.) (Doc. 391), Thomas Makowski, Thomas Pizano, Frank Crossin and Joseph Jones (Doc. 414), Joseph J. Joyce Associates, Inc., John Joyce and William Joyce (Doc. 419), Safeco Life Insurance Corporation (Doc. 420), ASCO Financial Group, Inc. and Donald Williamson (Doc. 426), and Joseph Perfilio (Doc. 427), have filed motions for summary judgment as to Plaintiff the Luzerne County Retirement Board's Complaint (Doc. 1).

Third-party Defendant Michael Morreale has filed a motion for summary judgment as to the third-party complaints filed against him by Makowski, Pizano, Crossin and Jones, as well as by Williamson, ASCO Financial Group, Inc. and Perfilio. (Docs. 400, 406.)  Counterclaim Defendant, and former Plaintiff, Stephen Flood has filed a motion for summary judgment as to the counterclaims of Williamson, ASCO Financial Group, Inc. and Perfilio. (Doc. 403.)  Plaintiff has also filed a motion for summary judgment as to the counterclaims of Williamson, ASCO Financial Group, Inc. and Perfilio. (Doc. 409.)

For the reasons set forth below, Defendants' motions will be granted as to Plaintiff's federal claims (Counts III, IV, VI and VII).  Summary judgment will be entered in favor of Defendants as to these claims.  The Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.  The Court will decline to exercise its supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiff's state law claims (Counts I and VIII), as well as the various state law counterclaims and third-party claims.  As such, these claims will be dismissed without prejudice.

3

**BACKGROUND**

I.     **Factual History**

     A.     **Introduction**

This action focuses on investment contracts entered into by the Luzerne County Retirement Board (the "Board") and/or its members between 1988 and 2002.  The current Board ("Plaintiff") has alleged that several of its former members engaged in a pay-to-play scheme, awarding contracts to invest or manage retirement fund assets and, in exchange, receiving political contributions to finance their reelection campaigns.  The former Board members allegedly involved in the scheme are Thomas Makowski, Thomas Pizano, Frank Crossin and Joseph Jones (collectively, at times, the "former Board members"). (Compl. ¶¶ 2-5, Doc. 1 at 7.)

     B.     **The Luzerne County Retirement Fund**

Luzerne County maintains a retirement fund (the "Fund") to provide its employees with income upon their retirement. *See County of Luzerne v. Luzerne County Retirement Board*, 882 A.2d 531, 533 (Pa. Commw. Ct. 2005).  The Fund is a legal entity which was created, and is governed, by the County Pension Law, 16 P.S. § 11651 *et seq. See County of Luzerne*, 882 A.2d at 534.  Employees of Luzerne County make contributions to the Fund through payroll deductions and, upon retirement, qualify to receive payments from the Fund. 16 P.S. § 11657(a), (b); *McCarrell v. Cumberland County Employees Retirement Board*, 547 A.2d 1293, 1294-95 (Pa. Commw. Ct. 1988); (Def.'s Ex. 95 at ZAV2095, Doc. 443 at 8.)  The Fund is a "defined benefit plan," which means that retirees are entitled to fixed benefit payments, regardless of the assets available in the

4

Fund to pay those benefits. (*See* LCRB 14292, Doc. 496-4 at 44; Def.'s Ex. 35 at LCRB 08580, Doc. 439-14 at 4.)  To the extent that the benefit payments owed by the Fund to retirees exceed the Fund's assets, Luzerne County must contribute taxpayer money to make up the difference. (*See* Def.'s Ex. 35 at LCRB 08580, Doc. 439-14 at 4.)

The Fund is administered by the Board. 16 P.S. § 11654(b).  The Board consists of five (5) elected officials of Luzerne County – the three (3) Commissioners, the Controller and the Treasurer. *Id.*; *County of Luzerne*, 882 A.2d at 534 n. 2.  Board members are trustees of the Fund and serve as its fiduciaries. 16 P.S. § 11659 ("The members of the board shall be trustees of the fund, and shall have exclusive management of the fund with full power to invest the moneys therein subject to the terms, conditions, limitations and restrictions imposed by law upon fiduciaries").

Meetings of the Board are chaired by the Chairman of the Luzerne County Commissioners. 16 P.S. § 11654(b).  Three (3) members of the Board constitute a quorum. *Id.*  The Board is subject to the provisions of the Pennsylvania Open Public Meeting Law, 65 PA. CONS. STAT. ANN. § 701 *et seq*, or Sunshine Act. 65 PA. CONS. STAT. ANN. § 703 (providing that any board of any political subdivision of the Commonwealth is subject to the Sunshine Act).

In March of 1988, the Board's members were Frank Crossin, Frank Trinisewski, and Jim Phillips, the three (3) Luzerne County Comissioners, Joseph S. Tirpak, the Luzerne County Controller, and Michael Morreale, the Luzerne County Treasurer. (Def.'s Ex. 56 at FLOOD 5459, Doc. 441-6 at 7.)[1]

---

[1]Trinisewski, Phillips and Tirpak are not, nor were they ever, parties to this case. (*See* Doc. 181 at 3 n. 2.)

C.     The Joyce-Williamson Agreement

According to Plaintiff, the putative pay-to-play scheme originated in 1987 by means of a "secret, undisclosed handshake deal" between Donald Williamson, John Joyce, and Joseph J. Joyce, Sr., John Joyce's father, now deceased. (Pl.'s Br. in Opp'n at 10., Doc. 484-1 at 27; *see* John J. Joyce Dep. 48:18-49:16, Feb. 21, 2006, Doc. 434-15 at 13.)

Donald Williamson, doing business as ASCO Financial Group, Inc. ("ASCO") (collectively, at times, "Williamson/ASCO"), a Pennsylvania corporation (Answer of ASCO ¶ 6, Doc. 201 at 2), is an insurance broker and investment advisory representative. (Donald Williamson Dep. 35:4-38:22, Aug. 17, 2005, Doc. 435-18 at 10-11.)  Donald Williamson is the president and chief executive officer of ASCO. (Answer of ASCO ¶ 7, Doc. 201 at 3.)  Williamson is also a broker/dealer for FSC Securities Corporation ("FSC"). (Williamson Dep. 31:19-24, Doc. 435-18 at 9.)[2]  His wife Maria Williamson is the secretary and vice president of ASCO. (Answer of ASCO ¶ 8, Doc. 201 at 3.)

John Joyce is president and part owner, along with his brothers Joseph J. Joyce, Jr. and William Joyce, of Joseph J. Joyce Associates, Inc. ("JJJA") (collectively, at times, the "Joyces"), a Pennsylvania corporation principally engaged in the sale of insurance products. (Answer of JJJA, John J. Joyce and William J. Joyce  ¶ 13, Doc. 205 at 2; *see* John J. Joyce Dep. 25:25-26:5, Doc. 434-15 at 7-8.)  He is also part owner of Joyce, Jackman & Bell Insurors ("JJ&B"), a Pennsylvania partnership and insurance agency. (*Id.* ¶ 14, Doc. 205 at 2; *see* John J. Joyce Dep. 9:22-10:2, Doc. 434-15 at 3-4.)  Shortly after

---

[2]Michael Joyce, brother of John, William and Joseph Jr., and Joseph Perfilio are broker/dealers for FSC. (Pl.'s Ex. 25 at LCRB 00013, Doc. 487-2 at 7.)

John Joyce graduated from college in 1977, he went to work for Williamson. (John J. Joyce Dep. 9:13-17, Doc. 434-15 at 3.)  John Joyce later became the Secretary of ASCO. (Answer of JJJA, John J. Joyce and William J. Joyce  ¶ 16, Doc. 205 at 2.)  He also held an ownership interest in ASCO at one time. (Williamson Dep. 105:20-24, Doc. 435-18 at 27.)  John Joyce continues to work for ASCO as a broker. (John J. Joyce Dep. 13:7-9, Doc. 434-15 at 5.)

The late Joseph J. Joyce, Sr. founded and managed both JJJA and JJ&B. (John J. Joyce Dep. 9:19-10:2, Doc. 434-15 at 3.)  Joseph Joyce, Sr. also held an ownership interest in (Williamson Dep. 105:20-24, Doc. 435-18 at 27) and served as treasurer of ASCO. (Answer of JJJA, John J. Joyce and William J. Joyce ¶ 15, Doc. 205 at 2.) Joseph Joyce, Sr. was very active in politics, at both the local and national levels. (JJJA, John J. Joyce and William J. Joyce's Mem. of Law at 2, Doc. 425 at 8; *see* Pl.'s Br. in Opp'n at 9, Doc. 484-1 at 26.)  The Joyces contributed money to the political campaigns of many candidates running for public office, including Makowski, Pizano, Crossin, Jones, Morreale and others. (*Id.* at 2-3, Doc. 435 at 8-9; *see* Pl.'s Br. in Opp'n at 9, Doc. 484-1 at 26.)

Pursuant to the handshake deal, the Joyces would bring accounts to Williamson/ ASCO, and, in exchange, the Joyces would receive fifty percent (50%) of the commissions Williamson/ASCO received from providing financial services to those accounts. (John J. Joyce Dep. 48:18-49:16, Doc. 434-15 at 13.)

In late 1987, Williamson/ASCO wanted to become investment manager for the Fund. (Williamson Dep. 112:12-23, Doc. 435-18 at 29.)  Knowing that Joseph Joyce, Sr. was a major political player in northeastern Pennsylvania, Williamson spoke with John

Joyce about the possibility of providing financial services to the Fund. (Williamson Dep.

113:6-13, Doc. 435-18 at 29.)  John Joyce then asked his father Joseph Joyce, Sr. to see

if he could find somebody in the Luzerne County government that Williamson could

speak with about working on the Fund. (Williamson Dep. 113:16-24, Doc. 435-18 at 29.)

Apparently, Joseph Joyce, Sr. spoke with Crossin, a Luzerne County Commissioner and

Board member, because, in January of 1988, Williamson received a phone call from

Crossin to set up an appointment to speak about the Fund. (Williamson Dep. 114:1-20,

Doc. 435-18 at 30.)  According to Williamson, Crossin was dissatisfied with the fact that

all of the Fund's assets were tied up in a single financial institution. (Williamson Dep.

114:5-17, Doc. 435-18 at 30; *see* Frank Crossin Dep. 14:15-15:6, Aug. 2, 2005, Doc.

434-9 at 5.)  In fact, Crossin and other Board members – Tirpak, Morreale and

Trinisewski – "had been discussing the multiple manager matrix concept to bring more

people into the fund, bring more local people involved, local brokers, local banks and that

type thing." (Crossin Dep. 14:22-15:5, Doc. 434-9 at 5.)  At that time, United Penn Bank

managed all of the Fund's sixty million dollars ($60,000,000) worth of assets. (Pl.'s Ex. 74

at LCRB 00551-00552, Doc. 454-12 at 3-4.)  United Penn Bank's fees for managing the

Fund amounted to approximately fifty-five thousand dollars ($55,000) per year. (*Id.* at

LCRB 00552, Doc. 454-12 at 4.)

　　　　Williamson met with Crossin later that January of 1988. (Williamson Dep. 114:5-

115:2, Doc. 435-18 at 30.)  Williamson explained in general terms his proposal that the

Fund would be managed using a multiple manager approach which Williamson/ASCO,

would administer and coordinate. (Crossin Dep. 24:13-25:2, Doc. 434-9 at 7.)  Williamson

then met with Charles Gelso, Solicitor for the Board. (Williamson Dep. 115:15-21, Doc.

435-18 at 30.)  Gelso provided Williamson with all the documents and financial reports Williamson needed to prepare a formal proposal to present to the Board. (Williamson Dep. 115:15-117:21, Doc. 435-18 at 30.)  Next, Williamson met with Tirpak, who placed Williamson/ASCO on the agenda of the Board's next meeting. (Williamson Dep. 118:6-118:18, Doc. 435-18 at 31.)

At a March 2, 1988 meeting of the Board, Williamson presented his investment proposal. (Pl.'s Ex. 74 at LCRB - 00550, Doc. 454-12 at 2.)  Williamson proposed a multiple manager approach to the Fund's management, a strategy which he asserted would: (1) increase diversification of Fund assets so as to reduce risk to principal; (2) significantly reduce investment management fees; and (3) increase the overall performance of the Fund by (a) utilizing the expertise of various types of financial institutions specializing in a certain class of assets, and (b) creating competition among the Fund's managers. (*Id.*)  The proposal called for four (4) portfolio investment managers: (1) United Penn Bank; (2) First Eastern Bank; (3) First Valley Bank; and (4) Safeco Life. (*Id.*)  Williamson/ASCO would coordinate the administrative details required to implement the multiple manager system. (*Id.*)

After Williamson had finished his presentation, the Board discussed whether to accept the multiple manager proposal. (*Id.*)  Morreale objected to an immediate decision by the Board, stating that "other banks were never contacted nor was it ever discussed by the Board as a unit." (*Id.*)  Morreale "could not see why any hasty decision was required" and "attempted to dissuade the other four members of the Board from making a decision, thus giving more time for consideration to a proposal for multiple management and to

9

allow more than four financial institutions to present proposals." (*Id.*)  Morreale moved to table Williamson's proposal but no other Board member seconded his motion. (*Id.*)

Objections to the Board's immediate decision also came from United Penn Bank, which did not want to lose control over the entirety of the Fund's assets, as well as Merchants Bank, Northeastern Bank and the Baltimore Life Insurance Company, which each asked the Board to delay its decision until they had the opportunity to present their own proposals on the subject of multiple fund management. (*Id.*)

Notwithstanding the objections to the hastiness of such a decision, Tirpak moved to accept the proposal of Williamson/ASCO. (*Id.*)  Phillips seconded Tirpak's motion. (*Id.*)  A vote was then taken. (*Id.*)  All Board members except for Morreale voted to accept Williamson/ASCO's proposal. (*Id.*)  Morreale voted against it. (*Id.*)  As such, on March 2, 1988, the very same day it was presented with the multiple fund manager proposal, the Board entered into a Consulting Services Agreement (the "ASCO Agreement") with Williamson/ASCO, retaining Williamson/ASCO to serve as the Fund's investment consultant and administrative agent. (Def.'s Ex. 56 at FLOOD 5453-5459, Doc. 441-6 at 1-7.)  All Board members, including Morreale, signed the ASCO Agreement. (*Id.* at FLOOD 5459, Doc. 441-6 at 7.)  Relevant provisions of the ASCO Agreement are set forth in the margin.[3]  As per their handshake agreement, the Joyces received

---

[3]

WHEREAS the Pension Board is in need of certain guidance and advice with respect to the future administration and investment management of its Defined Benefit Pension Plan, known as the Luzerne County Employees Retirement Plan; and

WHEREAS the Pension Board is desirous of obtaining pension administrative and investment management services from the Consultant; and

WHEREAS the Consultant is engaged in the practice of providing administrative services and

investment management guidance to selected clients within the context of the "County Pension Law," Act 96 of 1971, as amended; and

. . .

WHEREAS it is the intention of the Consultant to fully comply with the Investment Advisors Act of 1940, 15 U.S.C. 80b-1, et. seq;

. . .

ARTICLE III

It is further agreed that this Agreement shall constitute written authority, appointing the Consultant as Administrative Agent and investment liaison for the pension plan and all pension plan documentation required for the takeover and implementation of the recommendations made to the Pension Board may be obtained from any previous plan administrator and investment manager(s) in a timely fashion.

. . .

ARTICLE V

It is further agreed by and between the parties hereto that the Consultant shall act as a liaison on behalf of said Pension Board with the Luzerne County Retirement Office, Consulting Actuary, Norm Pickering, and the various investment portfolio managers appointed by the Pension Board, providing administrative support, accounting documentation and investment management services to the Pension Board and on behalf of all the plan participants.

ARTICLE VI

It is expressly agreed by and between the parties hereto that the Consultant will be compensated for all services rendered by through a service fee agreement with Safeco Life, Seattle, Washington, at their normal assets under management service fee rate of 20 basis points, or 2/10ths of 1.00 percent of the assets managed by Safeco Asset Management Company, and maintained for the pension plan.  The plan nor its participants will incur any direct costs or fees for the administrative services provided by the Consultant, his company or employees, including costs incurred for out-of-pocket expenses, travel, food and lodging expenses incurred during and in conjunction with providing any consulting service in support of this agreement and the management of the pension plan.

ARTICLE VII

It is further agreed that the Pension Board will ultimately choose the particular investment instruments and portfolio manager(s) required to fund the pension trust, with the further understanding that the investments will could [sic] be acquired through the Consultant named in this Agreement as Agent or Broker, but that no arrangement of this nature is required as part of this agreement.

ARTICLE VIII

The Pension Board hereby acknowledges and understands the fact that:

(a)     Agents and brokers may charge a commission for their services;
(b)     The Consultant is a licensed Agent and Broker and that commissions or service fees may be earned in conjunction with the acquisition of certain investments for the Pension Trust;
(c)     That such transactions are State regulated and fixed contractually by the vendor, so that essentially the same commission structure would exist regardless of where or through

11

approximately fifty percent (50%) of the commissions Williamson/ASCO received from work on the Fund. (*See* Joyce Br. in Supp. at 3, Doc. 425 at 9.)

On June 29, 1989, Williamson/ASCO took standing authority to request disbursements or make withdrawals of the Fund's assets from Safeco Life Insurance Corporation in order to pay participant benefits. (Pl.'s Ex. 115 at ASCO 001491, Doc. 491-3 at 2.)  On January 2, 1992, Williamson/ASCO received authority to request disbursements or withdrawals of the Fund's assets from Provident Mutual Life Insurance Company in order to pay benefits. (Def.'s Ex. 58 at FLOOD 6066, Doc. 441-8 at 1.)  On December 31, 1999, the Board entered into a separate contract with Williamson/ASCO, retaining them to administer the daily operations of the Luzerne County Retirement Office (the "Retirement Office"). (Pl.'s Ex. 123 at LCRB 00590-00593, Doc. 491-3 at 28-31.)  In 2001, the Retirement Office was closed and all of its functions were outsourced to ASCO. (Lois Kammerer Dep. 29:5-7, June 17, 2005, Doc. 434-18 at 8.)

---

whom the investment was procured;

(d)     That all commissions shall be fully disclosed in accordance with Federal regulations governing;

(e)     That the Consultant maintains a General Securities license through the National Association of Securities Dealers (NASD) in accordance with Federal and State regulations;

(f)     Further, he is duly licensed with the State with certain product vendors, including SAFECO Life and SAFECO Securities Corporation, and may receive commission or fee compensation in connection with products or investments directly placed with that product vendor.

. . .

ARTICLE XIII

It is understood by the Pension Board that the Consultant is not registered with the Securities and Exchange Commission as a Registered Investment Advisor and clearly does not hold himself out to be such for purposes of this agreement. . . .

(*Id.* at FLOOD 5455-5456, Doc. 441-6 at 3-4.)

D.    **The Joyce and Williamson Campaign Contributions**

Between 1991 and 2002, the Joyces, their companies, and their employees, contributed eighty-two thousand fifty dollars ($82,050) to the reelection campaigns of Makowski, Pizano and Crossin. (*See* Pl.'s Am. Resp. to JJJA Interrogs. at Ex. A, Doc. 457-6 at 10-12.)  Williamson, his wife Maria, as well as agents and employees of ASCO, contributed nineteen thousand seven hundred dollars ($19,700) to the campaigns of Makowski, Pizano, Crossin and Jones. (*See* Pl.'s Resp. to Williamson Interrogs. at Ex. A, Doc. 498-2 at 35.)[4]

Plaintiff contends that, shortly before or after these contributions were made, Makowski, Pizano, Crossin and Jones, as Board members, "unlawfully caused the Retirement Plan to incur contractual obligations that furthered the lucrative deals made by the ASCO and Joyce defendants.  Rather than making those contracts at formal meetings of the Board, they did so by signing or acquiescing [to] the contracts in back-room meetings outside of public view." (Pl.'s Br. in Opp'n at 14, Doc. 484-1 at 31.)

The contractual obligations entered into as part of this alleged pay-to-play scheme include those entered into with: (1) Safeco Life Insurance Corporation; (2) Provident Mutual Life Insurance Company; (3) The Manufacturers Life Insurance Company (U.S.A.); (4) First Security Investments; (5) Wells Real Estate Funds, Inc.; (6) Rochdale

---

[4]In addition, back in 1989, ASCO contributed one thousand dollars ($1000) to Trinisewski's campaign. (*See* Def.'s Ex. 42 at Flood 5111, Doc. 440-7 at 3.)  The Joyces made a campaign contribution to Trinisewski as well. (*See id.*)  Plaintiff does not contend that Trinisewski was part of the alleged scheme, but, based on the minutes from a May 2003 meeting of the Board, it appears that Flood did consider Trinisewski a part of the scheme at one time. (*See id.*)

13

Investment Management, Inc.;[5] and (7) Linsco Private Ledger Corp.  (*See id.* at 13-34, Doc. 484-1 at 30-51.)

### E.    The Safeco Investments

On March 21, 1988, the Board entered into an investment agreement with Safeco Life Insurance Corporation ("Safeco") to purchase a Qualified Pension Annuity Contract, Series II ("QPA-2"), which would become effective on May 4, 1988. (Pl.'s Ex. 358 at Safeco 00127-00134, Doc. 456-3 at 1-8.)  The QPA-2 was a traditional fixed annuity with a guaranteed rate of return. (*Id.* at Safeco 00127, Doc. 456-3 at 1; Pl.'s Ex. 360 at Safeco 00116, Doc. 456-4 at 3.)  The initial interest rate was approximately eight percent (8%) (Pl.'s Ex. 358 at Safeco 00127, Doc. 456-3 at 1), and Safeco promised that in no event would the Fund's interest rate be less than seven and one-quarter percent (7.25%) for the first five (5) years of the contract and no less than four and one-quarter percent (4.25%) for all contract years thereafter (Pl.'s Ex. 360 at Safeco 00116, Doc. 456-4 at 3). All deposits were held in Safeco's general corporate fund, not a separate account. (*See* Pl.'s Ex. 360 at Safeco 00115, Doc. 456-4 at 2.)  Thirteen and one-half million dollars ($13,500,000) of the Fund's assets was deposited into the QPA-2. (*Id.* at Safeco 00128, Doc. 456-3 at 2.)  The QPA-2 agreement was signed by Board members Trinisewski and Tirpak. (*Id.* at Safeco 00129, 00134, Doc. 456-3 at 3, 8.)  Williamson also signed the agreement in his capacity as administrative agent for the Fund. (*Id.* at Safeco 00130, 00134, Doc. 456-3 at 4, 8.)  The QPA-2 provided that Williamson/ASCO would receive a

---

[5]Rochdale Investment Management, Inc. was not named as a defendant in Plaintiff's Complaint and is not a party to this action. (*See* Doc. 181 at 4 n. 3.)  Plaintiff states in its brief that the parties have since settled. (Pl.'s Br. in Opp'n at 33-34, Doc. 484-1 at 50-51.)

three percent (3%) up-front commission based on the thirteen and one-half million dollar ($13,500,000) deposit, or four hundred five thousand dollars ($405,000). (*Id.* at Safeco 00130, Doc. 456-3 at 4.)  Williamson split this money equally with John Joyce. (*Id.* at Safeco 00131, Doc. 456-3 at 5.)  The three percent (3%) up-front commission was in addition to the one-fifth of one percent (0.2%), or twenty (20) basis points, that Williamson/ASCO charged as an annual service fee. (*Id.* at Safeco 00130, Doc. 456-3 at 4.)[6]

In March 1993, a Safeco "Resource Variable Account A" annuity was established using two million dollars ($2,000,000) of the Fund's assets. (Pl.'s Ex. 361 at ASCO 000158-000163, Doc. 456-5.)  Crossin, Tirpak and Morreale signed the agreement. (*Id.* at ASCO 000160, Doc. 456-5 at 3.)[7]  Norm Pickering, of the Hay Group, also signed the agreement. (*Id.*)  The Resource Variable Account A was an "unallocated group variable annuity contract." (*Id.* at ASCO 000161, Doc. 456-5 at 4.)  No rate of return was promised.  Rather, the values provided by the Resource Variable Account A were based on the investment experience of a separate account and were therefore variable and not guaranteed. (Def.'s Ex. 320 at Safeco 00751, Doc. 451-14 at 1.)

The Resource Variable Account A offered annuitants a variety of investment options, including, among others, equity, money market, bond and growth funds. (*Id.*)

---

[6]In September 1995, the QPA-2 was liquidated. (Pl.'s Ex. 374 at Safeco 00011-00014, Doc. 493-4 at 1-4.)  The liquidation was approved by Crossin, Tucker, Phillips, Tirpak and Morreale. (*Id.* at Safeco 00011, Doc. 493-4 at 2.)

[7]Despite the fact that a majority of the Board signed this agreement, including two Board members – Tirpak and Morreale – whom Plaintiff does not contend were involved in the pay-to-play scheme, Plaintiff protests the Safeco Resource Variable Account on the ground that it was neither presented to, nor approved by, the Board at a public meeting, based on the fact that there are no Board minutes demonstrating otherwise. (Pl.'s Br. in Opp'n at 20, Doc. 484-1 at 37.)

These sub-funds were managed by Safeco. (Scott Bartholomaus Dep. 225:5-6, 262:15-19, Mar. 22, 2006, Doc. 434-2 at 6, 15.)  Of the two million dollars ($2,000,000) invested in the Resource Variable Account A, one million dollars ($1,000,000) was invested in an equity sub-fund, five hundred thousand dollars ($500,000) was invested in a growth sub-fund, and five hundred thousand dollars ($500,000) was invested in the Northwest sub-fund. (Def.'s Ex. 321 at Safeco 00746, Doc. 451-15 at 1.)  Each of these sub-funds had different objectives, whether it was more conservative or more aggressive and risky. (Bartholomaus Dep. 225:9-14, Doc. 434-2 at 6.)

The Resource Variable Account A, considered by Safeco to be a variable-only annuity, was oftentimes sold in tandem with the QPA-2, considered by Safeco to be a fixed-only annuity. (Bartholomaus Dep. 257:10-22, Doc. 434-2 at 14.)  The Resource Variable Account A discloses that Williamson would receive thirty-five percent (35%) of the commission and that JJJA would receive sixty-five percent (65%) of the commission. (*Id.* at ASCO 000161, Doc. 456-5 at 4.)

On December 27, 1993, Fund assets were used to purchase a "Safeflex Allocated Group Variable Annuity" from Safeco. (Pl.'s Ex. 623 at Safeco 00752-00753, Doc. 494-4 at 9-10; Pl.'s Ex. 624 at Safeco 00754-00755, Doc. 494-4 at 6-7.)  Crossin, Tirpak and Morreale signed the Safeflex annuity contract. (Pl.'s Ex. 624 at Safeco 00755, Doc. 494-4 at 7.)[8]  The Safeflex annuity contract combined fixed and variable offerings into one annuity contract – a separate variable account with fixed annuity riders. (Bartholomaus

---

[8]Again, despite the fact that a majority of the Board signed the Safeflex annuity contract, including two Board members whom Plaintiff does not allege participated in the putative pay-to-play scheme, Plaintiff contends that this annuity was part of the scheme. (Pl.'s Br. in Opp'n at 20, Doc. 484-1 at 37.)

Dep. 263:12-22, Doc. 434-2 at 16; Pl.'s Ex. 629 at Safeco 00765-00774, Doc. 494-4 at 24-33; Pl.'s Br. In Opp'n at 103, Doc. 484-1 at 120 (citing Safeco Statement of Material Facts ¶ 41, Doc. 422 at 8).)  It appears that the Fund's assets were placed in an international fund portfolio managed by Scudder/Stevens & Clark. (Pl.'s Ex. 623 at Safeco 00752, Doc. 494-4 at 9; *see* Bartholomaus Dep. 262:22-263:7, Doc. 434-2 at 15-16.)  The Safeflex annuity contract discloses that Williamson and Joseph J. Joyce were agents for Safeco and would split the commission equally.[9]

Plaintiff argues that these contracts were "signed by individual Board members in back-room meetings with Williamson, after at least one of those signatories to those contracts received campaign contributions from Safeco." (Pl.'s Br. in Opp'n at 20, Doc. 484-1 at 37.)  Williamson/ASCO and JJJA split the commissions received from the sale of these Safeco annuities. (*See* Pl.'s Ex. 361 at ASCO 000161, Doc. 456-5 at 4; Pl.'s Ex. 623 at Safeco 00752, Doc. 494-4 at 9.)

## F.    The Provident Annuities

On October 3, 1991, Williamson/ASCO entered into a "Special Agent's Agreement" with Provident Mutual Life Insurance Company ("Provident"),[10] thus enabling them to sell Provident's insurance products and annuities. (Pl.'s Ex. 550 at NAT 00899-

---

[9]In the fall of 1997, the Safeflex annuity contract was liquidated. (*See* Pl.'s Ex. 379 at ASCO 037702-037703, Doc. 493-4 at 37-38 (liquidating contract number LP1035436); Pl.'s Ex. 113 at Safeco 00345, Doc. 455-7 at 22 (Schedule A for contract number "LP1035436 SAFEFLEX").)

[10]Provident changed its name to Nationwide Life Insurance Company of America pursuant to a sponsored demutualization, effective October 1, 2002. (Nationwide Statement of Material Facts ¶ 1 n. 1, Doc. 398; *see* Pl.'s Answer ¶ 1, Doc. 482.)  As such, Nationwide Life Insurance Company of America is the successor to Provident. (*Id. See* Pl.'s Answer ¶ 1.)  Nationwide Life Insurance Company ("Nationwide"), the company improperly named as a defendant in Plaintiff's Complaint, is affiliated with Nationwide Life Insurance Company of America but is not the successor to Provident. (*Id. See* Pl.'s Answer ¶ 1.)

00904, Doc. 494-3 at 24-29.)  Shortly thereafter, on February 18, 1992, John Joyce entered into a "Special Agent's Agreement" with Provident to sell the same insurance products and annuities. (Pl.'s Ex. 21 at NAT 00915-00919, Doc. 487-2 at 1-5.)

On December 18, 1991, at a duly convened public meeting, the Board adopted and signed a resolution "to further diversify the asset management and expand the performance of the retirement fund." (Pl.'s Ex. 30 at NAT 01185, Doc. 454-3.)  To that end, the Board appointed Provident as an additional Pension Fund Investment Portfolio manager." (*Id.*)  All five (5) Board members – Crossin, Trinisewski, Phillips, Tirpak and Morreale – voted in favor of the resolution. (Def.'s Ex. 24 at LCRB 00561, Doc. 439-5 at 4.)  All five (5) Board members signed the resolution. (*Id.*)  Six million dollars ($6,000,000) was transferred to Provident to purchase a group annuity contract (the "First Provident Annuity"). (Pl.'s Ex. 30 at NAT 01185, Doc. 454-3; Pl.'s Ex. 29 at ASCO 001478-001479, Doc. 487-2 at 12-13.)[11]  The First Provident Annuity offered eight (8) different sub-funds into which Fund assets could be placed. (*Id.*)  Only one, the "Guaranteed Investment Certificates," offered a guaranteed rate of return. (*Id.*; *see* Pl.'s Ex. 91 at NAT 00002, Doc. 454-17 at 1.)  The Fund's money was invested in three sub-funds – a value equity fund, a bond fund and an aggressive equity fund. (Pl.'s Ex. 29 at ASCO 001478-001479, Doc. 487-2 at 12-13.)[12]  Under the terms of the First Provident

---

[11]The First Provident Annuity was numbered 003234-201-001. (*See* Pl.'s Ex. 32 at NAT 01161, Doc. 487-2 at 16.)

[12]The Fund's assets placed in the First Provident Annuity were allocated as follows:

> Value Equity Fund: $3,000,000;
> Bond Fund: $1,000,000;
> Aggressive Equity Fund: $2,000,000.

Annuity, these sub-funds were separate accounts, segregated from all other assets of Provident. (Pl.'s Ex. 91 at NAT 00018, 00022, Doc. 454-17 at 16, 20.)  The assets placed in the sub-funds were managed by Provident. (*Id.* at NAT 00023, Doc. 454-17 at 21 ("The investment and reinvestment of such assets will be made by [Provident] in its discretion based solely upon [Provident's] determination of market conditions at the time such investment or reinvestment is made.").)  The First Provident Annuity provided that the value of the Fund's sub-fund investments could increase or decrease with investment experience and were not guaranteed as to fixed-dollar amounts. (*Id.* at NAT 00002, Doc. 454-17 at 1.)

Only Crossin signed the First Provident Annuity. (Pl.'s Ex. 29 at ASCO 001479, Doc. 487-2 at 13.)[13]  Williamson and John Joyce, as agents for Provident, derived hundreds of thousands of dollars in commissions as a result of the First Provident Annuity. (Nationwide Statement of Material Facts ¶ 37, Doc. 398; *see* Pl.'s Ex. 32 at NAT 01160-01167, Doc. 487-2 at 15-22.)[14]

---

(Pl.'s Ex. 29 at ASCO 001479, Doc. 487-2 at 13.)

[13]Plaintiff argues that "[o]nly defendant Crossin, who had received substantial contributions from the Joyces in the three months leading up to the signing of the [group annuity] contract and who benefitted when Joseph Joyce, Sr. either contributed $20,000 to his campaign or co-signed a loan for that amount, signed the [group annuity] contract with Provident." (Pl.'s Br. In Opp'n at 22-23, Doc. 484-1 at 39-40.)  This argument would have more force if it were not for the fact that all five (5) Board members voted in favor of the resolution authorizing Crossin's signing of the First Provident Annuity. (*See* Def.'s Ex. 24 at LCRB 00561, Doc. 439-5 at 4.)

[14]Defendants, particularly Nationwide, argue that a "Selector Contract Expense Form," signed by Morreale, in his capacity as County Treasurer and Board member, disclosed that Williamson/ASCO, and Joyce were licensed representatives of Provident and that they would receive commissions from Provident as a result of Provident's managing a portion of the Fund's assets. (Def.'s Ex. 216 at FLOOD 3853, Doc. 447-4 at 2.)  Indeed, next to the heading "Licensed Representative" at the top of the form, Williamson's and Joyce's names appear. (*See id.*)
Conversely, Plaintiff points to a different version of the same "Selector Contract Expense Form" which does not list Williamson or Joyce as licensed representatives of Provident. (Pl.'s Ex. 338 at

In January 1993, an additional five million dollars ($5,000,000) was invested in the First Provident Annuity. (Pl.'s Ex. 568 at ASCO 001461-001463, Doc. 456-20 at 2-4.)  All five (5) Board members – Crossin, Tucker, Phillips, Tirpak and Morreale signed a letter authorizing this additional investment of the Fund's money in the First Provident Annuity. (*Id.* at ASCO 001462, Doc. 456-20 at 3.)  This money was placed in the aggressive equity fund and the fixed income fund. (*Id.* at ASCO 001463, Doc. 456-20 at 4.)[15]  The fixed income fund was unlike the other sub-funds, as money invested therein was held in Provident's general account. (Pl.'s Ex. 91 at NAT 00014, Doc. 454-17 at 13.)  The fixed income fund promised a guaranteed interest rate that was set by Provident at the beginning of each calendar year. (*Id.*)

Beginning in 1994 and continuing until 2002, Williamson and William Joyce solicited political contributions for Makowski, Crossin, Pizano and Morreale from Jeffrey

---

ASCO 001480, Doc. 493-3 at 16.)

Defendants point to the Bates page number printed on their exhibit, "FLOOD 3853," which evidences that this document was produced by Flood himself during the discovery process. (Nationwide's Statement of Material Facts ¶ 37, Doc. 398 at 11.)  Because this document was in Flood's possession, Defendants argue, the fact that Williamson and Joyce were to share the commissions from Provident's management of Fund assets was not only known by Flood, a Board member not alleged to have been involved in the putative pay-to-play scheme, but also, and perhaps more important, was not actively concealed from Plaintiff by Defendants. (*Id.*)

Plaintiff, however, points to the fax transmittal line at the top of Defendants' exhibit, which shows an October 10, 2002 transmittal date, and contends that Defendants' exhibit was faxed to Flood by Nationwide during Flood's investigation of the Fund. (Pl.'s Answer to Nationwide's Statement of Material Facts ¶ 37, Doc. 482 at 14.)  As such, Plaintiff argues that this document did not come into Flood's possession until after the investigation had begun, and thus Flood and Plaintiff did not know about Joyce's sharing in the commissions.  However, Plaintiff does not dispute that it produced the document in this litigation.  Plaintiff also does not dispute the authenticity of the document, nor could it. *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 476 F. Supp. 2d 913, 922 (N.D. Ill. 2007) (when a party has produced the document in question, he has implicitly authenticated the document).  As such, regardless when Defendants' exhibit came into Plaintiff's possession, it is an authentic document which confirms that Morreale, a Board member whom Plaintiff does not contend was involved in the alleged pay-to-play scheme, signed a document disclosing that Williamson and Joyce would share the commission on the First Provident Annuity.

[15]Three million dollars ($3,000,000) was placed in the fixed income fund; two million dollars ($2,000,000) was placed in the aggressive equity fund. (*Id.* at ASCO 001463, Doc. 456-20 at 4.)

Hugo, a Provident employee. (Jeffrey Hugo Dep. 116:16-122:14, Nov. 16, 2005, Doc. 434-14 at 30-32; *see* Pl.'s Ex. 598 at NAT 002107-002100, Doc. 456-21 at 1-4.)  Hugo testified that, for example, Williamson and William Joyce would call him and invite him to events held to raise money for these then Board members' reelection campaigns. (Hugo Dep. 118:4-10, Doc. 434-14 at 31.)  Between August 16, 1994 and August 11, 2002, Hugo contributed approximately two thousand nine hundred dollars ($2,900) to the Crossin, Makowski, Pizano and Morreale to finance their campaigns. (*See* Nationwide Resp. to Pl.'s Interrogs. at 3, Doc. 498-2 at 21; Pl.'s Ex. 37 at MPCJ 01221, Doc. 487-4 at 13; Pl.'s Ex. 41 at MPCJ 00477, Doc. 487-4 at 34; Pl.'s Ex. 48 at LCRB 032417, Doc. 488-3 at 8.)  Plaintiff submits that these political contributions on the part of a Provident employee were the impetus for the former Board members, specifically Makowski, Crossin and Pizano, to purchase three more Provident annuities for the Fund. (Pl.'s Br. in Opp'n at 24, Doc. 484-1 at 41.)

On August 31, 1995, Crossin and Tirpak, on behalf of the Board, entered into a second group annuity contract with Provident (the "Second Provident Annuity"). (Pl.'s Ex. 182 at ASCO 001444-001450, Doc. 455-13 at 1-7.)[16]  The Second Provident Annuity was purchased for four million dollars ($4,000,000). (*Id.* at ASCO 001449, Doc. 455-13 at 6.) This money was placed in the United States Government bond fund, the balanced fund, the diversified equity and international equity funds. (*Id.*)[17]  As with the First Provident

---

[16]The Second Provident Annuity was numbered 003234-202-001. (*See* Pl.'s Ex. 92 at NAT 01168, Doc. 488-4 at 54.)

[17]The asset allocation was as follows:

U.S. Government Bond Fund: $700,000;
International Equity Fund: $300,000;

Annuity, these sub-funds were separate accounts segregated from all other assets of Provident. (*See* Pl.'s Ex. 34 at NAT 001251, Doc. 454-5 at 42.)  Also as with the First Provident Annuity, the values of these separate accounts could increase or decrease with investment experience and were not guaranteed as to fixed-dollar amounts. (*Id.* at NAT 001210, Doc. 454-5 at 1.)

Hugo is listed on the Second Provident Annuity as the "Pension / Service Representative."  (*Id.* at ASCO 001448, Doc. 455-13 at 5.)  Williamson and Joseph Joyce, Sr. are listed as agents on the form. (*Id.*)  It appears that they split the commission on the Second Provident Annuity. (*Id.*)[18]

On August 20, 1999, Crossin, Makowski and Jones entered into a third group annuity contract with Provident (the "Third Provident Annuity"), committing approximately thirty-seven million dollars ($37,000,000) of the Fund's assets to Provident and consolidating the First and Second Provident Annuities. (Pl.'s Ex. 258 at NAT 001193, 001291-001325, Doc. 455-16 at 1-36.)[19]  As of November 29, 2002, this money was

---

Balanced Fund: $1,000,000;
Diversified Equity Fund: $2,000,000.

(Pl.'s Ex. 182 at ASCO 001449, Doc. 455-13 at 6.)

[18]Plaintiff argues in its brief that "[t]he Second Provident Agreement was not approved at a public meeting and, again, was not signed by a majority of the Board." (Pl.'s Br. in Opp'n at 23, Doc. 484-1at 40.)  However, the same day Crossin and Tirpak signed the Second Provident Annuity, all five (5) Board members – Crossin, Tirpak, Phillips, Morreale and Rose Tucker – wrote a letter to Williamson authorizing him to advise Safeco to liquidate the Fund's QPA-2 and to wire the proceeds to several banks, one of which was Provident in order to purchase the Second Provident Annuity. (Pl.'s Ex. 374 at Safeco 00011-00014, Doc. 493-3 at 54-57.)  All five (5) Board members signed the letter authorizing the liquidation of the QPA-2 and the wire transfer from Safeco to Provident. (*Id.*)

[19]The Third Provident Annuity was numbered 003234-203-001. (*See* Pl.'s Ex. 258 at NAT 001291, Doc. 455-16 at 1.)  As the Third Provident Annuity consolidated the First and Second Provident Annuities, not all of the thirty-seven million dollars ($37,000,000) was invested at this time.  It appears that only an additional four million five hundred thousand dollars ($4,500,000) was invested to reach

placed in the following funds: the United States Government bond fund, the fixed income fund, the diversified bond fund, the growth fund, the diversified equity fund, the small cap value fund, and the small cap growth fund. (Pl.'s Ex. 560 at NAT 00979, Doc. 494-3 at 16.)[20]  The fixed income fund was held as part of Provident's general account. (Pl.'s Ex. 258 at NAT 01303, Doc. 455-16 at 13.)  The fixed income fund was an interest bearing investment that promised a guaranteed rate of return and thus was not subject to market volatility or fluctuations associated with stock or bond funds. (*Id.*; *see* Pl.'s Ex. 560 at NAT 00980, Doc. 494-3 at 17.)  The other sub-funds were separate accounts segregated from all other assets of Provident. (*Id.* at NAT 01307, Doc. 455-16 at 17.)  As with the First and Second Provident Annuities, the values of the separate accounts could increase or decrease with investment experience and were not guaranteed. (*Id.* at NAT 01291, Doc. 455-16 at 1.)  For each separate account, Provident would determine how to invest the assets contained therein. (*Id.* at NAT 01307, Doc. 455-16 at 17.)

---

the thirty-seven million dollar ($37,000,000) total. (*See* Pl.'s Ex. 561 at NAT 01054, Doc. 494-3 at 15 (showing that, with regard to the Third Provident Annuity, only one deposit of four million five hundred thousand dollars ($4,500,000) was made between 1999 and 2002.)  As such, it appears that much of this total was already invested with Provident in the First and Second Provident Annuities. (*See id.*)

[20]The asset allocation of the approximately thirty five million dollars ($35,000,000) placed in the Third Provident Annuity was as follows:

> U.S. Government Bond Fund: $3,914,114, or 11.1%;
> Fixed Income Fund: $10,644,636, or 30.3%;
> Diversified Bond Fund: $11,276,835, or 32.1%;
> Growth Fund: $3,434,064, or 9.8%;
> Diversified Equity Fund: $3,088,540, or 8.8%;
> Small Cap Value Fund: $1,564,446, or 4.5%;
> Small Cap Growth Fund: $1,209,590, or 3.4%.

(Pl.'s Ex. 560 at NAT 00979, Doc. 494-3 at 16.)  Also, of the ten million six hundred forty-four thousand six hundred thirty-six dollars ($10,644,636) in the fixed income fund, four million five hundred thousand dollars ($4,500,000) of this amount was originally placed in a deposit account. (Pl.'s Ex. 561 at NAT 01054, Doc. 494-3 at 15.)  This money was moved to the fixed income fund in March of 2000. (*Id.*)

ASCO and JJJA are listed as the brokers for the Third Provident Annuity and received commissions as a result of the Board purchasing it. (JJJA, John J. Joyce and William J. Joyce's Mem. of Law at 2, Doc. 425 at 8; *see also* Pl.'s Ex. 38 at Urban 00732, Doc. 454-6 at 1.)[21]

On June 6, 2000, Makowski and Pizano, on behalf of the Board, purchased a fourth group annuity from Provident (the "Fourth Provident Annuity"). (Pl.'s Ex. 259 at NAT 001194, 001326-1369, Doc. 455-17 at 1-45; Pl.'s Ex. 189 at ASCO 035128-035131, Doc. 491-3 at 64-67.)[22]  The Fourth Provident Annuity committed approximately twenty-three million additional dollars ($23,000,000) of Fund assets. (Pl.'s Ex. 94 at NAT 01177, Doc. 488-4 at 63.)  As of November 29, 2002, the approximately twenty-three million dollars ($23,000,000) was invested in the following sub-funds: the United States Government bond fund, the fixed income fund, the value equity fund, and a deposit account. (Pl.'s Ex. 560 at NAT 00980, Doc. 494-3 at 17.)[23]   The deposit account was an

[21] The fact that ASCO would be splitting its commission with JJJA is handwritten in the bottom, lefthand corner of the cover page. (*Id.* at Flood 6076, Doc. 447-7 at 2 (stating "Agents - ASCO Financial & Joseph J. Joyce Associates").) Koehler admits that she made this notation on the Third Provident Annuity. (Koehler Dep. 44:14-10, Doc. 434-19 at 12.)

[22] The Fourth Provident Annuity was numbered 003234-204-001. (*See* Pl.'s Ex. 94 at NAT 01177, Doc. 488-4 at 63.)

[23] The asset allocation of the twenty-three million dollars ($23,000,000) in the Fourth Provident Annuity was as follows:

> Fixed Income Fund: $12,040,164, or 52.9%;
> Deposit Account: $4,302,917, or 18.9%;
> U.S. Government Bond Fund: $4,803,237, or 21.1%;
> Value Equity Fund: $1,603,476, or 7%.

(Pl.'s Ex. 560 at NAT 00980, Doc. 494-3 at 17.) Originally, in August 2000, eleven million six hundred sixty-one thousand one hundred thirty dollars ($11,661,130) was placed in the money market fund. (Pl.'s Ex. 561 at NAT 01054, Doc. 494-3 at 15.) A few days later, six million dollars ($6,000,000) of this money was moved to the fixed income fund, four million dollars ($4,000,000) was moved to the U.S. Government bond fund, and one million six hundred sixty-three thousand eight hundred twenty-six dollars ($1,663,826) was moved to the value equity fund. (*Id.*) In June 2001,

interest-bearing account that was part of Provident's general corporate account. (Pl.'s Ex. 259 at NAT 01337, Doc. 455-17 at 12.)  The principal of the deposit account plus the interest credited to such account were guaranteed by Provident. (*Id.*)  The fixed income fund, as well as the other sub-fund separate accounts, were the same as was described with regard to the other Provident annuities.

The Fourth Provident Annuity was not approved at a public meeting by a majority of the Board.  In fact, Urban, a Board member at the time, did not even know that the Fourth Provident Annuity had been purchased. (Stephen Urban Dep. 14:18-15:21, June 10, 2005, Doc. 435-16 at 5.)  ASCO and JJJA were the licensed representatives on the Fourth Provident Annuity and received commissions as a result of the Board purchasing it. (*See* Pl.'s Ex. 259 at NAT 001194, Doc. 455-17 at 45.)

Makowski and Pizano received political contributions, in the two hundred fifty dollar ($250) to five hundred dollar ($500) range, from William Joyce, Jeffrey Hugo, John Joyce, Joseph Joyce, Jr., Joseph Perfilio and Donald Williamson in the year prior to purchasing the Fourth Provident Annuity. (Pl.'s Ex. 44 at MPCJ 00814, 00817, 00827, 00829, 00833, Doc. 487-4 at 54-62.)  All of these campaign contributions were disclosed in campaign finance reports filed with Luzerne County and the Commonwealth of Pennsylvania's Bureau of Commissions, Elections and Legislation. (*See id.* at MPCJ 00807, Doc. 487-4 at 54.)

Over the life of the four (4) Provident annuities, John Joyce and JJJA were paid

---

eighty-seven thousand eight hundred seventy-four dollars ($87,874) was invested in the value equity fund. (*Id.*)  In October 2001, four million two hundred sixty thousand two hundred forty-nine dollars ($4,260,249) was invested in the deposit account. (*Id.*)  In November 2001, five million dollars ($5,000,000) was placed in the fixed income fund. (*Id.*)

25

approximately one million six hundred ninety-eight thousand four hundred dollars ($1,698,400) in commissions. (Pl.'s Ex. 32 at NAT 001160-01167, Doc. 487-2 at 15-22; Pl.'s Ex. 92 at NAT 01168-01172, Doc. 488-4 at 54-58; Pl.'s Ex. 93 at NAT 01173-01176, Doc. 488-4 at 59-62; Pl.'s Ex. 94 at NAT 01177-01179, Doc. 488-4 at 63-65.)  Williamson and ASCO were paid approximately two million one hundred forty-nine thousand three hundred dollars ($2,149,300) in commissions. (Pl.'s Ex. 32 at NAT 001160-01167, Doc. 487-2 at 15-22; Pl.'s Ex. 92 at NAT 01168-01172, Doc. 488-4 at 54-58; Pl.'s Ex. 93 at NAT 01173-01176, Doc. 488-4 at 59-62; Pl.'s Ex. 94 at NAT 01177-01179, Doc. 488-4 at 63-65.)

Plaintiff contends that the four (4) Provident annuities imposed extremely high contract charges on the Fund. (Pl.'s Br. in Opp'n at 25, Doc. 484-1 at 42.)  Moreover, the contract charges were not the only fees imposed by Provident. (*Id.*)  Rather, "[f]or those parts of the [Fund]'s assets that were invested in the Provident contracts' equity options, the investment manager appointed by Provident to handle the [Fund]'s assets in those accounts charged management fees." (*Id.* (citing Pl.'s Ex. 91 at NAT 00022, Doc. 488-4 at 37).)  In addition, the Provident annuities all provided that, in the event of early, non-benefit withdrawals, significant expense recovery charges would be imposed. (*Id.*)

G.      **The Manulife Annuity Contracts**

On October 5, 1994, Crossin and Tirpak, on behalf of the Board, entered into an "Ultraflex Group Annuity Contract" with Manufacturers Life Insurance Company (U.S.A.) ("Manulife") (the "First Manulife Annuity Contract"). (Pl.'s Ex. 45 at Manulife 00891-00892,

Doc. 488-2 at 1-2.)[24]  Morreale signed the First Manulife Annuity Contract as a witness to the agreement.[25] (*Id.* at Manulife 00892, Doc. 488-2 at 2.)  Williamson also signed the agreement as the Fund's "pension consultant." (*Id.*)  The First Manulife Annuity Contract authorized Manulife to accept written financial and administrative direction from Tirpak and Williamson. (*Id.*)  Five million dollars ($5,000,000) of the Fund's assets would be deposited with Manulife. (*Id.* at Manulife 00891, Doc. 488-2 at 1.)  In addition to the five million dollar ($5,000,000) initial deposit, four hundred thousand dollars ($400,000) would be invested in yearly recurring deposits. (*Id.* at Manulife 00892, Doc. 488-2 at 2.)  Five million dollars ($5,000,000) was wire transferred to Manulife in December of 1994. (*See* Pl.'s Ex. 466 at Manulife 00594, Doc. 494-3 at 7.)

The First Manulife Annuity Contract was an unallocated non-participating group annuity contract. (Pl.'s Ex. 45 at Manulife 00895, Doc. 488-2 at 5.)  Initially, half of the Fund's money was placed in a five (5) year guaranteed fund which promised a guaranteed compound interest rate. (Pl.'s Ex. 466 at Manulife 00594, Doc. 494-3 at 7.)  The other two million five hundred thousand dollars ($2,500,000) was split equally among five (5) pooled funds which did not guarantee a rate of return. (*Id.*; *see* Pl.'s Ex. 45 at Manulife 00891, Doc. 488-2 at 1.)  These pooled funds included a high-quality bond fund, an income fund, a growth opportunities fund, a diversified capital fund and a high-yield

---

[24]The account number for the First Manulife Annuity Contract was GD 40026-00-7. (*See* Pl.'s Ex. 466 at Manulife 00594, Doc. 494-3 at 7.)

[25]Also, in April 1997, Morreale signed a letter authorizing Manulife to withdrawal seven million five hundred thousand dollars ($7,500,000) from the First Manulife Annuity Contract account. (Def.'s Ex. 199 at Manulife 00492, Doc. 446-9 at 1.)

fund. (Pl.'s Ex. 45 at Manulife 00891, Doc. 488-2 at 1.)[26]  The Fund's assets which were placed in the guaranteed fund were held by Manulife with its general funds. (*Id.* at Manulife 00913, Doc. 488-2 at 23.)  The pooled funds were separate accounts and the Fund's assets which were placed in the pooled funds were segregated from Manulife's other assets. (*Id.* at Manulife 00916, Doc. 488-2 at 26.)  The value of the investments in Manulife's pooled funds could increase or decrease to reflect the investment experience of that particular fund. (*Id.* at Manulife 00893, Doc. 488-2 at 3.)  Manulife did not guarantee these values. (*Id.*)

Williamson and Joseph Joyce, Sr. served as insurance brokers for Manulife and derived commissions from the sale of the First Manulife Annuity Contract. (Pl.'s Ex. 47 at Manulife 00954-00956, Doc. 488-3 at 1-3.)  Gary Housman, a Manulife employee, served as the sales representative. (Pl.'s Ex. 459 at Manulife 00957, Doc. 494-2 at 24.)

On July 19, 1995, Housman contributed two hundred dollars ($200) to the Committee to Elect Crossin/Makowski. (Pl.'s Ex. 37 at MPCJ 01220, Doc. 487-4 at 12.)  On May 17, 1999, Housman contributed five hundred dollars ($500) to the Committee to Elect Makowski and Pizano. (Pl.'s Ex. 40 at MPCJ 00620, Doc. 487-4 at 29.)  On August 16, 1999, Housman contributed another two hundred dollars ($200) to the Committee to Elect Makowski and Pizano. (Pl.'s Ex. 41 at MPCJ 00497, Doc. 487-4 at 40.)  All of these

---

[26]Monies placed in the high-quality bond fund invested primarily in United States government bonds.  Monies placed in the income fund were invested solely in shares of the T. Rowe Price Spectrum Income Fund, a mutual fund.  Deposits to the growth opportunities fund were invested solely in shares of the Fidelity Advisor Growth Oppurtunities Fund, also a mutual fund.  Deposits to the diversified capital fund were invested solely in shares of the Fidelity Advisor Income & Growth Fund, also a mutual fund.  Deposits to the high-yield fund were invested solely in shares of the Fidelity Advisor High Yield Fund, another mutual fund. (Pl.'s Ex. 45 at Manulife 00916-00918, Doc. 488-2 at 26-28.)

contributions were disclosed in campaign finance reports.

Plaintiff contends that these contributions were made in order to secure Manulife's position as a Fund money manager, as well as to receive additional Fund assets to invest and manage. (Pl.'s Br. in Opp'n at 29, Doc. 484-1 at 46.)

On May 19, 1995, two (2) months before Housman made his first political contribution, one million dollars ($1,000,000) of Fund assets, six hundred thousand dollars ($600,000) more than the four hundred thousand dollar ($400,000) yearly recurring deposits called for by the First Manulife Annuity Contract, was deposited with Manulife. (Pl.'s Ex. 469 at Manulife 00585-00587, Doc. 494-3 at 3-5.)[27]  Tirpak, not Crossin or Makowski, signed the remittance notice. (*Id.* at Manulife 00586, Doc. 494-3 at 4.)

On October 2, 1995, five (5) months after Housman's first campaign contribution, an additional three million dollars ($3,000,000) was wire transferred to Manulife as a result of the Board terminating and liquidating the QPA-2 annuity held with Safeco. (Pl.'s Ex. 374 at Safeco 00012, Doc. 493-4 at 3.)[28]  This money was also placed in the First Manulife Annuity Contract. (*Id.*)[29]  Tirpak and Crossin signed the remittance notice. (Pl.'s

---

[27]This one million dollars ($1,000,000) was split among several of Manulife's pooled funds. (Pl.'s Ex. 469 at Manulife 00586, Doc. 494-3 at 4.)

[28]The Court notes that all five (5) Board members at that time, Crossin, Tucker, Phillips, Tirpak and Morreale, signed the Board directive to liquidate the QPA-2 and reinvest the proceeds with Manulife, among other financial institutions. (*Id.* at Safeco 00011, Doc. 493-4 at 2.)  Of these members, only Crossin is alleged to have received political contributions from Housman, leaving four (4) apparently impartial Board members, all of whom approved this Board action.

[29]Of the three million dollars ($3,000,000), only two hundred fifty thousand dollars ($250,000) was placed in a guaranteed fund. (Pl.'s Ex. 471 at Manulife 00580, Doc. 494-3 at 2.)  The remainder was split amongst several pooled funds, including a growth plus stock fund, a capital growth stock fund, an emerging growth stock fund, an international stock fund, a growth and income fund, a Vanguard S.T. account, and a Fidelity Contrafund. (*Id.*)  Deposits to these pooled funds were for the most part

Ex. 471 at Manulife 00580, Doc. 494-3 at 2.)

As of December 31, 1998, twelve million three hundred sixty-eight thousand seven hundred fifty-one dollars ($12,368,751) was invested in the First Manulife Annuity Contract. (Manulife 01133, Doc. 497-2 at 53.)  Three million seven hundred eleven thousand eighty-five dollars ($3,711,085) was invested in a five (5) year compound interest bearing guaranteed account. (*Id.*)  Eight million six hundred fifty-seven thousand six hundred sixty-five dollars ($8,657,665) was invested in non-guaranteed, separate, pooled funds. (*Id.*)

On July 26, 2000, eleven million eight hundred ten thousand nine hundred and two dollars ($11,810,902) was withdrawn from the First Manulife Annuity and transferred to the Fourth Provident Annuity. (Pl.'s Ex. 485 at Manulife 00434, Doc. 494-3 at 9; Manulife 00449-00451, Doc. 497-2 at 28-30.)  This effectively liquidated all of the separate accounts held by the Fund. (Manulife 00449, Doc. 497-2 at 28.)  On October 5, 2001, the First Manulife Annuity was terminated when four million two hundred fifty-nine thousand six hundred forty dollars ($4,259,640) was withdrawn from a five (5) year compound interest bearing guaranteed account. (*See* Manulife 00973, Doc. 497-2 at 34; Pl.'s Br. in Opp'n at 102 n.27.)

On March 10, 1999, Crossin and Makowski, on behalf of the Board, entered into an "Ultraflex Plus Group Annuity Contract" with Manulife (the "Second Manulife Annuity Contract"). (Pl.'s Ex. 49 at Manulife 00001-00002, Doc. 488-3 at 12-13.)[30]  This annuity

---

invested in mutual funds.

[30]The contract number for the Second Manulife Annuity Contract was GD 40090-00-3. (*See* Pl.'s Ex. 49 at Manulife 00003, Doc. 488-3 at 14.)

contract gave Manulife thirteen million dollars ($13,000,000) of the Fund's assets to invest and manage, as well as annual, recurring deposits of five hundred thousand dollars ($500,000). (*Id.* at Manulife 00001, Doc. 488-3 at 12.)  Williamson signed the Second Manulife Annuity Contract as a witness to the agreement, as well as in his capacity as the Board's pension consultant. (*Id.* at Manulife 00002, Doc. 488-3 at 13.)

As of October 28, 2002, the Second Manulife Annuity Contract was valued at nine million two hundred fifty thousand three hundred twenty dollars ($9,250,320). (Pl.'s Ex. 530 at Manulife 00054, Doc. 494-3 at 34.)  All of this money was placed in Manulife's non-guaranteed pooled funds held in separate accounts. (*Id.*)[31]

Throughout the course of the two Manulife annuity contracts, ASCO was paid commissions totaling approximately one million one hundred ninety thousand three hundred dollars ($1,190,300). (Pl.'s Ex. 101 at Manulife 00978-00979, 01041-01042, 01125-01126, 01180-01181, 01228-01229, 01282-01283, 01321-1322, Doc. 488-4 at 69-82; Pl.'s Ex. 102 at Manulife 00156-00157, 00224-00226, 00263-00264, 00299-300, Doc. 488-4 at 83-91.)  JJJA received approximately five hundred ninety thousand two hundred dollars ($590,200) in commission.  (Pl.'s Ex. 101 at Manulife 00978-00979, 01041-01042,

---

[31]The assets in the Second Manulife Annuity Contract were allocated amongst the pooled funds as follows:

> Money Market Fund: $4,676,173;
> Equity Income Fund: $1,838,126;
> 500 Index Fund: $647,941;
> Blue Chip Growth Fund: $686,947;
> Growth Fund: $489,079;
> Strategic Opportunities Fund: $912,053.

(Pl.'s Ex. 530 at Manulife 00054, Doc. 494-3 at 34 (as of October 28, 2002).)  It appears that the money in the money market fund was previously invested in a three (3) year compound interest bearing guaranteed account. (*See* Manulife 00078, 00108, 00244, Doc. 496-5 at 46, 51, 67.)

01125-01126, 01180-01181, 01228-01229, 01282-01283, 01321-1322, Doc. 488-4 at 69-82.)[32]

### H.    The FSI Bonds

In August 1994, Williamson invested Fund assets with First Security Investments, Inc. ("FSI"). (FSI 00001-00005, Doc. 495-4 at 21-25.)  It appears that the Fund's assets invested with FSI were used to purchase secured bonds offered in a private placement in February 1995. (*See* FSI 00006, Doc. 495-4 at 26.)  Tirpak and Crossin signed documents connected with this investment. (*See, e.g.,* FSI 00004, Doc. 495-4 at 24.)  In March 1995, Stephen Alinikoff, a stockbroker for FSI, made a one thousand dollar ($1,000) contribution to the Committee to Elect Crossin/Makowski. (LCRB 032542, Doc. 496-5 at 32.)

### I.    The Wells Agreement

In early 1999, at Williamson's recommendation, ten million dollars ($10,000,000) of Fund assets, in deposits of one million dollars ($1,000,000) and nine million dollars ($9,000,000), were invested with Wells Real Estate Funds, Inc. ("Wells"), a real estate investment trust (the "Wells Agreement"). (Pl.'s Ex. 25 at LCRB 00012-00014, Doc. 487-2 at 6-8; Pl.'s Ex. 26 at LCRB 00015-00017, Doc. 487-2 at 9-11; Williamson Dep. 439:16,

---

[32]It appears that Morreale knew about the Second Manulife Annuity Contract.  On July 11, 2001, Makowski, Pizano and Morreale signed a document titled "Ultraflex Withdrawal Notice," withdrawing ten percent (10%) of the Fund assets held by Manulife in order to pay out retirement benefits. (Def.'s Ex. 203 at Manulife 00133-00136, Doc. 446-12 at 1-4 ("Contract GD 40090-00-3").)  Also, in January 2000, Morreale signed a document entitled "Group Notification of Change in Signing Authority," which notified Manulife of changes to the Board's membership, and thus who was authorized to sign financial documents related to the annuity contracts. (Pl.'s Ex. 465 at Manulife 00438, Doc. 494-3 at 8.)  In the upper right-hand corner of the document are the two (2) contract numbers for the two (2) Manulife Annuity Contracts. (*See id.*)

Doc. 435-19 at 45; Crossin Dep. 277:10-288:25, Doc. 434-10 at 13-15.)  The Wells

Agreement was signed by Makowski and Crossin. (Pl.'s Ex. 25 at LCRB 00013, Doc.

487-2 at 7; Pl.'s Ex. 26 at LCRB 00016, Doc. 487-2 at 10.)  Makowski, Crossin and Jones

signed the form acknowledging receipt of the prospectus. (Pl.'s Ex. 25 at LCRB 00014,

Doc. 487-2 at 8; Pl.'s Ex. 26 at LCRB 00017, Doc. 487-2 at 11.)  FSC served as

broker/dealer for both deposits. (Pl.'s Ex. 25 at LCRB 00013, Doc. 487-2 at 7; Pl.'s Ex. 26

at LCRB 00016, Doc. 487-2 at 10.)  As FSC representatives, Michael Joyce and Perfilio

shared a seven percent (7%) commission, or seventy thousand dollars ($70,000) on the

first one million dollar ($1,000,000) deposit. (Pl.'s Ex. 25 at LCRB 00013, Doc. 487-2 at

7.)  Williamson, also an FSC representative, received the commission on the second nine

million dollar ($9,000,000) deposit. (Pl.'s Ex. 26 at LCRB 00016, Doc. 487-2 at 10;

Williamson Dep. 332:7-333:14, Doc. 435-19 at 18.)[33]

## J.   Rochdale

On March 10, 1999, Makowski, Crossin and Jones, on behalf of the Board,

entered into a portfolio monitoring agreement with FSC, appointing Rochdale Investment

Management, Inc. ("Rochdale") as third party investment manager and investing one

million one hundred thousand dollars ($1,100,000). (ASCO 035831-035835, Doc. 495-3

at 1-5.)  As  an FSC representative, Williamson collected commission on this

investment.[34]  (ASCO 035831, Doc. 495-3 at 1; *see* Williamson Dep. 327:18-332:21, Doc.

---

[33]Flood produced a copy of the Wells Agreement, as well as an accompanying wire authorization form, during discovery. (*See* Def.'s Ex. 230 at Flood 6393-6395, Doc. 447-15 at 1-3; Def.'s Ex. 231 at Flood 5706, Doc. 447-16 at 1; Def.'s Ex. 232 at Flood 6396-6398, Doc. 447-17 at 1-3.)  As such, it appears that Plaintiff possessed these documents.

[34]The contract states that the Fund received a fifty percent (50%) discount on the fees it was to pay pursuant to the fee schedule. (*See* ASCO 35832-35833, Doc. 495-3 at 2-3.)

435-19 at 17-18.)[35]

**K.   LPL**

On July 27, 1999, Michael Hirthler, a registered representative of Linsco Private Ledger Corp. ("LPL") made a two hundred fifty dollar ($250) campaign contribution to the Committee to Elect Makowski and Pizano. (Pl.'s Ex. 41 at MPCJ 00484, Doc. 487-4 at 38.)  Less than one (1) month later, on August 20, 1999, Crossin, Makowski and Jones invested one million five hundred thousand dollars ($1,500,000) of the Fund's money with LPL. (Pl.'s Ex. 85 at LCRB 00059-00060, Doc. 488-4 at 16-17.)[36]  Six (6) weeks later, on October 4, 1999, Hirthler made a second campaign contribution to the Committee to Elect Makowski and Pizano, this time in the amount of one thousand five hundred dollars ($1,500). (Pl.'s Ex. 41 at MPCJ 00542, Doc. 487-4 at 48.)

---

[35]It appears that Morreale knew of FSC's management role.  In February 1999, Morreale, along with Makowski and Crossin, signed a letter of authorization for a bank wire of one million dollars ($1,000,000) from FSC to Wells. (Def.'s Ex. 231 at Flood 5706, Doc. 447-16 at 1.)  This money represented the one million dollar initial deposit with Wells.  Also, in November 2001, Morreale, along with Makowski and Pizano, signed a letter of authorization for a bank wire, closing the Fund's account with FSC and transferring five million dollars ($5,000,000) to Provident to place in the Fourth Provident Annuity. (Def.'s Ex. 179 at Flood 5701-5703, Doc. 445-27 at 1-3.)

[36]Both Plaintiff and Flood produced copies of the LPL wire authorization form during discovery. (*See id.*; Def.'s Ex. 65 at Flood 5740-5744, Doc. 441-14 at 1-5.)  Plaintiff contends that the documents Bates-stamped Flood did not come into Mr. Flood's possession until 2002.  (Letter from Carl A. Solano, Counsel for Plaintiff, to the Honorable A. Richard Caputo, U.S. District Judge (Oct. 8, 2007) Doc. 533.)  Plaintiff also argues that certain contracts Bates-stamped LCRB – specifically, those contracts that Defendant Board members signed with the insurance companies without Board approval – were also not in Plaintiff's possession as of August 2002.  (*Id.*)  Plaintiff makes this assertion about those contracts based on a status report prepared by Deputy Controller Koehler indicating that "[n]o originals or copies of contracts with individual investment managers could be located in the records of the Controller's Office," (*id.* citing Memorandum from Glynis Koehler, to Stephen L. Flood, Controller (Aug. 19, 2002), LCRB 14292-14296, Doc. 533 at 3)) and on Plaintiff's counsel's own review of Plaintiff's documents that had been stored in the Luzerne County Courthouse Annex, which, counsel state, do not contain the disputed contracts. (*Id.*)

Even if the Court credits this argument, however, it cannot overlook the LCRB Bates stamp on the LPL wire authorization form; as this form is not one of the contracts to which Plaintiff refers, its Bates stamp is evidence that it was in Plaintiff's possession since its composition on August 20, 1999.

**L.     The Fund's Accountants – Snyder & Clemente**

Snyder & Clemente performed accounting services for the Fund from the mid-1980s until 2002. (Martin Flaherty Dep. 14:22-15:3; 102:11-13, June 27, 2005, Doc. 434-12 at 5, 27.)  Each year Snyder & Clemente prepared what is called a "compilation" so that the Fund's actuary, the Hay Group, could prepare an actuarial valuation of the Fund. (Flaherty Dep. 14:1-5, Doc. 434-12 at 5.)  "A compilation is receiving information from management, basically reading it over and putting it in the form of financial statements . . . ." (Raymond G. Zavada Dep. 15:21-16:1, June 15, 2005, Doc. 435-22 at 5; *see* Flaherty Dep. 16:23-6, Doc. 434-12 at 5 ("The compilation is basically compiling statements from the books and records of the plan. . . .  We merely gather information").)  Snyder & Clemente compiled these financial statements from information received from ASCO and, sometimes, the investment managers themselves. (Flaherty Dep. 17:7-20, Doc. 434-12 at 5.)  Specifically, Snyder & Clemente would start with an investment manager's account statement, look at the transactions that occurred during the year, and then follow the money from one bank statement to another. (Flaherty Dep. 58:18-59:21, Doc. 434-12 at 16.)

Snyder & Clemente was able to obtain all of the documentation needed to prepare the compilation. (Flaherty Dep. 18:8-10, Doc. 434-12 at 6.)  Neither ASCO nor any investment manager gave Snyder & Clemente any problems when asked to turn over documents. (Flaherty Dep. 22:19-21, Doc. 434-12 at 7.)  In preparing the compilations, Snyder & Clemente created spreadsheets disclosing the investment managers and the investment management fees charged to the Fund by each manager. (Flaherty Dep. 93:1-24, Doc. 434-12 at 24; Raymond G. Zavada Dep. 72:24-73:15, June 15, 2005, Doc.

35

435-22 at 19; *see, e.g.,* Def.'s Ex. 129 at SC 001745, Doc. 444-8 at 1.)  These spreadsheets were available to Board members. (Flaherty Dep. 56:1-11, Doc. 434-12 at 15.)

### M.     The Fund's Auditors – Zavada & Associates

Zavada & Associates has been the Fund's auditor since the 1980s. (Zavada Dep. 14:2-9, Doc. 435-22 at 5.)  "An audit is a verification process whereby an independent party, an accounting firm, reviews backup documentation, policies and procedures, and renders an opinion that the financial statements are fairly presented in accordance with generally accepted accounting principles." (Zavada Dep. 15:7-15, Doc. 435-22 at 6.)  "An audit includes examining on a test basis evidence supporting the amounts and disclosures on the financial statements." (Zavada Dep. 113:8-14, Doc. 435-22 at 29.)

The audit was performed after both Snyder & Clemente performed the compilation and the Hay Group issued its actuarial report. (*See* Zavada Dep. 50:7-12, Doc. 435-22 at 14.)  Indeed, the starting point for Zavada & Associates was Snyder & Clemente's compilation. (Zavada Dep. 46:9-18, Doc. 435-22 at 13.)  Zavada & Associates also received a copy of the Hay Group's actuarial report. (Zavada Dep. 47:22-48:3, Doc. 435-22 at 13.)  Both were necessary items to completing the audit. (Zavada Dep. 56:6-9, Doc. 435-22 at 15.)

After receiving the compilation and actuarial report, Zavada & Associates would then send requests to various investment managers to confirm much of the information. (Zavada Dep. 46:15-18, Doc. 435-22 at 13.)  Importantly, the spreadsheets prepared by Snyder & Clemente, those disclosing the investment managers and the investment management fees charged to the Fund by each manager, were confirmed by Zavada &

36

Associates. (Zavada Dep. 74:6-9, Doc. 435-22 at 20.)

Zavada & Associates also received information and account statements from ASCO, and, prior to ASCO taking over as administrative agent for the Fund, from Plaintiff. (Zavada Dep. 57:3-58:18, Doc. 435-22 at 15-16.)  Specifically, Zavada & Associates received from ASCO "[i]nformation on investments.  Pretty much any, any investment that they managed, there would be all the monthly statements and all the detail on the transactions in those accounts that were maintained at ASCO." (Zavada Dep. 58:12-18, Doc. 435-22 at 16.)

Also, every year Zavada & Associates would receive a statement of account from Provident related to the annuities held by the Fund. (Zavada Dep. 65:24-66:8, Doc. 435-22 at 18; *see* Def.'s Ex. 133 at ZAV0550-0573, Doc. 444-12 at 1-23; *see also* Def.'s Ex. 138 at ZAV1305, Doc. 444-17 at 1; Def.'s Ex. 139 at ZAV1273, Doc. 444-18 at 1.)  These statements of account displayed the commissions and fees related to the Provident annuities, as well as the fact that JJJA was receiving a portion of them. (*See, e.g.,* Def.'s Ex. 133 at ZAV 0550, Doc. 444-12 at 1.)  These statements of account also disclosed the administrative fees charged to the Fund. (*See id.*)

Zavada & Associates' audit reports included, among other things, charts displaying the Fund's expenses by type. (*See, e.g.,* Def.'s Ex. 128 at ZAV 5448, Doc. 444-7 at 13.) These charts covered the Fund's expenses for the previous ten (10) year period. (*See id.*)  One of the columns of expenses is entitled "Administrative/Miscellaneous." (*See id.*) The audit reports also contain charts displaying the additions and deductions from the Fund's assets for the year. (*See id.* at ZAV 5449, Doc. 444-7 at 14.)  One of the rows in

37

the addition part of the chart is entitled "Less investment expense." (*See id.*)  A row listing

deductions is entitled "Administrative expense." (*See id.*)

> ### N.      The Fund's Actuaries – The Hay Group

The Hay Group has performed actuarial services for the Fund since the late

1970s. (Norman Pickering Dep. 37:3-12, Sept. 14, 2005, Doc. 435-6 at 10.)  In fact, the

Hay Group performed actuarial valuations for sixty (60) of the sixty-seven (67) counties in

Pennsylvania. (Pickering Dep. 92:21-93:3, Doc. 435-6 at 24.)  Specific to the Fund, the

Hay Group prepared a report on the financial actuarial position of the Fund – that is,

essentially, answering the question of whether the Fund will have enough assets to pay

out retirement and other benefits to Fund members in the future.  If a shortfall is

predicted, Luzerne County must contribute taxpayer money to make up the difference.

(Pickering Dep. 68:2-7, Doc. 435-6 at 18; *see* Def.'s Ex. 35 at LCRB 08580, Doc. 439-14

at 4.)  For the years 1987 through 2001, Luzerne County was not required to make any

monetary contribution to the Fund. (Def.'s Ex. 94 at LCRB 07516, Doc. 442-24 at 9;

Def.'s Ex. 91 at ZAV3409, Doc. 442-21 at 23; Pickering Dep. 68:2-69:4, Doc. 435-6 at

18.)

Most of the financial information the Hay Group used to prepare the actuarial

report was provided by Plaintiff itself, its secretary and/or controller. (Pickering Dep.

46:11-47:10, Doc. 435-6 at 13.)  Snyder & Clemente also supplied the Hay Group with

financial statements needed to prepare the actuarial report. (Pickering Dep. 46:19-47:8,

Doc. 435-6 at 13.)

The actuarial reports prepared by the Hay Group disclosed, among other things,

the total amount charged to the Fund for administrative and investment management expenses. (*See, e.g.,* Def.'s Ex. 91 at ZAV3391, Doc. 442-21 at 6.)  The actuarial reports also contained charts explaining how the Fund's assets were allocated among different types of investments – cash, stocks, bonds, real estate, etc. (*See, e.g.,* Def.'s Ex. 92 at Urban 01158, Doc. 442-22 at 7.)

### O.    ASCO's Annual Reports

Each year, from 1989 through 2002, ASCO prepared a financial report concerning the Fund for Plaintiff. (Michael Morreale Dep.152:6-10, June 14, 2005, Doc. 435 at 39; Flood Dep. 266:6-14, Doc. 434-13 at 68.)  Financial reports for the years 1989 through 1992, 1994 through 1996, and 1999 through 2002 are included in the summary judgment record.[37]

ASCO's reports appear to be fairly comprehensive, sometimes including copies of Snyder & Clemente's compilation and the Hay Group's actuarial valuation. (*See* Pl.'s Ex. 110 at LCRB 00874-00928, Doc. 491-2 at 1-55.)  Relevant to the instant motions is the fact that ASCO's reports disclosed each of the Fund's investment managers, the amount and style of the investments, as well as the total amount of administrative and investment

---

[37]Indeed, judging by their Bates stamp numbers, some of these reports were produced by Plaintiff itself during discovery. (*See* Def.'s Ex. 73 at LCRB 00664-00667, Doc. 442-3 at 1-4; Def.'s Ex. 74 at LCRB 00709-00714, Doc. 442-4 at 1-6; Def.'s Ex. 75 at LCRB 00741-00744, Doc. 442-5 at 1-4; Def.'s Ex. 76 at LCRB 00775-00780, Doc. 442-6 at 1-6; Def.'s Ex. 77 at ASCO 032564-03271, Doc. 442-7 at 1-8; Def.'s Ex. 78 at ASCO 031906-031910, Doc. 442-8 at 1-5; Def.'s Ex. 79 at LCRB 00802-00815, Doc. 442-9 at 1-14; Def.'s Ex. 83 at LCRB 00818-00836, Doc. 442-13 at 1-19; Def.'s Ex. 84 at ASCO 030962-030979, Doc. 442-14 at 1-15; Def.'s Ex. 85 at LCRB 00874-00892, Doc. 442-15 at 1-19; Def.'s Ex. 86 at LCRB 00929-00953, Doc. 442-16 at 1-25; Def.'s 87 at LCRB 00961-00976, Doc. 442-17 at 1-16; Def.'s Ex. 88 at LCRB 00977-01002, Doc. 442-18 at 1-26.)  Although Plaintiff disputes the relevance of Bates stamp identifiers for documents stamped Flood and certain contracts stamped LCRB (*see* Letter from Carl A. Solano, Counsel for Plaintiff, to the Honorable A. Richard Caputo, U.S. District Judge (Oct. 8, 2007) Doc. 533), there is no contention that other LCRB-stamped documents, such as these financial reports, were not in its possession at any time after ASCO prepared them for Plaintiff.

management expenses charged to the Fund by the investment managers. (*See, e.g.,* Pl.'s Ex. 110 at LCRB 00879, 00889-00890, Doc. 491-2 at 6, 16-17.)  ASCO's reports also disclosed the return experienced by the Fund, including returns from prior years, and sometimes the returns delivered by each particular investment manager. (*See, e.g.,* Pl.'s Ex. 108 at LCRB 00813, 00815, Doc. 488-5 at 128, 130.)

### P.    The Retirement Office

Lois Conrad was coordinator of the Retirement Office from 1982 until 1993. (Lois Conrad Dep. 19:11-22:21, 434-6 at 6-7.)[38]  The Retirement Office was tasked with the job of maintaining the Fund's books and records, giving advice to and preparing benefits quotes for prospective retirees, paying benefits, as well as other administrative functions. (Conrad Dep. 32:14-24, 54:19-55:19, Doc. 434-6 at 9, 15; Kammerer Dep. 17:19-24, Doc. 434-18 at 5; Pl.'s Ex. 123 at LCRB 00590-00593, Doc. 491-3 at 28-31.)  Conrad testified that, after the Board went to the multiple manager system proposed by Williamson/ASCO, the Retirement Office routinely received account statements sent every month by the various money managers. (Conrad Dep. 31:2-32:24, Doc. 434-6 at 9.)  Conrad recalls Safeco having sent account statements to the Retirement Office, which she had then filed. (Conrad Dep. 33:12-34:5, Doc. 434-6 at 9-10.)  Conrad also recalled that ASCO sent monthly statements to the Retirement Office explaining the performance of the Fund's investments. (Conrad Dep. 63:7-21, Doc. 434-6 at 17.)  ASCO also sent annual reports to the Retirement Office every year. (Conrad Dep. 64:18-65:6, Doc. 434-6 at 17.)  Conrad testified that she would look over the account statements, use

---

[38]Conrad was formerly known as Lois Novitsky, having changed her surname in 2002. (Conrad Dep. 6:24-7:8, Doc. 434-6 at 3.)

them to compile monthly balance sheets and yearly financial reports of the Fund's assets and liabilities, income and expenses (*see* Def.'s Ex. 110 at LCRB 00663, Doc. 443-16 at 1 (1988 financial report disclosing the Fund's four (4) investment managers, including Safeco and the QPA-2)), and then store them in a locked filing cabinet. (Conrad Dep. 32:14-24, 54:19-55:19, Doc. 434-6 at 9, 15.)  Conrad stated that she prepared financial reports every year she was coordinator of the Retirement Office. (Conrad Dep. 55:10-14, Doc. 434-6 at 15.)

Conrad testified that she would file account statements based on certain criteria – which money manager, which period of time the statement covered, etc. (Conrad Dep. 33:2-34:3, Doc. 434-6 at 9-10.)  Conrad stated that she never discarded any of the account statements. (Conrad Dep. 34:5-8, Doc. 434-6 at 10.)  Conrad also testified that Board members received copies of the money manager account statements. (Conrad Dep. 34:16-22, Doc. 434-6 at 10.)

In 1991, Lois Kammerer joined the Retirement Office as a bookkeeper. (Conrad Dep. 39:5-17, Doc. 434-6 at 11.)  Conrad testified that Kammerer was an employee in whom she had absolutely no confidence. (Conrad Dep. 39:17-40:9, Doc. 434-6 at 11.)  Conrad stated "I couldn't get anywhere with that woman who was supposed to help me, and she just did her own thing." (Conrad Dep. 42:20-24, Doc. 434-6 at 12.)

In the fall of 1993, Conrad either resigned as coordinator of the Retirement Office (Conrad Dep. 41:6-42:24, Doc. 434-6 at 11-12; Kammerer Dep. 16:23, Doc. 434-18 at 5), or her position was eliminated due to the consolidation of the Retirement Office and the Office of Employee Benefits (Def.'s Ex. 26 at LCRB 00576, Doc. 439-7 at 3).  Either way, in the fall of 1993, Kammerer took over for Conrad as head of the Retirement Office.

41

(Kammerer Dep. 14:12-17:17, Doc. 434-18 at 5.)  Kammerer served in that capacity until 2001. (*Id.*)

While running the Retirement Office, Kammerer received financial statements from ASCO and investment managers reflecting the Fund's investment performance. (*See, e.g.,* Def.'s Ex. 156 at LCRB 18741, Doc. 445-10 at 1; Kammerer Dep. 94:8-24, 97:21-3, 104:9-13, 119:11-15, Doc. 434-18 at 25, 27, 31.)  Kammerer also stated that ASCO sent the Retirement Office monthly spreadsheets regarding the performance of the Fund's investments. (Kammerer Dep. 146:7-148:5, Doc. 434-18 at 38.)  Kammerer did not read these documents. (Kammerer Dep. 93:16-19, Doc. 434-18 at 24.)  Kammerer stated that she placed the financial documents she received in filing cabinets in the Retirement Office alphabetically according to which investment manager sent them. (Kammerer Dep. 104:5-24, Doc. 434-18 at 27.)  Kammerer also sometimes gave copies of financial statements to Board members. (Kammerer Dep. 148:18-21, Doc. 434-18 at 38.)  Kammerer stated that financial statements and other investment-related documentation was mailed to the Retirement Office throughout her tenure there. (Kammerer Dep. 149:1-3, Doc. 434-18 at 38.)  Kammerer stated that she changed Conrad's policy of keeping documents for "years and years and years," instead discarding documents after roughly seven (7) years. (Kammerer Dep. 98:20-101:2, Doc. 434-18 at 26-27.)

Both Conrad and Kammerer testified that they dealt with the Hay Group on a daily basis. (Conrad Dep. 37:1-6, Doc. 434-6 at 10; Kammerer Dep. 18:16-19:15, Doc. 434-18 at 6.)

In 2001, the Retirement Office, which had, in 1993, been consolidated with the Office of Employee Benefits, and, in 2000, partially outsourced to ASCO, was completely

42

outsourced to ASCO. (Kammerer Dep. 29:1-7, Doc. 434-18 at 8.)  ASCO thus was

tasked with the jobs of maintaining the books and records of the Fund, providing

retirement quotes to prospective retirees, processing benefits payments, counseling

prospective retirees and recent retirees, and other administrative functions. (*See* Pl.'s Ex.

123 at LCRB 00590-00593, Doc. 491-3 at 28-31; *see also* Conrad Dep. 32:14-24, 54:19-

55:19, Doc. 434-6 at 9, 15; Kammerer Dep. 17:19-24, Doc. 434-18 at 5.)  As a result,

Kammerer lost her job as head of the Retirement Office. (Kammerer Dep. 29:5-7, Doc.

434-18 at 8.)

### Q.    The Annual Meetings

On at least two (2) occasions, the Board held annual meetings with the investment

managers, the accountants, auditors and actuaries to discuss the Fund. (Conrad Dep.

74:19-75:11, Doc. 434-6 at 20; Kammerer Dep. 149:6-9, Doc. 434-18 at 38; Morreale

Dep. 22:13-24:20, Doc. 435 at 7; Frank Crossin Dep. 48:4-16, Doc. 434-9 at 13.)  These

meetings would be luncheons at area hotels. (Conrad Dep 75:16-21, Doc. 434-6 at 20;

Morreale Dep. 22:13-23:7, Doc. 435 at 7.)  Norm Pickering from the Hay Group,

Williamson from ASCO, as well as some of the investment managers were present.

(Kammerer Dep. 150:1-12, 154:3-5, Doc. 434-18 at 39-40; Morreale Dep. 24:2-32:14,

Doc. 435 at 7-9.)  Williamson/ASCO handed out booklets that listed the money managers

and explained the progress of the Fund's investments. (Kammerer Dep. 154:13-21, Doc.

434-18 at 40; *see* Morreale Dep. 32:9-10, Doc. 435 at 9.)

### R.    Alleged Concealment of the Scheme

Notwithstanding the apparently extensive accounting, auditing and actuarial

services performed by Snyder & Clemente, Zavada & Associates, and the Hay Group, not to mention ASCO, Plaintiff contends that the putative pay-to-play scheme was deliberately concealed from other members of the Board, as well as the public, in at least two ways. (Pl.'s Br. in Opp'n at 34, Doc. 484-1 at 51.)  First, Plaintiff contends that those Board members who did not participate in the scheme did not know that the Joyces were to share in the commissions Williamson/ASCO received on Fund investments. (Pl.'s Br. in Opp'n at 11, Doc. 484-1 at 28.)  Second, Plaintiff argues that ASCO's role as administrative agent for the Fund facilitated the concealment of the scheme. (*See id.* at 19, Doc. 484-1 at 36.)  By directing that all documentation be directed to ASCO, rather than to the Board, members such as Morreale, Flood and Urban, whom Plaintiff avers did not participate in the scheme, were kept in the dark. (*See id.* at 17, Doc. 484-1 at 34.) Plaintiff also asserts that the commissions, fees and recovery expense charges related to the investment contracts were not disclosed to it.

The Court notes two important points.  First, Plaintiff does not, and could not, dispute the fact that all campaign contributions made to Makowski, Pizano, Crossin and Jones were publicly disclosed in campaign finance reports. (*See* Pl.'s Br. in Opp'n at 73, Doc. 484-1 at 90.)  Second, Plaintiff does not contend, and there is no evidence, that any Defendant concealed or altered any documents which were given to Plaintiff's accountants, auditors and actuaries for their review in performing services for the Fund. (*See* Pl.'s Br. in Opp'n at 71-72, Doc. 484-1 at 88-89.)

### S.      Urban and Flood Elected; Investigation Commences

In November 1999, Stephen Urban was elected Luzerne County Commissioner,

44

defeating Jones. (Stephen Urban Dep. 245:11-13, June 10, 2005, Doc. 435-16 at 62.)

Stephen Flood became Luzerne County Controller in 2002. (*See* Stephen Flood Dep.

40:14-17; 51:16-18, Doc. 434-13 at 11, 14.)  According to Flood, when he assumed

office, he was asked by employees and some retirees to review the Fund to make sure

that they were receiving the highest rate of return on the Fund's assets. (Flood Dep. 53:2-

6, Doc. 434-13 at 14.)

        In March 2002, Flood hired Glynis Koehler, a certified public accountant, to help

him investigate the Fund. (Glynis Koehler Dep. 28:3-4; 31:9-12, June 8, 2005, Doc. 434-

19 at 8-9; Flood Dep. 50:12-19, Doc. 434-13 at 14.)[39]  Flood and Koehler "gathered from

various warehouses or commissioners' offices or the controller's office every record that

[they] could come upon." (Flood Dep. 51:2-6, Doc. 434-13 at 14.)  Most of the records

Flood  and Koehler reviewed during their investigation were found in public storage.

(Flood Dep. 51:12-52:20, Doc. 434-13 at 14.)  Others were obtained from Snyder &

Clemente, Zavada & Associates, ASCO and Provident. (Koehler Dep. 26:3-30:12,

180:23-184:8, Doc. 434-19 at 8-9, 46-47.)[40]  In addition to financial information, Flood

and Koehler also reviewed the minutes of all of the board meetings over the fourteen (14)

year period. (*See* Def.'s Ex. 151 at LCRB 14293, Doc. 445-6 at 2.)

        As a result of their investigation, Flood and Koehler concluded that: (1) the

---

[39]Koehler was initially given the title of senior accountant. (Koehler Dep. 31:15, Doc. 434-19 at 9.)
Later, her position title was changed to that of deputy controller. (Koehler Dep. 31:23-34:4, Doc. 434-
19 at 9-10.)

[40]Provident initially balked at providing Plaintiff with information related to commissions paid to
Williamson and Joyce, its agents, considering it proprietary. (Koehler Dep. 187:23-188:5, Doc. 434-
19 at 48.)  Provident actually had to be subpoenaed by Flood, in his capacity as Controller, in order to
provide this information. (*Id.*)

45

Sunshine Act had been violated;[41] (2) the County Pension Plan Best Practices had been violated;[42] and (3) the Defendant former Board members Makowski, Crossin, Pizano and Jones had breached their fiduciary duties as trustees of the Fund.[43] (*See* Koehler Dep. 13:7-16, Doc. 434-19 at 4; Flood Dep. 28:23-50:1, Doc. 434-13 at 8-14.)

At the height of the alleged scheme, August 2002, the retirement fund's assets were split among nineteen (19) investment managers and twenty-nine (29) separate portfolios. (LCRB 14292, Doc. 496-4 at 44.)

As of 2003, when this action commenced, two thousand sixty-three (2,063) Luzerne County employees were making contributions into the Fund. (Def.'s Ex. 95 at ZAV2095, Doc. 443 at 8.)  Eight hundred seventeen (817) retirees received benefits from the Fund at that time. (*Id.*)  As of December 31, 2003, the Fund's net assets held in trust for pension benefits totaled one hundred sixty-six million, five hundred fifty-seven thousand two hundred thirty-six dollars ($166,557,236). (*Id.* at ZAV2094, Doc. 443 at 7.) The Fund's 2003 value was down from the highwater mark it reached at the end of 1999, prior to the 2001 recession, when the Fund was valued at two hundred three million four hundred ninety-six thousand seven hundred eighty dollars ($203,496,780). (Def.'s Ex. 51

---

[41]This conclusion was based on the lack of resolutions or approvals recorded in the minutes of meetings for the opening of many of the investment accounts. (*See* Def.'s Ex. 151 at LCRB 14294, Doc. 445-6 at 3.)

[42]This conclusion was based on Williamson's apparent conflict of interest.  Williamson served as both the Fund's consultant, as ASCO, and as an investment manager for FSC.  Under the County Pension Plan Best Practices, published by the County Commissioners Association of Pennsylvania, a pension plan consultant should be independent of any investment management. (*See* LCRB 14296, Doc. 496-4 at 48.)

[43]This conclusion was based on the alleged pay-to-play, campaign contributions for investment contracts and excessive fees, scheme. (*See* Flood Dep. 29:14-31:2, Doc. 434-13 at 8-9.)

at NAT 01135, Doc. 441 at 4.)

    **T.**    **The Board Terminates ASCO as Consultant and Administrative Agent**

        **1.**    **The September 5, 2002 Board Meeting**

On September 5, 2002, a regular meeting of the Board, which consisted of Luzerne County Commissioners Thomas Pizano, Thomas Makowski, and Stephen Urban, Luzerne County Controller Stephen Flood, and Luzerne County Treasurer Michael Morreale, was held. (Def.'s Ex. 33 at FLOOD 5196, Doc. 439-12 at 1.)  Pizano presided over the meeting. (*Id.*)  All members of the Board were present. (*Id.*)  The minutes of the meeting follow:

> Commissioner Thomas Pizano requested that the Refunds of Contribution and Interest, Purchase of Military Service, and Purchase of Leave of Absence be read first.  Controller Stephen Flood objected stating as the Retirement Board Secretary he is in charge of the agenda for the meeting and the order in which the motions are read[.] Commissioner Pizano then asked the opinion of Solicitor James Blaum, who stated the Chairman conduct[s] the meeting and how the agenda should be handled.  Mr. Flood stated that Mr. Blaum was not the Solicitor for the Retirement Board and could not provide an opinion.  After Commissioner Pizano refused to consider the proposals he stated the meeting was adjourned and both he and Commissioner Makowski left the meeting. However, because the Board did not vote to adjourn the meeting, the three remaining members, a quorum, continued the session of the Retirement Board.

(*Id.*)

With Pizano and Makowski gone, Flood moved the terminate ASCO as the Fund's investment consultant and administrative agent. (*Id.*)  Morreale seconded the motion. (*Id.*) Flood, Morreale, and Urban, who was the third remaining Board member, unanimously voted to terminate the contract the Board had with Williamson and ASCO.  Flood then

47

moved to hire Merrill Lynch as the Fund's investment advisor.  (*Id.* at FLOOD 5197, Doc. 439-12 at 2.)  Morreale seconded this motion. (*Id.*)  Flood, Morreale and Urban then unanimously voted to hire Merrill Lynch as investment advisor. (*Id.*)  Ironically,  these Board members did not request bids from other financial advisors. (*See* Def.'s Ex. 34 at FLOOD 5191, Doc. 439-13 at 1.)  To avoid any conflict of interest, Flood, Morreale and Urban terminated Merrill Lynch as one of the Fund's money managers. (Def.'s Ex. 33 at FLOOD 5197, Doc. 439-12 at 2.)  Flood, Morreale and Urban voted to hire Mockenhaupt Benefits Group to replace ASCO as administrator of the Fund. (*Id.*)  Flood, Morreale and Urban, acting as the Board, then passed resolutions consistent with the aforementioned votes. (*Id.* at FLOOD 5200-5201, Doc. 439-12 at 5-6.)

Flood, Morreale and Urban then engaged in an open discussion about the Fund and its management. (*Id.* at FLOOD 5199, Doc. 439-12 at 4.)

> Controller Stephen Flood began by stating that there has been a bleeding of the fund for the past nine years.  He stated that the fund was valued at $165 million in January and $142 million today.  He explained that the taxpayers would have to contribute as much as $1 million or $2 million next year to keep the plan solvent.  Mr. Flood stated that the value of the fund dropped from $203 million at the start of 2000 to its current worth of approximately $142 million.  He also explained that the fund was paying out $40,000 a week to an estimated 46 money managers.  Commissioner Urban stated that they would be reducing by half the amount of fees paid to these money managers, saving nearly $1 million and lessening the burden on taxpayers for this shortfall of the fund.
>
> Judd Shoval then asked the Board why they hired Merrill Lynch without seeking proposals from interested advisers and presenting them at an advance public hearing.  Both Mr. Flood and Commissioner Urban then pointed out that since 1993 there has been no public meeting to hire money managers[.]

48

> They stated that it would take six to eight months to issue a request for proposal[s] and receive and calculate the responses and that the County is in need of an advisor immediately.

(*Id.*)

### 2.    The September 17, 2002 Board Meeting

A Board meeting was then held on September 17, 2002. (Def.'s Ex. 34 at FLOOD 5191, Doc. 439-13 at 1.)  Pizano, Urban, Flood and Morreale attended. (*Id.*)  Makowski was unable to attend because he was accompanying his wife to a previously scheduled doctor's appointment. (*Id.*)  After the meeting was called to order, public comment was received on the Board's decision to fire ASCO and hire Merrill Lynch as the Fund's investment advisor. (*Id.* at FLOOD 5191-5192, Doc. 439-13 at 1-2.)  An excerpt from the Board minutes follows.

> Tom Lazur, director of the UFCW Local 1776, which
> represents 300 workers at Valley Crest Nursing Home asked
the Board why Merrill Lynch was hired and no requests for proposals were put out[.]  The majority of the Board defended the hiring of Merrill Lynch without RFPs stating that the fund was dwindling and there was no current financial advisor.  Mr. Lazur then stated that he felt the comments made in the newspaper about the union leaders were out of line and that he was informed by county officials during contract negotiations and was satisfied with the fund[']s performance and its ability to operate without a county subsidy. He also pointed out that Merrill Lynch was one of the county's money managers that had lost millions of dollars.  Mr. Lazur then recommended that the majority set up an advisory committee for any union to provide their input and protect their members.  Ellen Bush (from Smith Barney and one of the present money managers under ASCO) was then identified by Mr. Lazur as a friend who would do an evaluation of the fund free of charge. Mr. Flood then showed management agreements, letters, consent forms, and contract acceptance forms from Don Williamson only signed by Commissioner Makowski with no reference to any other Retirement Board member.  He also showed certain certifications that were only signed by a portion of the Board.  Attorney Hassey[, Solicitor for the Board,] was then asked to comment on the procedures the Board must follow as to these agreements and contracts.  He responded by saying the Board has to serve as a trustee and oversee the fund and the majority of the vote for everything must be brought before the Board and voted.  Commissioner Pizano then stated that he was not consulted about

the meeting Merrill Lynch was holding . . . on October 3, 2002 and would not be able to attend because it was his daughter's birthday.  Mr. Flood responded that Merrill Lynch scheduled the meeting and that it was the only day available to accommodate that many people.  After others complained that Commissioner Pizano would not be able to attend, Ray Crisci of Merrill Lynch stated that they would conduct three sessions that day at 1, 4 and 7 p.m. to make it convenient for people to attend.  Alan Pugh, 9-1-1 Deputy Director then questioned the Board [as to] why they didn't seek out proposals before hiring Merrill Lynch and Mockenhaupt Benefits Group.  Mr. Flood then stated that other companies were verbally contacted.  Joseph Perfilio of ASCO then spoke stating that it was the Board's responsibility to make sure that all Board members were aware of current happenings and that it was not the consultant's role[.]  He then asked . . . if the Board was going to interview every money manager.  Mr. Flood responded YES, by saying that the Board will be working long into the night doing interviews.

(*Id.* at FLOOD 5191-5192, Doc. 439-13 at 1-2.)[44]

After public comment, Pizano requested a motion to rescind the firing of ASCO as investment consultant and administrative agent for the Fund. (*Id.* at FLOOD 5192, Doc. 439-13 at 2; *see* Def.'s Ex. 35 at LCRB 08577-08578, Doc. 439-14 at 1-2.)  Pizano also requested that the hiring of Merrill Lynch be rescinded. (*Id.*)  These motions failed for lack of a second. (*Id.*)

### 3.    The October 1, 2002 Board Meeting

At the October 1, 2002 meeting of the Board, which all Board members attended, a representative from the Mockenhaupt Benefits Group, which had been hired by Flood, Morreale and Urban as the administrative agent for the Fund, informed the Board that it would not be feasible to have a local representative. (Def.'s Ex. 35 at LCRB 08582-08583, Doc. 439-14 at 6-7.)  Because there would be no local presence for retirees, Morreale requested a motion, which was unanimously approved, to receive proposals

---

[44]Lazur also sent Morreale a letter, dated September 13, 2002, in which he requested that the Board's September 5 actions be rescinded. (*See* Def.'s Ex. 260 at ML 006793-006795, Doc. 448-22 at 1-3.)  It appears that flyers were also made to protest the decision to fire ASCO and hire Merrill Lynch. (*See* Def.'s Ex. 261 at ML 011659, Doc. 448-23 at 1.)

from local companies, including ASCO, to handle the administrative duties of the Fund. (*Id.* at LCRB 08583, Doc. 439-14 at 7.)

Also, Urban requested a motion, which was unanimously approved, to make the payment of fifteen thousand dollars ($15,000) to ASCO for administrative and retirement office managerial services rendered for the third quarter of 2002. (*Id.* at LCRB 08578, Doc. 439-14 at 2.)

Later during the meeting, Norm Pickering, from the Hay Group, presented the Board with the findings of the actuarial valuation that the Hay Group performed. (*See id.* at LCRB 08580, Doc. 439-14 at 4.)  Pickering stated that Luzerne County would have to contribute three hundred thirteen thousand, six hundred forty-nine dollars ($313,649) to the Fund for 2002. (*Id.*)  This was the first year in more than a decade in which the County was required to make a contribution to the Fund. (*See* Def.'s Ex. 259 at ML 004838, Doc. 448-21 at 5.)  In addition, this contribution was far less than that paid by other counties of similar size in Pennsylvania for 2002. (*See id.*)  Pickering also estimated that the County would have to contribute nearly five million dollars ($5,000,000) for 2003. (Def.'s Ex. 35 at LCRB 08580, Doc. 439-14 at 4.)

Finally, Merrill Lynch, which had been previously appointed investment consultant, gave a presentation concerning future money managers of the Fund. (*Id.*)  Plaintiff then selected several investment firms to interview. (*Id.* at LCRB 08580-08582, Doc. 439-14 at 4-6.)

It should also be noted that, during public comment, an employee of ASCO requested that Plaintiff provide ASCO with copies of the minutes and/or audiotapes from

51

the previous four (4) meetings. (*Id.* at LCRB 08577, Doc. 439-14 at 1.)  Flood agreed to

do so. (*Id.*)

### U.      The Board Liquidates the Fund's Investments

On October 15, 2002, the Board held a meeting. (Def.'s Ex. 36 at FLOOD 2428,

Doc. 440 at 1.)  Pizano, Flood, Urban and Morreale attended. (*Id.*)  Makowski was

absent. (*Id.*)  At the meeting, Flood moved to terminate eighteen (18) money managers.[45]

(*Id.* at FLOOD 2429, Doc. 440 at 2.)  Pizano raised the issue of the amount of the fees

and penalties the Fund would have to pay in order to liquidate all of these accounts. (*Id.*

at FLOOD 2429-2430, Doc. 440 at 2-3.)  Ray Crisci, of Merrill Lynch, "explained that it

would depend on the negotiations with the money managers. . . . [T]here would definitely

be fees associated with Manulife Financial and Provident Mutual." (*Id.* at FLOOD 2430,

Doc. 440 at 3.)  Notwithstanding the risk of paying fees and penalties, nor knowing their

actual cost, Flood, Morreale and Urban voted to terminate the money managers and

liquidate the Fund's accounts. (*Id.*)  Pizano voted against termination and liquidation. (*Id.*)

At the meeting, Flood also moved to revoke Williamson's standing authorization to

make disbursements and withdrawals. (*Id.*)  Morreale seconded this motion. (*Id.*)  Flood,

Morreale and Urban then voted in favor of the revocation. (*Id.*)  Pizano abstained. (*Id.*)

On October 18, 2002, Flood wrote a letter to Gary McMahan, President of

---

[45]The money managers Flood sought to terminate were: (1) FSC Securities Corp. (Rochdale Investment Management); (2) First National Community Bank (liquidate CD at maturity); (3) First Security Investments (FSCC Campus Advisors); (4) First Union Bank (Evergreen); (5) Janney Montgomery Scott (Bennett Lawrence); (6) LPL Financial Services; (7) Manulife Financial; (8) Mellon Bank; (9) Morgan Stanley Dean Witter (Lazard); (10) PNC Bank; (11) Provident Mutual (all accounts); (12) Prudential Securities (Emerald Advisors); (13) Prudential Securities (Brandes); (14) Shoval Consistent Performance Fund; (15) Smith Barney (Emerald Advisors); (16) Smith Barney (Templeton); (17) Smith Barney (TCW); and (18) Wells Real Estate (FSC Securities - all accounts). (*Id.* at FLOOD 2429, Doc. 440 at 2.)

52

Nationwide Provident, informing him that all of the Fund's contracts with Provident, with the exception of the First Provident Annuity, were entered into in violation of Pennsylvania law, as they were not approved at public meetings by a majority vote, nor were the contracts signed by the minimum number of Board members. (LCRB 13802-13803, Doc. 496-4 at 35-36.)  Flood also stated that ASCO, a Provident broker/dealer, was "currently under investigation for potential illegal practices." (LCRB 13803, Doc. 496-4 at 36.)  Consequently, Flood, on behalf of the Board, formally requested that the Third and Fourth Provident Annuities be liquidated. (LCRB 13802, Doc. 496-4 at 35.)  Urban and Morreale also signed this letter. (LCRB 13803, Doc. 496-4 at 36.)

Flood wrote a similar letter to Chris Britt, of Manulife, informing him that, in the opinion of Plaintiff, the Manulife annuity contracts were entered into in violation of Pennsylvania law. (Manulife 00043-00044, Doc. 496-5 at 39-40.)  Flood requested that the Manulife annuity contracts be liquidated immediately and without penalty. (Manulife 00043, Doc. 496-5 at 39.)  Urban and Morreale signed this letter. (Manulife 00044, Doc. 496-5 at 40.)  Manulife refused to agree to waive the termination fees, and charged the Fund for terminating its investments. (Manulife 00050, Doc. 496-5 at 42.)

Similar letters were written to other investment managers which the Board voted to be terminated. (*See, e.g.,* Def.'s Ex. 258 at 004872-004874, Doc. 448-20 at 1-3.)  Flood, Urban and Morreale signed these letters. (*See id.*)

### V.    Solicitor Hassey's Letters

On September 12, 2002, Raymond Hassey, Solicitor to the Board, sent a memorandum to the Board reminding them of their fiduciary responsibilities to the Fund and advising them that "each time you liquidate an account, in order to transfer monies to

another fund, you are incurring transfer charges, transaction fees and, in some cases, penalties for early withdrawal." (Def.'s Ex. 171 at NAT 01105, Doc. 445-21 at 2.)  "[I]f money is to be relocated from one source to another, and no substantial benefit is to be realized, then you should reconsider reallocating these funds in order to avoid the generation of unnecessary expenses and transaction fees, which would likely be substantial . . . ." (*Id.*)  Nevertheless, the Board terminated eighteen (18) of the Fund's money managers.

In October 2002, Hassey wrote two (2) more letters to the Board. (Def.'s Ex. 175 at NAT 01096, Doc. 445-25 at 1; Def.'s Ex. 176 at LUZPRIV 0001-0002, Doc. 445-26 at 1-2.)  In the first letter, Hassey took issue with the Board for firing the Fund's money managers and liquidating the Fund's accounts without having consulted a securities attorney. (Def.'s Ex. 175 at NAT 01096, Doc. 445-25 at 1.)

Thereafter, on October 30, 2002, Hassey wrote a letter formally notifying the Board of his intention to resign as Solicitor to the Board, effective immediately. (Def.'s Ex. 176 at LUZPRIV 0001, Doc. 445-26 at 1.)  Essentially, Hassey criticized the Board's most recent decisions, calling them politically motivated and not in the best interests of the Fund. (*Id.*) The full contents of Hassey's letter is set forth in the margin.[46]

---

[46]When an attorney represents a client, there is a fundamental understanding that the two are working together to advance and protect the interests of the client.  Over the past two months, the Board has hastily taken action on a series of very important matters, without advance consultation or legal advice from its Solicitor.

As the changes started taking place, an atmosphere of urgency was created in order to justify the transition.  Although your motives appear to have been good, I have had serious concerns about the manner in which this transition was being accomplished.  In order to slow down the "runaway train" mentality which seized the Board, and restore a sense of balance and reason, I have provided a series of written legal opinions regarding the actions taken, as well as recommendations to the Board as to how these very sensitive issues should be addressed.

Because of extraordinary animosity existing among members on the Board, I specifically provided that my opinions should remain confidential and privileged communications, so that they could not be

## W.    Schnader, Harrison's Investigation

In January 2003, the Board retained the law firm of Schnader, Harrison, Segal & Lewis LLP ("Schnader, Harrison") to investigate the Board's management of the Fund for the period of January 1, 1988 through December 31, 2002. (*See* Def.'s Ex. 153 at LCRB 17798, Doc. 445-7 at 3.)  Flood, Urban and Morreale authorized the investigation. (*Id.* at LCRB 17796, Doc. 445-7 at 1.)  The method for conducting the investigation was to gather information about the activities of the Board, examine relevant legal principles, and assess whether the Board had properly exercised its fiduciary duties in managing the Fund's assets. (*Id.* at LCRB 17799, Doc. 445-7 at 4.)  Schnader, Harrison issued a preliminary report (the ""Flood Report") explaining the results of its investigation in May 2003. (*Id* at LCRB 17796-17818, Doc. 445-7 at 1-23.)

Schnader, Harrison attorneys came to view at least two areas of concern. (*Id.* at LCRB 17800, Doc. 445-7 at 5.)

> First, the Board's conduct of its traditional investment
> management and advisory roles, especially its relationship
> with ASCO.  In 1988, the Board retained ASCO to be the
> [Fund]'s pension management consultant, ostensibly to advise

---

used as political footballs to undermine one another.

Unfortunately, I have been contacted by reporters from both local newspapers, who have anonymously been provided with my confidential communications to the Board.  Thereafter, upon request, the Board provided the reporters with my communications.

It is now clear to me that any action I take as Solicitor to try to counsel and protect the interests of the Retirement Board will be used by the factions of the Board to advance their own political and personal interests.

This is not how I practice law.  In your role as elected officials serving on the Retirement Board, you walk a narrow line on whether to behave as "politicians" or as "public servants".  The Solicitor's role in representing this Board is to interact with its members in their role as "public servants".  The privileged communications and opinions I provide to you are designed to further the best interests of the Retirement System, and assist you in maintaining your responsibilities as fiduciaries.  The politics should be checked at the door. . . .

(Def.'s Ex. 176 at LUZPRIV 0001-0002, Doc. 445-26 at 1-2.)

the Board in drafting investment plans, determining asset
allocations, and retaining investment managers.  In addition,
ASCO was to perform periodic performance reviews.  In 1999,
the Board entered into an additional agreement with ASCO
under which ASCO would perform the daily administration and
operation of the [Fund].  However, both of the [Fund]'s agreements with ASCO are
ambiguous and contradictory, and in our view more than likely present a conflict of
interest and a violation of fiduciary obligations.  These probable violations appear to have
been exacerbated by the fact that ASCO and its affiliates made numerous political
contributions to certain members of the Board over this period of time.
Second, the Board's overall management and oversight
of the [Fund], which again appears to have violated fiduciary
standards.

(*Id.* at LCRB 17800-17801, Doc. 445-7 at 5-6.)  The Flood Report detailed a variety of

alleged improprieties, including, among other things: (1) deviation by ASCO from the

consulting services agreement; (2) investment of Fund assets in improper investment

vehicles; (3) Williamson's qualifications and failure to register as an investment adviser;

(4) violation of the County Pension Plans Best Practices; (5) violation by ASCO of the

Investment Advisers Act; (6) receipt of campaign contributions from ASCO and many of

the investment managers; and (7) breaches of fiduciary obligations. (*Id.* at LCRB 17801-

17818, Doc. 445-7 at 6-23.)  Schnader, Harrison concluded the Flood Report by stating:

It appears at the very least that ASCO was not a qualified
investment adviser, engaged in self-dealings and conflicts of
interest.  The Board either knew or should have known about
it in 1988, yet, until recently, did nothing about it, perhaps due
to the political contributions that the then majority Board
members received from ASCO and others, and therefore a
strong argument can be made that the former Board, ASCO
and others breached their fiduciary duties to the [Fund] and its
beneficiaries.

(*Id.* at LCRB 17818, Doc. 445-7 at 23.)

## X.     The County Sues the Board

In April 2003, Luzerne County filed an action against the Board in state court seeking to enjoin the Board from paying Schnader, Harrison's legal fees. *County of Luzerne*, 882 A.2d at 533.  The Court of Common Pleas, Luzerne County, denied injunctive relief, concluding that Schnader, Harrison's estimated legal fee, which was only forty-five thousand dollars ($45,000) for the investigation that resulted in the Flood Report, would not actuarially impair the Fund. *Id.*

Thereafter, in May 2003, the Board, or, more specifically, Flood, Urban and Morreale, authorized Schnader, Harrison to continue its investigation into the Fund. (*See* Def.'s Ex. 43 at Flood 5108, Doc. 440-8 at 4.)  In the fall of 2003, Schnader, Harrison was formally retained to prosecute a lawsuit on behalf of the Board against Defendants to recoup lost monies and excessive fees. (*See* Def.'s Ex. 45 at Flood 5065, Doc. 440-10 at 7; Def.'s Ex. 149, Doc. 445-4 at 1-2.)  This action was filed in October 2003. (*See* Doc. 1.)

Then, in December 2003, upon learning that the legal fees associated with the investigation and filing of a lawsuit in federal court would cost the Fund at least four hundred thousand dollars ($400,000), with the entire litigation potentially costing as much as four million dollars ($4,000,000), the County again sought to enjoin the Board from paying any legal fees to Schnader, Harrison. *County of Luzerne*, 882 A.2d at 533.  This time, the Court of Common Pleas, Luzerne County, agreed with the County that these costs would actuarially impair the Fund and granted the injunction. *Id.*  The Commonwealth Court of Pennsylvania reversed, concluding that the Fund would not be actuarially impaired if these legal fees were incurred. *Id.* at 535.  Accordingly, the Board

57

was allowed to continue to pay Schnader, Harrison to prosecute this action.

## II.     Procedural History

### A.     The Complaint

On October 9, 2003, Plaintiffs Stephen L. Flood, the Luzerne County Controller, and the Luzerne County Retirement Board ("Board"), on behalf of the Luzerne County Employee Retirement System, filed a ninety-eight (98) page Complaint. (Doc. 1.) Therein, Plaintiffs set forth eight (8) claims against twenty-six (26) Defendants. (*Id.*)  In Count I, Plaintiffs alleged that Defendants Makowski, Pizano, Crossin, Jones, ASCO and Donald Williamson breached their fiduciary duty that was owed to Plaintiffs. (Compl. ¶¶ 169-177, Doc. 1 at 53-59.)  In Count II, Plaintiffs alleged that Defendants Nationwide, Manulife, Wells, Wells Investment Securities, Wells REIT, FSC, FSI, LPL, Safeco, Devonshire, Perfilio, Joyce Associates, JJI, JJJA, JJ&B, Joseph Joyce, William Joyce, Michael Joyce, John Joyce and Maria Williamson aided and abetted the breach of fiduciary duty committed by Makowski, Pizano, Crossin, Jones, ASCO and Donald Williamson. (*Id.* ¶¶ 178-181, Doc. 1 at 59-61.)  In Counts III, IV, V and VI, Plaintiffs set forth claims against all Defendants pursuant to the civil remedy provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c). (*Id.* ¶¶ 182-217, Doc. 1 at 62-92.)[47]  In Count VII, Plaintiffs alleged that ASCO and Donald Williamson had violated the Investment Advisors Act of 1940, 15 U.S.C. § 80b-1 *et seq*. ("IAA"). (*Id.* ¶¶ 218-231, Doc. 1 at 92-95.)  Finally, in Count VIII, Plaintiffs set forth a claim

---

[47]The predicate acts upon which Plaintiff bases its RICO claims are mail and wire fraud. (*Id.* ¶¶ 189, 206, Doc. 1 at 64-72, 79-87.)

of unjust enrichment against against ASCO, Donald Williamson, FSC, FSI, LPL, Manulife, Nationwide, Wells, Wells REIT, Wells Investment Securities, Perfilio, JJI, JJJA, Joseph Joyce, Michael Joyce and John Joyce. (*Id.* ¶¶ 232-237, Doc. 1 at 95-96.)

## B.    The Motions to Dismiss the Complaint

Nearly all of the original Defendants filed motions to dismiss (Docs. 46, 91, 93, 95, 96, 98, 100, 104 and 108.)  In a Memorandum and Order, dated August 24, 2004, the Court granted these motions in part and denied them in part. (Doc. 181.)  Specifically, the Court: (1) dismissed Count II (aiding and abetting breach of fiduciary duty) against all Defendants except LPL; (2) dismissed Count III (conducting a RICO enterprise in violation of 18 U.S.C. § 1962(c)) against all Defendants except Makowski, Pizano, Crossin, Jones, ASCO, Donald Williamson, Maria Williamson, JJJA, JJ&B, Joseph Joyce, Manulife, Nationwide and LPL; (3) dismissed Count IV (conspiring to conduct a RICO enterprise in violation of 18 U.S.C. § 1962(d)) against Joyce Associates; (4) dismissed Count V (acquiring or maintaining an interest or control of a RICO enterprise in violation of 18 U.S.C. § 1962(b)) against all Defendants except LPL; and (5) dismissed Count VI (conspiring to acquire or maintain an interest or control of a RICO enterprise in violation of 18 U.S.C. § 1962(d)) against Joyce Associates. (Doc. 181 at 72-76.)

## C.    Counterclaims and Crossclaims

Thereafter, the remaining Defendants filed their answers, counterclaims and crossclaims.  Specifically, ASCO, Donald Williamson, Maria Williamson, Perfilio, Michael Joyce and Devonshire filed counterclaims against Flood and the Board for contribution and indemnification, and against Flood only for intentional interference with contractual

relations. (Doc. 201.)  ASCO, Donald Williamson, Maria Williamson, Perfilio and Michael Joyce also filed a third-party complaint against Morreale, Merrill Lynch & Co., Pierce Fenner & Smith Incorporated, Bender Crisci Sennett & Hudacek Group, Raymond L. Crisci, Rodney F. Sennett, Stephen L. Hudacek, Peter M. Butera, William H. Bender and Gary T. Crisci, setting forth claims for contribution, indemnification and intentional interference with contractual relations. (Doc. 212.)

Makowski, Pizano, Crossin and Jones filed a counterclaim against the Board for indemnification. (Doc. 203.)  Makowski, Pizano, Crossin and Jones also filed third-party claims against Morreale for breach of fiduciary duty, indemnification and contribution. (Doc. 206.)

### D.   Stipulations of Dismissal

Since then, several parties have settled their disputes.  Stipulations of dismissal have been entered in favor of Wells, Wells REIT, and Wells Investment Securities (Doc. 224), LPL (Doc. 227), FSC (Docs. 342, 343), Joseph Joyce, Jr. (Doc. 356), JJI (Doc. 357), Michael Joyce (Doc. 378), Maria Williamson (Doc. 382), JJ&B (Doc. 383) and Devonshire (Doc. 384).  The Board has also settled with FSI and Rochdale. (Pl.'s Br. in Opp'n at 33, Doc. 484-1 at 50.)

### E.   The Motions to Dismiss the Counterclaims and Crossclaims

In addition, in a Memorandum and Order, dated April 6, 2004, the Court dismissed the counterclaim against Flood for intentional interference with contractual relations brought by ASCO, Donald Williamson, Maria Williamson, Perfilio, Michael Joyce and Devonshire. (Doc. 308.)

Also, in a Memorandum and Order dated April 8, 2005, the Court dismissed certain third-party claims brought against Morreale. (Doc. 310.)  The indemnity claim brought by Makowski, Pizano, Crossin and Jones was dismissed. (*Id.*)  The intentional interference with contractual relations claim raised by ASCO, Donald Williamson, Maria Williamson, Perfilio and Michael Joyce was dismissed as well. (*Id.*)

In a Memorandum and Order, dated June 22, 2005, the Court dismissed the third-party complaint brought by ASCO, Donald Williamson, Maria Williamson, Perfilio and Michael Joyce (Doc. 212) as it related to Merrill Lynch & Co., Pierce Fenner & Smith Incorporated, Bender Crisci Sennett & Hudacek Group, Raymond L. Crisci, Rodney F. Sennett, Stephen L. Hudacek, Peter M. Butera, William H. Bender and Gary T. Crisci. (Doc. 336.)

## F.      Flood Dropped as a Plaintiff

Flood's term as Luzerne County Controller ended on December 31, 2005. (Doc. 344.)  Consequently, on January 4, 2006, pursuant to Rule 21 of the Federal Rules of Civil Procedure, FED. R. CIV. P. 21, Flood was dropped as a plaintiff in this action. (Doc. 345.)  Flood remains in the case as a counterclaim defendant.  The Board is now the lone plaintiff.

## G.      The Instant Motions for Summary Judgment

In October 2006, Defendants Nationwide, Manulife, Makowski, Pizano, Crossin, and Jones, JJJA, John Joyce and William Joyce, Safeco, Donald Williamson and ASCO, and Perfilio filed motions for summary judgment as to Plaintiff's Complaint. (Docs. 390, 391, 414, 419, 420, 426 and 427.)  Third-party Defendant Morreale filed motions for

summary judgment as to the third-party complaints filed against him by Defendants

Makowski, Pizano, Crossin and Jones and Defendants Donald Williamson, ASCO and

Perfilio. (Docs. 400, 406.)  Flood filed a motion for summary judgment as to Defendants

Donald Williamson, ASCO and Perfilio's counterclaims against him. (Doc. 403.)  The

Board also filed a motion for summary judgment as to Defendants Donald Williamson,

ASCO and Perfilio's counterclaims brought against it. (Doc. 409.)  These motions have

been fully briefed and are now ripe for disposition.[48]

<h2 style="text-align:center">LEGAL STANDARD</h2>

Summary judgment is appropriate if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." FED. R. CIV. P. 56(c).  A fact is material if proof of its

existence or nonexistence might affect the outcome of the suit under the applicable

substantive law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish

---

[48] On December 10, 2006, Plaintiff filed a motion requesting that the Court reinstate Count II (aiding and abetting breach of fiduciary duty) of its Complaint. (Doc. 465.)  This count had been dismissed by the Court in the Memorandum and Order (Doc. 181), dated August 24, 2004, on the ground that the Supreme Court of Pennsylvania had not yet recognized such a cause of action, based on section 876 of the Restatement (Second) of Torts, RESTATEMENT (SECOND) OF TORTS § 876(b) (1965), and the Court was hesitant to predict that it would do so based on the decisions of two lower courts. *See Koken v. Steinberg*, 825 A.2d 723 (Pa. Commw. Ct. 2003); *Lichtman v. Taufer*, No. 005560, 2004 WL 1632574 (Pa. Com. Pl. July 13, 2004).  The impetus for Plaintiff's motion was the November 2006 decision of *Sovereign Bank v. Valentino*, 914 A.2d 415 (Pa. Super. Ct. 2006), in which the Superior Court of Pennsylvania held that concerted tortious action, as defined by section 876, is a recognized civil cause of action under Pennsylvania law, thus joining the Commonwealth Court in recognizing a cause of action for aiding and abetting a breach of fiduciary duty.  However, for the sake of judicial economy, the Court issued a Memorandum Order (Doc. 525) on June 6, 2007 denying Plaintiff's motion to reinstate Count II (aiding and abetting breach of fiduciary duty) of Plaintiff's Complaint.

that it is entitled to judgment as a matter of law.  Where, however, there is a disputed

issue of material fact, summary judgment is appropriate only if the factual dispute is not a

genuine one.  *See id.* at 248.   An issue of material fact is genuine if "a reasonable jury

could return a verdict for the nonmoving party."  *Id*.

Where there is a material fact in dispute, the moving party has the initial burden of

proving that: (1) there is no genuine issue of material fact; and (2) the moving party is

entitled to judgment as a matter of law.  *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER,

FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed. 1983).  The moving party

may present its own evidence or, where the nonmoving party has the burden of proof,

simply point out to the Court that "the nonmoving party has failed to make a sufficient

showing of an essential element of her case."  *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved

against the moving party, and the entire record must be examined in the light most

favorable to the nonmoving party.  *See White v. Westinghouse Elec. Co.*, 862 F.2d 56,

59 (3d Cir. 1988).  Once the moving party has satisfied its initial burden, the burden shifts

to the nonmoving party to either present affirmative evidence supporting its version of the

material facts or to refute the moving party's contention that the facts entitle it to

judgment as a matter of law.  *See Anderson*, 477 U.S. at 256-257.

The Court need not accept mere conclusory allegations, whether they are made in

the complaint or a sworn statement.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888

(1990).  In deciding a motion for summary judgment, "the judge's function is not himself

to weigh the evidence and determine the truth of the matter but to determine whether

there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.


## DISCUSSION

I.     **Defendants' Motions for Summary Judgment as to Plaintiff's Federal Claims**

     A.     **RICO Claims (Counts III, IV and VI)**

          1.     **RICO – In General**

"Congress passed RICO in an effort to combat organized, long-term criminal

activity." *Jennings v. Auto Meter Products, Inc.*, --- F.3d ----, 2007 WL 2120337, at *4 (7th

Cir. July 25, 2007).  "Although § 1964(c) provides a private civil action to recover treble

damages for violations of RICO's substantive provisions, the statute was never intended

to allow plaintiffs to turn garden-variety state law fraud claims into federal RICO actions."

*Id.* (internal and external citations omitted).  In order to establish a violation of section

1962(c), a section upon which Plaintiff relies in Count III of its Complaint, a plaintiff must

show the following elements by a preponderance of the evidence: "(1) conduct (2) of an

enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex

Co., Inc.*, 473 U.S. 479, 496 (1985).  A pattern of racketeering activity may be established

by showing that at least two (2) predicate acts occurred within ten (10) years of each

other. 18 U.S.C. § 1961(5).  "In order to curb 'widespread attempts to turn routine

commercial disputes into civil RICO actions,' courts carefully scrutinize the pattern

requirement to 'forestall RICO's use against isolated or sporadic criminal activity, and to

prevent RICO from becoming a surrogate for garden-variety fraud actions properly

brought under state law.'" *Jennings*, --- F.3d ----, 2007 WL 2120337, at *4 (internal and external citations omitted).  The pattern requirement may be established through "the so-called 'continuity plus relationship' test: the predicate acts must be related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong)." *See H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989) ("RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity") (emphasis in original).

## 2.    Conducting and Participating in a RICO Enterprise (Count III)

In Count III, Plaintiff alleges that Defendants violated 18 U.S.C. § 1962(c), which prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

As mentioned above, Plaintiff must, at the least, show that two (2) predicate acts were committed within ten (10) years of each other. 18 U.S.C. § 1961(5).  Any crime enumerated in 18 U.S.C. § 1961(1) may constitute a predicate act, including mail and wire fraud. 18 U.S.C. § 1961(1)(B).  Any crime which constitutes securities fraud is expressly excluded by the Private Securities Litigation Reform Act ("PSLRA"). *See* 18 U.S.C. § 1964(c).  Although two (2) predicate acts are necessary to establish a pattern of racketeering activity, they are not necessarily sufficient. *H.J. Inc.*, 492 U.S. at 237.  The

predicate acts must be related and amount to or threaten to become continued criminal activity. *Id.* at 239.

Plaintiff's RICO claims rest on the theory that various Defendants committed predicate acts of mail and/or wire fraud.  Mail and/or wire fraud occurs when there is: (1) a scheme to defraud; (2) use of the mails (for mail fraud) or interstate wire communications (for wire fraud) in furtherance of the scheme; and (3) fraudulent intent. *United States v. Pharis*, 298 F.3d 228, 233-34 (3d Cir. 2002) (citing *United States v. Strum*, 671 F.2d 749, 751 (3d Cir. 1982)).  An additional issue is whether Plaintiff's RICO claims are barred by the PSLRA.  This issue will be addressed first.

### a.        The PSLRA

Defendants contend that the PSLRA bars Plaintiff's RICO claims.  Under the civil remedy provision of RICO, 18 U.S.C. § 1964(c), "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962."  Thus, any conduct which is actionable as fraud in the purchase or sale of securities cannot constitute a predicate offense under RICO, whether or not the plaintiff alleges securities fraud. *Bald Eagle School District v. Keystone Financial, Inc.*, 189 F.3d 321, 330 (3d Cir. 1999).  The threshold inquiry in this analysis, then, is whether the annuities purchased by the Fund from Safeco, Provident and Manulife constitute "securities" under the federal securities law.

### i.        Are the Annuities "Securities"?

### (A)        Statutory Background

Section 3(a)(8) of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. § 77a *et*

*seq.*, exempts from its provisions "[a]ny insurance or endowment policy or annuity contract or optional contract issued by a corporation subject to the supervision of the appropriate insurance regulatory of any state." 15 U.S.C. § 77c(a)(8).  "Although the provisions of section 3 of the 1933 Act are generally viewed as providing exemptions from the registration requirements of the 1933 Act, but not from [the] anti-fraud provisions [of the Securities Exchange Act of 1934 (the "1934 Act")], the Securities and Exchange Commission (SEC) has unequivocally interpreted section 3(a)(8) to have been adopted by Congress in order to *exclude* from 'security status' those insurance contracts that come within section 3(a)(8)." Christopher S. Petito, *Variable Annuities & Variable Life Insurance Regulation*, Part I, Chapter 2, § 2:1.2 (Practising Law Institute, 2007) (citing Definition of 'Annuity Contract or Optional Annuity Contract', Securities Act. Rel. No. 6,558, 1984 WL 547110 (Nov. 21, 1984)).  "Thus, the anti-fraud provisions of the federal securities laws do not apply to the offering of insurance products entitled to rely upon section 3(a)(8)." *Id.*  "[T]his means that even the anti-fraud provisions of the [1934 Act] and rules thereunder do not apply to the offering of insurance contracts that come within section 3(a)(8) of the 1933 Act." *Id.* (citing *Otto v. Variable Annuity Life Insurance Company ("Otto I")*, 814 F.2d 1127, 1130 (7th Cir. 1986) (upholding district court's grant of summary judgment on 1934 Act claim where annuity contract was entitled to rely upon section 3(a)(8) exemption); *rev'd and remanded on reh'g ("Otto II")*, 814 F.2d 1127, 1142 (7th Cir. 1987) (reversing prior dismissal and remanding for consideration of 1934 Act claims based upon determination that section 3(a)(8) not available)).

        **(B)**    **The Two Types of Annuities – Fixed versus Variable**

"Any kind of annuity contract that existed in 1933 is covered by section 3(a)(8)."

Petito, *supra*, at § 2:2.1.  "These products have a rate of interest that is fixed for the life of

the contract and may or may not be based upon a life contingency[, which takes into

account the annuitant's mortality risk, that is, the risk that the annuitant will outlive his life

expectancy]."  *Id.*  (*See* Pl.'s Br. in Opp'n at 102-103, Doc. 484-1 at 119-120.)[49]  As such, a

fixed annuity is properly considered a type of insurance and is exempt from both the

registration and anti-fraud provisions of federal securities laws. Petito, *supra*, at § 2:1.2.

The chief characteristic of a variable annuity is a direct correlation between

investments and the payouts to the annuitant. *Malone v. Addison Insurance Marketing,*

*Inc.*, 225 F. Supp. 2d 743, 749 (W.D. Ky. 2002).  "Variable annuities ordinarily guarantee

neither minimum contract values nor even any portion of premium payments." Petito,

*supra*, at § 2:2.4.  "Rather, variable annuities offer returns tied directly to the performance

of a mutual fund underlying a separate account, or a portfolio of securities held directly by

the separate account." *Id.*  "The only assets of the insurer that support the value of a

variable annuity are the securities held in the fund underlying a separate account or held

directly by the separate account." *Id.*

"A variable annuitant thus assumes much greater risk than the holder of a fixed

annuity who is provided with a guarantee.  'The holder of a variable annuity cannot look

forward to a fixed monthly or yearly amount . . . [i]t may be greater or less depending on

---

[49]While a mortality risk assumption is not a necessary element in order for an annuity contract to
rely upon section 3(a)(8), the presence or absence of it may be an appropriate factor to consider in a
general facts and circumstances analysis under 3(a)(8). Securities Act. Rel. No. 6,645, 1986 WL
703849 (May 29, 1986)).

the wisdom of the investment policy.'" *Malone*, 225 F. Supp. 2d at 749 (quoting *SEC v. Variable Annuity Life Insurance Company of America*, 359 U.S. 65, 70 (1959)).[50]

---

[50]Perhaps the case which best explains the differences between fixed and variable annuities is *Lander v. Hartford Life and Insurance Company*, 251 F.3d 101 (2d Cir. 2001). There, the United States Court of Appeals for the Second Circuit described the types of annuities as follows.

> An annuity is a contract between a seller (usually an insurance company) and a buyer (usually an individual, also referred to as the "annuitant") whereby the annuitant purchases the right to receive a stream of periodic payments to be paid either for a fixed term or for the life of the purchaser or other designated beneficiary. For traditional or "fixed" annuities, the stream of payments begins immediately or soon after the contract is purchased. The contract will specify the amount of interest that will be credited to the annuitant's account as well as the amount of payments to be received under the contract. Fixed annuities are typically thought of as insurance products because the annuitant receives a guaranteed stream of income for life, and the insurer assumes and spreads the "mortality risk" of the annuity-the risk that the annuitant will live longer than expected, thereby receiving benefits that exceed the amount paid to the seller of the policy.

> Variable or deferred annuities differ in that the stream of payments that the annuitant receives does not immediately commence upon purchase of the contract. Instead, the purchaser of a variable annuity will make either a single payment or series of payments to the seller, who will then invest this principal in various securities, usually mutual funds or other investments. The annuitant typically controls how the principal is invested, choosing from a set of portfolios according to the annuitant's investment strategy. During the accumulation phase of the annuity-from the time the policy is purchased to the time it begins to pay out-the value of the annuity will rise or fall depending on the performance of the underlying securities in which the annuitant's principal is invested. After a defined number of years the policy will reach its maturity date and begin to pay benefits to the annuitant, known as the "payout" phase. The annuitant is not guaranteed a certain level of benefits under the policy, instead, the payment amount will vary depending upon the value of the portfolio upon maturity and the annuitant's life expectancy.

> Variable annuities are typically characterized as "hybrid products," possessing characteristics of both insurance products and investment securities. For example, by providing periodic payments that will continue for the life of the annuitant, variable annuities provide a hedge against the possibility that an individual will outlive his or her assets after retirement, thereby making the policies similar to insurance contracts. In addition, most variable annuity contracts contain a death benefit whereby the beneficiary of the policy will receive a specified amount if the annuitant dies before the payout period begins. Finally, like fixed annuities, the insurer assumes and pools the risk of policyholders outliving the expected term of the annuity. But at the same time, variable annuities possess characteristics akin to those of investment securities.

## (C)    The Supreme Court Cases

In *SEC v. Variable Annuity Life Insurance Company of America ("VALIC")*, the

United States Supreme Court held that a variable annuity, pursuant to which the

annuitant paid premiums which the company would invest, and, at an appointed date,

would receive in return periodic payments in amounts dependent on the productivity of

the company's investments, was a "security" subject to federal securities laws, and was

not "insurance," thus limiting the reach of section 3(a)(8)'s exemption. 359 U.S. at 71-72.

In so doing, the Court distinguished between a fixed annuity, which operates like

insurance, and a variable annuity, which operates like a security. *Id.   See also Malone*,

225 F. Supp. 2d at 748 (discussing *VALIC*).   The Court explained:

> [F]ixed annuities[ ] offer[   ] the annuitant specified and definite
> amounts beginning with a certain year of his or her life.   The
> standards for investment of funds underlying these annuities
> have been conservative.   The variable annuity introduced two
> new features.   First, premiums collected are invested to a
> greater degree in common stocks and other equities.   Second,
> benefit payments vary with the success of the investment
> policy. . . .   The holder of a variable annuity cannot look
> forward to a fixed monthly or yearly amount in his advancing
> years.   It may be greater or less, depending on the wisdom of

---

> Most notably, unlike the beneficiary of a fixed annuity, the variable
> annuitant bears the investment risk of the underlying securities.  Because
> the amount of benefits paid to the annuitant under the contract is not
> fixed, but will vary depending on the performance of the investment
> portfolio, many consumers use variable annuities as a tool for
> accumulating greater retirement funds through market speculation.
> Variable annuities must be registered with the SEC as securities under
> the Securities Act of 1933[ ] . . . .   While variable annuities are primarily
> sold by insurance companies, the policies must be offered through
> "separate accounts."  These separate accounts must be registered with
> the SEC as investment companies under the Investment Company Act of
> 1940[ ] . . . .

*Id*. at 104-05.

> the investment policy. . . .  The difficulty is that, absent some
> guarantee of fixed income, the variable annuity places all the
> investment risks on the annuitant, none on the company.  The
> holder gets only a pro rata share of what the portfolio of equity
> interests reflects-which may be a lot, a little, or nothing. . . .
> [W]e conclude that the concept of "insurance" involves some
> investment risk-taking on the part of the company.  The risk of
> mortality, assumed here, gives these variable annuities an
> aspect of insurance.  Yet it is apparent, not real; superficial,
> not substantial.  In hard reality the issuer of a variable annuity
> that has no element of a fixed return assumes no true risk in
> the insurance sense. . . .  For in common understanding
> "insurance" involves a guarantee that at least some fraction of
> the benefits will be payable in fixed amounts.  The companies
> that issue these annuities take the risk of failure.  But they
> guarantee nothing to the annuitant except an interest in a
> portfolio of common stocks or other equities . . . .  There is no
> true underwriting of risks[.] . . .

*Id.* at 69-73 (internal citations and footnotes omitted).  Thus, the Court held that the

variable annuity at issue was a security and not insurance. *Id*.

Several years later, in *SEC v. United Benefit Life Insurance Co.*, the Supreme

Court clarified its decision in *VALIC* with regard to the difference between a fixed and

variable annuity. 387 U.S. 202 (1967).  In *United Benefit*, the "Flexible Fund Annuity" at

issue was a deferred annuity under which the annuitant paid premiums to the company,

which it then held in a separate account. *Id*. at 205.  The company invested these monies

for the most part in common stocks. *Id*.  The company did not promise to accumulate net

premiums at a specified rate of interest. *Id.* at 208.  Rather, the annuitant was credited

with a proportionate share of the total fund and could withdrawal all or part of this interest.

*Id.* at 205.  The annuitant was also entitled to an alternative cash value measured as a

percentage of his net premiums which gradually increased as the annuity approached its

maturity date. *Id*. at 205.  At maturity, the purchaser could elect to receive the cash value

of his policy, measured by either his interest in the "Flexible Fund" or by the net premium

guarantee, which was one hundred percent (100%) of the investment, whichever was

greater. *Id.* After maturity, the purchaser's interest in the "Flexible Fund" terminated. *Id.*

at 206.[51]

Thus, during the pre-maturity or so-called "accumulation" phase of the "Flexible

Fund" contract, "[i]nstead of promising to the policyholder an accumulation to a fixed

amount of savings at interest, the insurer promises to serve as an investment agency and

allow the policyholder to share in its investment experience.  The insurer is obligated to

produce no more than the guaranteed minimum at maturity, and this amount is

substantially less than that guaranteed by the same premiums in a conventional deferred

annuity contract." *Id.* at 208.  The "Flexible Fund" program thus "allow[ed] the purchaser

to reap the benefits of a professional investment program," *Id.* at 204, while essentially

providing a floor, in the form of the net premium guarantee, below which the purchaser's

investment could not fall. *Id.* at 205.

The Court held that, during the pre-maturity accumulation phase, the "Flexible

Fund" annuity was not entitled to section 3(a)(8)'s exemption because the annuitant had

a direct interest in the fund's performance, and thus bore the risk of the investment. *Id.* at

211.  "'Flexible Fund' arrangements . . . appeal to the purchaser not on the usual

insurance basis of stability and security but on the prospect of 'growth' through sound

investment management.  And while the guarantee of cash value based on net premiums

---

[51]Because of the termination of interest in the "Flexible Fund" at maturity, the Court concluded that
it was appropriate to analyze whether the pre-maturity or "accumulation" phase was itself a "security"
within the meaning of the Securities Act. *Id.* at 206-07.  The "Flexible Fund" contract made "[t]wo
entirely distinct promises" whose "operation [was] separated at a fixed point in time." *Id.* at 207.

reduces substantially the investment risk of the contract holder, the assumption of an

investment risk cannot by itself create an insurance provision under the federal

definition." *Id.* "The basic difference between a contract which to some degree is insured

and a contract of insurance must be recognized." *Id.* Thus, the Court held that the

accumulation phase of the "Flexible Fund" annuity did not fall within the exemption

provided by section 3(a)(8). *Id.* The Court further held that it constituted an "investment

contract" under federal securities laws. *Id.* at 211-12. As such, the Court concluded that

the accumulation phase of the "Flexible Fund" was a nonexempt security that must be

registered with the SEC. *Id.* at 212.

### (D)   Other Cases of Note

In *Gilmore v. MONY Life Insurance Company of America*, the MONY annuity

contract at issue provided that the annuitant must make purchase payments to the

issuer, which were then allocated, at the annuitant's choice, to the guaranteed interest

account and/or to variable subaccounts. 165 F. Supp. 2d 1276, 1282 (M.D. Ala. 2001).

The guaranteed interest account was part of the issuer's general account and purchase

payments allocated to it earned an interest rate not less than three and one-half percent

(3.5%). *Id.* at 1283. The assets allocated to the variable subaccounts were kept separate

from the issuer's other assets and accounts. *Id.* at 1282. Each of these subaccounts

invested in, among other things, money market instruments, bonds and stocks. *Id.* The

purchase payments allocated among the various subaccounts could increase or

decrease in value depending on the investment experience of the subaccounts; there

was no guarantee that the value of the purchase payments allocated to any of the

subaccounts would increase or that the purchase payments made would not lose value. *Id.* The annuitant bore the entire investment risk for all monies placed in the variable subaccounts. *Id.* at 1282-83.

The United States District Court for the Middle District of Alabama found that the MONY variable annuity at issue was similar to the Flexible Fund in *United Benefit*, in that it contained a portion – the subaccounts – which, like the accumulation portion of the Flexible Fund, placed all of the investment risk on the annuitant, and another portion – the guaranteed interest account – which, like the maturity portion of the Flexible Fund, offered the annuitant a fixed return. *Id.* at 1283.

The court then analyzed the subaccounts separately, as the Supreme Court did with the accumulation phase of the Flexible Fund in *United Benefit*. *Id.* The court concluded that, because the value of the purchase payments placed in the subaccounts could increase or decrease and the annuitant bore the entire investment risk for all monies placed therein, the subaccounts were not exempt insurance, but rather were securities. *Id.* at 1283-84. Essentially, the issuer "promised to serve as the annuitant's investment agency, expressly allowing the annuitant to share in the subaccounts' investment experience, be it good or bad." *Id.* at 1283.

In *Malone v. Addison Insurance Marketing, Inc.*, the annuity contract at issue was known as "The Ultimate Equity Index." 225 F. Supp. 2d 743, 746 (W.D. Ky. 2002). The contract stated that the Ultimate Equity Index was a single-premium deferred annuity. *Id.* "In effect, the Index operated as an insurance plan with an investment aspect through which [the annuitant] purchased a contract backed by [the issuer]." *Id.* "Under the

74

contract terms, [the issuer] guaranteed [the annuitant] a minimum return of 100 percent

of her premium plus *at least* 3 percent interest annually, depending on how the S & P 500

Index fared." *Id.* (emphasis in original).  "Specifically, [the issuer] agreed to pay [the

annuitant] an annual interest credit based on a formula tied to the performance of the S &

P 500 Index during the contract year." *Id.*  The issuer promised the annuitant that "she

would always get at least a 3 percent return annually and was guaranteed more if the S &

P 500 Index produced a higher rate of return.  This amounted to a guarantee of 134

percent of her premium at the end of her ten-year contract term." *Id.* at 746-47.

    The United States District Court for the Western District of Kentucky held that the

Ultimate Equity Index was a fixed annuity. *Id.* at 751.  The court reasoned that the issuer

guaranteed the annuitant a minimum three percent (3%) return, irrespective of the

performance of the S & P 500 Index. *Id.* at 750-51.  As such, the issuer assumed the bulk

of the investment risk, not the annuitant, who received a three percent (3%) interest

payment regardless of how poorly the market performed. *Id.* at 750.  "If [the issuer] was

unable to surpass [the S & P Index] in its own investment of the [annuitant's] premium,

then it was the loser." *Id.* at 751.  Conversely, the only risk born by the annuitant was that,

if she had chosen a different contract, her money might have been worth more than the

one hundred thirty four percent (134%) at the end of the ten (10) year contract term. *Id.*

    The court also noted a structural difference between this annuity contract and

variable annuities – the annuitant's "benefit payments from [the issuer] were not directly

dependent on the performance of investments made with her money.  That is to say, . . .

[the annuitant's] contract did not operate like a variable annuity: her payments were not a

function of a personalized portfolio and her principal was not held in an independent account." *Id.* Rather, the annuitant's benefit payments were a function of the issuer's own investment of the premium payments. *Id.* Consequently, the court held that the Ultimate Equity Index was a fixed annuity and therefore excluded from the definition of "security." *Id.*

### (E)   Analysis

Initially, the Court notes that it will limit its analysis to only those contracts for which Plaintiff still seeks damages – that is, those entered into with Safeco, Provident and Manulife. (*See* Pl.'s Br. in Opp'n at 34, 92 Doc. 484-1 at 51, 109.)  In the opinion of the Court, all of the Safeco, Provident and Manulife annuities, except the QPA-2, are variable annuities not entitled to the exemption provided for by section 3(a)(8).

### (1)   The Safeco Annuities

The QPA-2 was a traditional fixed annuity with a guaranteed interest rate. (Pl.'s Ex. 358 at Safeco 00127, Doc. 456-3 at 1.)  All deposits were held in Safeco's general fund, not a separate account. (Pl.'s Ex. 360 at Safeco 00115, Doc. 456-4 at 2.)  Safeco bore all of the risk as it had to meet minimum interest payments.  As such, it falls within the exemption provided by section 3(a)(8), 15 U.S.C. § 77c(a)(8). *See Otto I*, 814 F.2d at 1131-32 (holding that insurance instrument was fixed annuity exempt from securities regulation because the instrument provided a guaranteed return of four percent (4%)).

The Resource Variable Account A was an unallocated group variable annuity contract. (Pl.'s Ex. 361 at ASCO 000161, Doc. 456-5 at 4.)  No rate of return was promised.  Instead, the values provided by the Resource Variable Account A were based

on the investment experience of a separate account and were therefore variable and not guaranteed. (Def.'s Ex. 320 at Safeco 00751, Doc. 451-14 at 1.)  Consequently, the Fund, not Safeco bore all of the investment risk.

The Fund's assets were placed in separate account sub-funds managed by Safeco. (Bartholomaus Dep. 225:5-6, Doc. 434-2 at 6.)  Safeco, in turn, invested these monies in stocks and mutual funds. (Bartholomaus Dep. 224:24-225:22, Doc. 434-2 at 6.)  As such, Safeco was acting as an investment agency and allowed the Fund to share in its investment experience.

While Plaintiff argues that the Resource Variable Account A was oftentimes sold in tandem with the QPA-2, these were separate contracts and, under *United Benefit*, are severable when undertaking an analysis as to whether the section 3(a)(8) exemption is available.

Accordingly, the Court concludes that the Resource Variable Account A was a variable annuity not entitled to the section 3(a)(8) exemption.

Likewise, the Court concludes that the variable portion of the Safeflex annuity is a variable annuity not entitled to the section 3(a)(8) exemption.  The Safeflex annuity was a hybrid annuity offering a variable annuity with fixed riders.  The Fund's assets were placed in an international fund portfolio.  Values provided by the variable portion of the Safeflex annuity were based on the investment experience of a separate account and were variable, not guaranteed. (Pl.'s Ex. 629 at Safeco 00765, Doc. 494-4 at 24.)  As such, the Fund bore the risk of the investments made by, and shared in the investment experience of, Safeco and/or Scudder/Stevens & Clark.  As such, the variable portion of the Safeflex annuity falls outside the scope of the exemption provided by section 3(a)(8),

77

15 U.S.C. § 77c(a)(8).

### (2)  The Provident Annuities

To the extent that Fund assets were placed in variable subaccounts, the Provident Annuities were variable annuities not entitled to the section 3(a)(8) insurance exemption. Each of the four (4) Provident Annuities had essentially the same basic terms.  Fund assets could be placed in sub-funds which were held in Provident's general account and guaranteed a rate of return, or variable sub-funds segregated from all other assets of Provident.  The assets placed in the variable sub-funds were managed by Provident. The value of the assets placed in the variable sub-funds could increase or decrease depending on their investment experience.

With regard to the First Provident Annuity, the Fund initially placed assets in variable sub-funds – the value equity fund, the bond fund, and the aggressive equity fund. (*See* Pl.'s Ex. 29 at ASCO 001479, Doc. 487-2 at 13.)  Later on, the Fund again placed money in the aggressive equity fund. (Pl.'s Ex. 568 at ASCO 001463, Doc. 456-20 at 4.)  The Fund also placed money in the fixed income fund, which was an interest bearing investment promising a guaranteed rate of return. (*Id.*)

With regard to the Second Provident Annuity, the Fund placed its assets in variable sub-funds – the government bond fund, the international equity fund, the balanced fund and the diversified equity fund. (Pl.'s Ex. 182 at ASCO 001449, Doc. 455-13 at 6.)

The Third Provident Annuity merged the First and Second Provident Annuities.  As

78

of November 29, 2002, approximately seventy percent (70%) of the Fund's assets invested in the Third Provident Annuity, or approximately twenty-five million dollars ($25,000,000), were placed in the following variable sub-funds – the government bond fund, the diversified bond fund, the growth fund, the diversified equity fund, the small cap value fund, and the small cap growth fund. (Pl.'s Ex. 560 at NAT 00979, Doc. 494-3 at 16.)  Approximately ten million dollars ($10,000,000) was placed in the fixed income fund.

With regard to the Fourth Provident Annuity, Fund assets were placed in the following sub-funds: the government bond fund, the fixed income fund, the value equity fund, and a deposit account. (Pl.'s Ex. 560 at NAT 00980, Doc. 494-3 at 17.) Approximately seventy percent (70%) of the twenty-three million dollars invested in the Fourth Provident Annuity, about sixteen million dollars ($16,000,000), was allocated to the fixed income fund and deposit account. (*Id.*)

In the opinion of the Court, the Provident Annuities were variable annuities not entitled to the section 3(a)(8) exemption to the extent that the Fund's assets were placed in variable sub-funds segregated from Provident's general account and managed by Provident.  In investing money in the different variable sub-funds managed by Provident – the value equity fund, the aggressive equity fund, the government bond fund, the diversified bond fund, the growth fund, the international equity fund, the balanced fund, the diversified equity fund,  the small cap value fund, and the small cap growth fund – the Fund sought to share in the investment experience of Provident, which acted as an investment agency.  The Fund bore all of the investment risk, not Provident.  As such, to this extent, the Provident Annuities were variable annuities not entitled to section 3(a)(8)'s exemption.

79

To the extent that Fund assets were placed in the fixed sub-funds held by Provident in its general account, and which promised a guaranteed rate of return – the guaranteed income certificates, the fixed income fund and the deposit account – the Court concludes that the Provident Annuities were fixed annuities entitled to the insurance exemption of section 3(a)(8).

**(3)     The Manulife Annuity Contracts**

Likewise, the Court concludes that, to the extent that Fund assets were placed in variable pooled sub-funds, the Manulife Annuity Contracts were variable annuities not entitled to section 3(a)(8)'s exemption.  To the extent Fund assets were placed in sub-funds which guaranteed a fixed rate of return, the Manulife Annuity Contracts were fixed annuities entitled to section 3(a)(8)'s insurance exemption.

The two (2) Manulife Annuity Contracts had the same essential terms.  Funds invested with Manulife could be allocated to guaranteed funds and/or variable pooled funds.  Assets placed in a guaranteed fund were held by Manulife in its general account. (Pl.'s Ex. 45 at Manulife 00913, Doc. 488-2 at 23.)  The pooled funds were separate accounts and assets placed therein were segregated from Manulife's other assets. (*Id.* at Manulife 00916, Doc. 488-2 at 26.)  The value of the investments in Manulife's pooled funds varied to reflect the investment experience of that particular fund. (*Id.* at Manulife 00893, Doc. 488-2 at 3.)

With regard to the First Manulife Annuity Contract, two million five hundred thousand dollars ($2,500,000) was invested in a five (5) year guaranteed fund. (Pl.'s Ex. 466 at Manulife 00594, Doc. 494-3 at 7.)  Another two million five hundred thousand dollars ($2,500,000) was split amongst five (5) variable pooled funds, including a high-

quality bond fund, an income fund, a growth opportunities fund, a diversified capital fund and a high-yield fund. (Pl.'s Ex. 45 at Manulife 00891, Doc. 488-2 at 1.)  Later on, an additional four million dollars ($4,000,000) was invested, only two hundred fifty thousand ($250,000) of which was placed in the guaranteed fund. (*See* Pl.'s Ex. 471 at Manulife 00580, Doc. 494-3 at 2; Pl.'s Ex. 469 at Manulife 00586, Doc. 494-3 at 4.)

Accordingly, to the extent that Fund assets were placed in variable pooled sub-funds, the First Manulife Annuity Contract was a variable annuity not entitled to section 3(a)(8)'s exemption.  To the extent Fund assets were placed in the guaranteed fund, the First Manulife Annuity Contract was a fixed annuity entitled to section 3(a)(8)'s insurance exemption.

The Second Manulife Annuity Contract was a variable annuity not entitled to section 3(a)(8)'s exemption.  As of October 2002, all of the Fund's money invested in the Second Manulife Annuity Contract was placed in Manulife's non-guaranteed pooled funds. (*See* Pl.'s Ex. 530 at Manulife 00054, Doc. 494-3 at 34.)  As such, the Fund sought to share in the investment experience of Manulife, which acted as an investment agency.  The Fund bore all of the investment risk.  Accordingly, the Second Manulife Annuity Contract was a variable annuity not entitled to section 3(a)(8)'s insurance exemption.

### (F)    Conclusion

Accordingly, the Court concludes that all of the aforementioned annuity contracts, except for the QPA-2, were, at least to some extent, variable annuities not entitled to the

insurance exemption provided by section 3(a)(8).[52]


### ii.    Rule 151 Safe Harbor

The Court also notes that the SEC Rule 151 Safe Harbor, 17 C.F.R. § 230.151, does not apply to the variable annuities purchased from Safeco, Provident and Manulife. Under Rule 151, any annuity contract or optional annuity contract is deemed to be within the provisions of section 3(a)(8) of the 1933 Act provided that:

> (1) The annuity or optional annuity contract is issued by a corporation (the insurer) subject to the supervision of the insurance commissioner, bank commissioner, or any agency or officer performing like functions, of any State or Territory of the United States or the District of Columbia;
>
> (2) The insurer assumes the investment risk under the contract . . . ; and
>
> (3) The contract is not marketed primarily as an investment.

17 C.F.R. § 230.151(a).

Assuming Safeco, Provident and Manulife are subject to the supervision of the insurance and/or bank commissioner of any State or Territory, the annuities at issue do not fall within the safe harbor because Safeco, Provident and Manulife did not assume the investment risk under the annuity contracts, at least with regard to their variable portions.  In order for an insurer to assume the investment risk under the contract, one of the requirements is that the value of the contract can not vary depending on the investment experience of a separate account. *See* 17 C.F.R. § 230.151(b)(1).  Here, at

---

[52]While most of the annuities possessed mortality risk assumptions, as the Supreme Court stated, these were superficial, not substantial.  They certainly did not turn these variable annuities into exempt insurance.

least to some extent, the value of all of the annuities, except for the QPA-2, increased or decreased depending on the investment experience of a separate account.  As such, the Rule 151 Safe Harbor does not apply.

### iii.    Section 3(a)(2)

Several parties, particularly Manulife, make mention of section 3(a)(2) of the 1933 Act, 15 U.S.C. § 77c(a)(2), which exempts from registration group annuities sold to qualified retirement plans.  Although such annuities are exempt from the registration requirements of federal securities laws, they are not exempt from securities fraud claims. *See Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 564 n.18 (suggesting that the antifraud provisions of the 1933 and 1934 Acts continue to apply to interests that come within section 3(a)(2) exemption); *Abrams v. Oppenheimer Gov't Securities, Inc.*, 737 F.2d 582, 588 (7th Cir. 1984) (antifraud provisions of the securities laws apply to pension funds even though such funds are exempt from the registration requirements of the 1933 Act).  Accordingly, section 3(a)(2) is of no relevance to the instant summary judgment motions.

### iv.    Are the Annuities "Investment Contracts"?

Simply because all of the annuities, aside from the QPA-2, do not fall within the section 3(a)(8) exemption does not mean that they are "securities" under federal law.  As such, the Court must now determine whether the aforementioned annuities are "securities."

Federal securities laws define "security" to include an investment contract. *See* 15

U.S.C. § 77b(a)(1).  The Supreme Court has defined an "investment contract" to mean "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is lead to expect profits solely from the efforts of the promoter or a third party. . . ." *SEC v. W. J. Howey Co.*, 328 U.S. 293, 298-99 (1946).  "Thus, the three requirements for establishing an investment contract are: (1) 'an investment of money,' (2) 'in a common enterprise,' (3) 'with profits to come solely from the efforts of others.'" *Great Lakes Chemical Corporation v. Monsanto Company*, 96 F. Supp. 2d 376, 384 (D. Del. 2000) (citing *Howey*, 328 U.S. at 301).  This definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299.  In *United Benefit*, the Supreme Court held that the accumulation portion of the "Flexible Fund" variable annuity was a security under federal securities law. 387 U.S. at 211-12.  In the opinion of the Court, there does not appear to be any material difference between the "Flexible Fund" annuity in *United Benefit* and the variable annuities in the present case.  As such, *United Benefit* controls. However, for the sake of thoroughness, the Court will address the three-part *Howey* test.

The first prong of *Howey* is clearly met.  The Fund invested millions of dollars in the aforementioned annuity contracts with the hope of reaping the benefits of the investment experience of Safeco, Provident and Manulife. *See Steinhardt Group v. Citigroup*, 126 F.3d 144, 151 (3d Cir. 1997) (first prong of *Howey* met based on forty-two million dollar ($42,000,000) investment with the expectation of receiving an eighteen percent (18%) return).

The second, or "common enterprise," element is also satisfied.  The common enterprises, in the language of *Howey*, were the various sub-fund portfolios in which Fund assets were invested.  After the Fund selected which sub-funds in which to invest, Safeco, Provident or Manulife would then invest these monies in, among other things, stocks, bonds and mutual funds.  Any profits of the enterprise were due solely to the efforts of others, not the Fund, and yet the profits from the investments were credited to the Fund.  *See Peoria Union Stock Yards Co. Retirement Plan v. Penn Mutual Life Insurance Co.*, 698 F.2d 320, 325 (7th Cir. 1983); *Gilmore*, 165 F. Supp. 2d at 1284.[53]

The third prong is met as well.  The Fund's expected return was to be "with profits to come solely from the efforts of others" because, while the Fund chose the sub-funds in which to invest, the sub-funds were managed by Safeco, Provident or Manulife.  As such, the Fund depended on the investment expertise of others once it designated the sub-

---

[53]The United States Court of Appeals for the Third Circuit has not addressed the common enterprise element in the context of variable annuities.  However, it has held that the common enterprise element is satisfied by "horizontal commonality." *Steinhardt Group v. Citigroup*, 126 F.3d 144, 151 (3d Cir. 1997).  Horizontal commonality is characterized by "a pooling of investors' contributions and distribution of profits and losses on a pro-rata basis among investors." *Id.*

This standard is met here.  Under the Manulife Annuity Contracts, monies placed in the variable sub-funds were recorded in units.  The value of a unit of each pooled fund was computed by dividing the market value of the entire fund investments by the entire number of units in the fund.  (*See* Pl.'s Ex. 45 at Manulife 00916, Doc. 488-2 at 26.)  Similarly, monies invested pursuant to the Provident Annuities and placed in its separate accounts were used to purchase participation units.  (*See* Pl.'s Ex. 91 at NAT 00019, Doc. 488-4 at 34.)  The value of the Fund's Provident Annuities was the number of participation units it had purchased multiplied by their value. (*Id.* at NAT 00020, Doc. 488-4 at 35.)  Other annuity contracts participated in Provident's separate accounts. (*See id.* at NAT 00022, Doc. 488-4 at 37 ("The assets of the Value Equity Separate Account are segregated from all other assets of [Provident], and subject only to the claims of *contracts* participating in the Value Equity Separate Account) (emphasis added).)  Safeco's Resource Variable Account A and Safeflex annuities had similar proportionality provisions. (*See* Pl.'s Ex. 425 at ASCO 002066-002068, Doc. 494-2 at 4-6.)  As such, there was pro-rata pooling to satisfy the horizontal commonality standard. *See SEC v. Infinity Group Co.*, 212 F.3d 180, 187-88 (3d Cir. 2000) (finding horizontal commonality where the investor's return was directly proportional to the amount of the investment).

fund in which to invest. *See Gilmore*, 165 F. Supp. 2d at 1285 (annuity at issue satisfied third prong of *Howey* because the annuitant depended on the investment expertise of the insurer once the annuitant designated the subaccount into which the purchase payments were to be invested).

Accordingly, the Court concludes that the variable annuities at issue were "investment contracts" under *Howey*. Thus, they were "securities" under federal securities laws.

### v.    Actionable Securities Fraud

### (A)    Relevant Law

To determine whether Plaintiff's RICO claims are "actionable" under federal securities laws, it is necessary for the Court to recite the relevant law in this area. Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, "are directed at fraud '*in connection with* the purchase or sale' of securities." *Bald Eagle*, 189 F.3d at 329-30 (emphasis in original). Section 10(b) makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Thus, for a private plaintiff to establish securities fraud under Rule 10b-5, he must prove the following five (5) elements:

(1) a misrepresentation or omission of a material fact in connection with the purchase or sale of a security;

(2) scienter (i.e., a wrongful state of mind) on the part of the defendant;

(3) reliance on the misrepresentation (i.e., transaction causation);

(4) economic loss; and

(5) a causal connection between the material misrepresentation and the loss (i.e., loss causation).

*McCabe v. Ernst & Young, LLP*, --- F.3d ----, 2007 WL 2301916, at *5 (3d Cir. July 23, 2007) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

**(B)    Analysis**

Section 1964(c) "was not intended merely 'to eliminate securities fraud as a predicate offense in a civil RICO action,' but also to prevent a plaintiff from 'plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities

87

fraud.'" *Burton v. Ken-Crest Services, Inc.*, 127 F. Supp. 2d 673, 676 (E.D. Pa. 2001) (quoting H.R. Conf. Rep. No. 104-369, at 47).   The United States Court of Appeals for the Third Circuit has rejected efforts on the part of plaintiffs to elude section 1964(c) by pleading predicate acts that, while not securities fraud by name, are actionable as securities fraud and are "undertaken in connection with the purchase and sale of securities." *Id.* (citing *Bald Eagle*, 189 F.3d at 329-30; *In re Ikon Office Solutions, Inc. Securities Litig.*, 86 F. Supp. 2d 481, 486-87 (E.D. Pa. 2000)).

A fraud is "in connection with" a purchase or sale of securities when there are "deceptive practices touching [upon the purchase or] sale of securities." *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12-13 (1971).   Because the "in connection with" language is read broadly, Rule 10b-5 encompasses misrepresentations beyond those implicating the investment value of a particular security. *Angelastro v. Prudential-Bache Securities, Inc.*, 764 F.2d 939, 943 (3d Cir. 1985).   All the "in connection with" language requires is some causal connection between the alleged misrepresentation and the harm incurred when a security is purchased or sold. *Id.* at 944.

For example, frauds involving the trading process can be actionable under 10b-5. *Id.* at 943.   Thus, activities such "churning," which is a course of excessive trading through which a broker advances his own interests (e.g., commissions based on volume) over those of his customer, are actionable under 10b-5. *Id.* (citing *Costello v. Oppenheimer & Co.*, 711 F.2d 1361, 1367-68 (7th Cir. 1983)).   Hidden commissions in broker contracts can also constitute securities fraud. *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 835 F.2d 1031, 1033 (3d Cir. 1987).   The failure on the part of a

broker-dealer to inform a customer of a possible conflict of interest may also violate Rule 10b-5. *Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 130 (2d Cir. 2000) (citing *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1172 (2d Cir. 1970)).  "Many other types of fraud involving the trading process, rather than the investment value of a particular security have also been found to come within the scope of section 10(b) and Rule 10b-5." *Angelastro*, 764 F.2d at 943.

Here, the Court finds the putative pay-to-play, campaign contributions for annuity contracts and excessive commissions and charges, scheme is analogous to churning in that it is alleged that Defendants, in carrying out their putative scheme, advanced their own interests – campaign contributions with regard to the former Board members, annuity contracts charging excessive management fees and expense recovery charges with regard to Safeco, Provident, Manulife and the other money managers, and excessive commissions with regard to Williamson/ASCO and the Joyces – over those of Plaintiff, the Fund and/or its participants.  The essence of both churning and the pay-to-play scheme alleged here is the deception of a relying customer, in this case, Plaintiff, the Fund and/or its participants, by one entrusted with the handling of, and who exercises control over, his account, in this case, Defendants. *See Costello*, 711 F.2d at 1368.

In addition, Plaintiff's claims rely heavily upon the alleged concealment of (1) the commissions remitted to the Joyces, which caused Williamson/ASCO to increase his commissions to excessive levels, and (2) the excessive management fees and expense recovery charges related to the annuity contracts.  This conduct too is actionable as securities fraud. *Ettinger*, 835 F.2d at 1033 (charging undisclosed excessive

commissions constitutes securities fraud).[54]

This conclusion is consistent with the Supreme Court's emphasis that the federal securities laws were designed "'to achieve a high standard of business ethics . . . *in every facet of the securities industry."* United States v. Naftalin*, 441 U.S. 768, 775 (1979) (quoting *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186-87 (1963)) (emphasis added in *Naftalin*).  It does not matter that the fraud here is not of the "garden variety." *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 619 (9th Cir. 1981) (citing *Bankers Life*, 404 U.S. 6).

The conclusion that Defendants' conduct is actionable as securities fraud is not inconsistent with the Court's earlier memorandum (Doc. 181) at the motion to dismiss stage.  At that time, the in-depth factual analysis needed to determine whether the contracts at issue were "securities" precluded the Court from fully addressing the issue of whether the alleged conduct was actionable as securities fraud.  Because the annuity contracts, aside from the QPA-2, were "securities," the connection between the alleged fraud and the purchase or sale of securities is not as attenuated as the twice-removed relationship described in the earlier memorandum. (*See* Doc. 181 at 37-38.)

Accordingly, the alleged pay-to-play scheme may form the basis of section 10(b)

---

[54]The omissions here were material.  Materiality is defined as "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable [investor]." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *see Healey v. Catalyst Recovery of Pennsylvania, Inc.*, 616 F.2d 641, 647 (3d Cir. 1980).  The alleged concealment of both the conflict of interest, *Press*, 218 F.3d at 130, and the excessive commissions, *Ettinger*, 835 F.2d at 1033, satisfy the materiality requirement.

and Rule 10b-5 securities fraud violations.[55] *See Burton*, 127 F. Supp. 2d at 676-77 (holding that PSLRA barred RICO claims based on pension fund scheme involving failure to disclose conflicts of interest and commission arrangements).

### vi.    Conclusion as to PSLRA

The Court concludes that Plaintiff's claims are actionable as securities fraud.  As such, Plaintiff's RICO claims are barred by the PSLRA.  The Court will therefore grant summary judgment as to all of Plaintiff's RICO claims (Counts III, IV, and VI).

However, for the sake of thoroughness, the Court will assume that the PSLRA does not bar Plaintiff's RICO claims and address their merit.  Even with this generous assumption, Plaintiff's RICO claims do not survive summary judgment.

### b.    Scheme to Defraud

Congress has not defined the term "scheme to defraud" and so the federal courts have interpreted this element broadly in determining the reach of the mail fraud statute. *United States v. Pisani*, 773 F.2d 397, 409 (2d Cir. 1985).[56]  "The United States Supreme Court has held that [C]ongress may forbid any use of the mails that furthers a scheme to

---

[55]While the QPA-2 and the fixed portions of the other annuities were not "securities" under federal securities laws, because they were part of the putative pay-to-play scheme, they cannot be used to support a civil RICO claim. *See Bald Eagle*, 189 F.3d at 329-30 (holding that (1) even if some conduct is not actionable as securities fraud, that conduct cannot support a civil RICO claim if it was also undertaken in connection with the purchase of a security, and (2) conduct in maintaining Ponzi scheme was conduct undertaken in connection with the purchase or sale of securities).  As such, the Court rejects Plaintiff's argument that, because at least some or parts of the annuity contracts were not "securities," they therefore cannot be the subject of an action for securities fraud, and thus are actionable under RICO. (*See* Pl.'s Br. in Opp'n at 105, Doc. 484-1 at 122.)  Rather, the entire fraudulent scheme must be examined as a whole to determine if it falls within section 10(b) of the 1934 Act and Rule 10b-5. *Gatz v. Ponsoldt*, 297 F. Supp. 2d 719, 730-31 (D. Del. 2003).

[56]In *Pisani*, the defendant, once a member of the New York State Senate, successfully argued for the reversal of his mail fraud conviction on the ground that New York law did not prohibit a candidate from using campaign funds for personal purposes.  As such, the court concluded that "central premise underlying the fraudulent scheme charged against Pisani fail[ed]." *Id.* at 410.

defraud that it regards as contrary to public policy, even if [C]ongress could not forbid the scheme itself." *Id.* (citing *Parr v. United States*, 363 U.S. 370, 389 (1960)).

Fraudulent schemes include schemes to deprive another of the "intangible right of honest services." 18 U.S.C. § 1346.  State and local officials, as well as public employees, can be held accountable under the mail and/or wire fraud statutes when they deprive "the citizens they serve their right to honest services." *United States v. Antico*, 275 F.3d 245, 262 (3d Cir. 2001).  This doctrine applies when an official accepts bribes for official decisions or actions, or when the official fails to disclose a conflict of interest resulting in personal gain. *United States v. Panarella*, 277 F.3d 678, 690 (3d Cir. 2002).[57]

Plaintiff contends that Defendants committed honest services fraud and used mail and/or wire communications to do so. (*See* Pl.'s Br. in Opp'n at 67, Doc. 484-1 at 84.) Specifically, in paragraph 188 of its Complaint, Plaintiff alleged as follows.

a.   The Defendant Board Members retained ASCO as an investment adviser in exchange for political contributions;

b.   The Defendant Board Members permitted the investment of the Plan's funds in investments not suitable for the Plan in exchange for political contributions;

c.   The Defendant Board Members permitted the Plan to pay excessive fees and commissions to the co-defendants in exchange for political contributions;

d.   ASCO and Don Williamson made political contributions to the Defendant Board Members in order to exercise influence and control over the Plan's investment

---

[57]Holding that "where a public official takes discretionary action that the official knows will directly benefit a financial interest that the official has concealed in violation of a state criminal law, that official has deprived the public of his honest services under 18 U.S.C. § 1346." *Id.*

92

decisions;

e.      ASCO and Don Williamson recommended and permitted the
investment of the Plan's funds in investments not suitable for
the Plan in exchange for excessive and inappropriate
commissions;

f.      The Collaborators [– i.e., the investment companies,
their employees, and the Joyces –] made political
contributions to the Defendant Board Members in order
to exercise influence and control over the Plan's
investment decisions; and

g.      The Collaborators recommended and permitted the
investment of the Plan's funds in investments not
suitable for the Plan in exchange for excessive fees
and commissions.

(Compl. ¶ 188, Doc. 1 at 63-64.)

Subparagraphs a, b, c, d, and f all, in essence, allege honest services fraud by

bribery – political contributions were made to the former Board members in exchange for

their making a favorable decision, with regard to the investment of Fund assets, in their

official capacities.  Subparagraphs e and g allege honest services fraud by either a

conflict of interest or the non-disclosure of a financial interest – that is, Williamson/ASCO,

the Joyces, the investment managers and their employees recommended and permitted

the investment of the Fund's assets in investments which were not suitable for the Fund

in exchange for excessive and inappropriate commissions and fees. (Compl. ¶ 188, Doc.

1 at 63-64.)

### i.      Bribery

### (A)      Introduction

Defendants argue that they are entitled to summary judgment because there is no

evidence of quid pro quo, i.e., that there was no explicit agreement between the various

Defendants that, in exchange for campaign contributions, the former Board members

would award investment contracts.  Plaintiff contends that there is evidence of quid pro

quo, namely: (1) the former Board members' secretive conduct in entering into the

investment contracts outside of public view; (2) Pizano's admitting to a quid pro quo

exchange; and (3) the timing of the campaign contributions.  The Court agrees with

Defendants.

## (B)      Legal Standard

In *McCormick v. United States*, 500 U.S. 257 (1991), the United States Supreme

Court interpreted the Hobbs Act, 18 U.S.C. § 1951, which prohibits extortion under color

of official right, and held that a Hobbs Act violation can be found only "if the [campaign

contributions] are made in return for an explicit promise or undertaking by the official to

perform or not to perform an official act." *Id.* at 273.  Thus, under *McCormick*, proof of an

overt quid pro quo is required in the context of campaign contributions. *Id. See Antico*,

275 F.3d at 256 (stating that *McCormick* "held that a[ ] . . . *quid pro quo* is necessary for

conviction under the Hobbs Act when a public official receives a campaign contribution").

> Whatever ethical considerations and appearances may
> indicate, to hold that legislators commit the federal crime of
> extortion when they act for the benefit of constituents or
> support legislation furthering the interests of some of their
> constituents, shortly before or after campaign contributions
> are solicited and received from those beneficiaries, is an
> unrealistic assessment of what Congress could have meant
> by making it a crime to obtain property from another, with his
> consent, "under color of official right."  To hold otherwise
> would open to prosecution not only conduct that has long
> been thought to be well within the law but also conduct that in
> a very real sense is unavoidable so long as election

94

> campaigns are financed by private contributions or
> expenditures, as they have been from the beginning of the
> Nation.

*Id.* at 272.[58]

The Supreme Court's holding in *McCormick* has been applied to cases of mail

and/or wire fraud. *See United States v. Malone*, No. 02:03-CR-00500-LRH-LRL, 2006

WL 2583293, at *1 (D. Nev. Sept. 6, 2006) ("the Supreme Court's reasoning in

*McCormick* [is] equally applicable to charges of honest services wire fraud where the

'scheme or artifice to defraud' involved the payment of campaign contributions"); *United*

*States v. Warner*, No. 02 CR 506, 2005 WL 2367769, at *5 (N.D. Ill. Sept. 23, 2005)

(granting defendant's motion in limine to preclude the government from presenting

evidence related to official actions benefitting campaign contributors absent proof of quid

pro quo); *United States v. Triumph Capital Group, Inc.*, 260 F. Supp. 2d 444, 460-61 (D.

Conn. 2002) (finding that the government's indictment contained the necessary allegation

of quid pro quo).

As stated by the United States Court of Appeals for the Seventh Circuit, "accepting

a campaign contribution does not equal taking a bribe unless the payment is made in

exchange for an explicit promise to perform or not perform an official act." *United States*

---

[58]In *Evans v. United States*, 504 U.S. 255 (1992), the Supreme Court clarified that "the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific acts; fulfillment of the *quid pro quo* is not an element of the offense. . . . We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.* at 268.  This nuance, that no official act or "quo" need be proved so long as the payment or "quid" was made in return for the official act, *see Antico*, 275 F.3d at 257, is worth mentioning but is not applicable to the present case because there is no dispute that official acts, the awarding of investment contracts, were taken.  The issue here is whether the investment contracts were awarded in exchange for the campaign contributions.

*v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993).  "Money fuels the American political machine.  Campaigns are expensive, and candidates must constantly solicit funds.  People vote for candidates and contribute to the candidates' campaigns because of those candidates' views, performance, and promises.  It would be naive to suppose that contributors do not expect some benefit-support for favorable legislation, for example-for their contributions."  *Id.*

Accordingly, the Court concludes that Plaintiff must point to evidence that would create a genuine issue of material fact as to whether there was a quid pro quo – that is, that there was an agreement to exchange campaign contributions for the awarding of investment contracts.

## (C)        Analysis

Here, there is no question that Board members Makowski, Crossin, Pizano and Jones received campaign contributions from Williamson, the Joyces, their companies and employees, as well as employees of the Fund's money managers.  All of these contributions were publicly disclosed in campaign finance reports.

Plaintiff points to three pieces of evidence which it contends creates a genuine issue of material fact as to whether there was a quid pro quo.  The Court disagrees and concludes that there is no evidence in the summary judgment record that would allow a reasonable jury to find a quid pro quo.  The Court will address each of Plaintiff's arguments in turn.

First, Plaintiff argues that "Urban testified that the conduct of the defendant Board members in making contractual agreements without seeking Board approval caused him

to believe that campaign contributions were made in exchange for favors in awarding contracts." (*See* Pl.'s Br. in Opp'n at 78, Doc. 484-1 at 95; Urban Dep. 147:17-151:21, Doc. 435-16 at 38-39.)  This argument, in essence, is as follows.  Because there are no Board minutes evidencing that the investment contracts were entered into at public meetings, the Sunshine Act must have been violated.  Because the Sunshine Act was violated, there must have been dishonest, back-room dealings involving a quid pro quo, campaign contribution for investment contract, exchange.  The first of these statements is tenable.[59]  The second, however, is certainly not.  Violations of the Sunshine Act do not allow a reasonable jury to conclude that former Board members Makowski, Crossin, Pizano and Jones were engaged in a pay-to-play scheme to defraud the public of their honest services.

Second, Urban also testified that he had a conversation with Pizano in December 2003, in which Pizano told him that "he didn't receive any personal gain from these actions, but he did receive campaign contributions . . . in exchange for his actions at the time." (Urban Dep. 60:7-22, Doc. 435-16 at 16; *see* Pl.'s Br. in Opp'n at 78, Doc. 484-1 at 95.)  However, later in his deposition, Urban backtracked on this assertion.  When asked whether Pizano "ever sa[id] that he received campaign contributions in exchange for signing contracts," Urban responded "[n]o." (Urban Dep. 64:21-25, Doc. 435-16 at 17.) When asked whether Pizano "ever sa[id] he received campaign contributions in exchange for voting any particular way on any particular issue," Urban responded "[n]o."

---

[59]*See Tuttle v. Planning Board of City of Leominster*, 18 Mass. L. Rptr. 381, 2004 WL 2550466, at *8 (Mass. Super. Oct. 20, 2004) (finder of fact could infer that an undisclosed meeting of planning board occurred, where planning board decided to zone certain property for commercial use but the only minutes concerning the property reflected planning board's approval of the property for mixed-use).

(Urban Dep. 65:1-5, Doc. 435-16 at 17.)  Urban later attempted to clarify this contradiction in his testimony, stating that he interpreted Pizano's statement as an admission that he took campaign contributions in exchange for awarding investment contracts. (Urban Dep. 152:5-11, Doc. 435-16 at 39.)  Urban's attempted clarification, however, is pure speculation and of no probative weight.

Also pure speculation, or simply not evidence of quid pro quo but perhaps rather that money fuels the American political machine, are statements made by Trinisewski, Tucker and Dugan which are pointed to by Plaintiff. (*See* Pl.'s Br. in Opp'n at 78, Doc. 484-1 at 95.)  Trinisewski stated that contributions were made to majority commissioners "because they would have an open door," in that the majority "control[led] the jobs and the appointments and boards and things like that." (Trinisewski Dep. 24:19-25:13, Doc. 435-14 at 7.)  Tucker testified that "most everyone who was affiliated in any way with the county was generous and contributed." (Tucker Dep. 25:7-9, Doc. 435-15 at 7.)  When asked whether he agreed with the statement that the Joyces were strong political supporters in northeastern Pennsylvania, Dugan answered "[s]upporter of what? Of whom?  I don't know what you're trying to say there.  Apparently, he supported the commissioners or he wouldn't have been appointed, okay?  If that's what you're talking about." (Dugan Dep. 58:14-21, Doc. 434-11 at 16.)  All of these statements are generalities and utter speculation.  None are the least bit probative as to the issue of whether the particular Defendant former Board members, Makowski, Crossin, Pizano and Jones, accepted particular campaign contributions from particular Defendant investment brokers and/or companies as part of a quid pro quo exchange for particular official actions – the awarding of investment contracts.

98

Third, Plaintiff points to the contemporaneous nature of some of the campaign contributions and the awarding of investment contracts, as well as the fact that campaign contributions were made during years in which elections were not held. (Pl.'s Br. in Opp'n at 79-82, Doc. 484-1 at 96-99.)

As for the proximity in time between certain campaign contributions and the awarding of investment contracts, the United States Supreme Court explicitly rejected this as an indicator of a quid pro quo. *McCormick*, 500 U.S. at 272 ("to hold that legislators commit [a] federal crime . . . when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, *shortly before or after campaign contributions are solicited and received from those beneficiaries*, is an unrealistic assessment of what Congress could have [intended]") (emphasis added).

The fact that campaign contributions were made during a three (3) year period, 1996 through 1998, in which elections were not held, is also not evidence of a quid pro quo because "[c]ampaigns are expensive, and candidates must constantly solicit funds," *Allen*, 10 F.3d at 411 (citing *McCormick*, 500 U.S. at 272), including non-election years.

Aside from this evidence pointed to by Plaintiff, upon its own review of the record, the Court does not find any evidence of a quid pro quo.

The solicitation and acceptance of campaign contributions "is the very nature of politics, and in the absence of evidence indicating some wrongdoing independent of legal solicitation [and acceptance] of campaign contributions," the contributions from ASCO and Williamson, the Joyces, their companies and employees, and the Fund money managers, all of which were publicly disclosed in campaign finance reports, is evidence of nothing. *Roger Whitmore's Auto. Services, Inc. v. Lake County, Illinois*, 424 F.3d 659,

99

672 (7th Cir. 2005) (granting summary judgment on 18 U.S.C. § 1962(c) claim).

### (D)      Conclusion

Accordingly, the Court concludes that there is no evidence that would allow a reasonable jury to find a quid pro quo, campaign contribution for investment contract, exchange. Therefore, as a matter of law, the contributions made to Crossin, Makowski, Jones and Pizano cannot be found to constitute pay-to-play bribes.

### ii.      Failure to Disclose a Conflict of Interest Resulting in Personal Gain

### (A)      Introduction

Plaintiff essentially alleged in its Complaint that Williamson/ASCO, the Joyces, the investment managers and their employees recommended and permitted the investment of the Fund's assets in investments which were not suitable for the Fund in exchange for excessive and inappropriate commissions and fees. (Compl. ¶ 188, Doc. 1 at 63-64.) Plaintiff's brief poses alternative theories to support this allegation.

Plaintiff, first, contends that Williamson/ASCO had a conflict of interest in that they received commissions on deposits, thus eliminating any risk if the value of the Fund's assets declined. (Pl.'s Br. in Opp'n at 74-75, Doc. 484-1 at 92-93.)  Second, Plaintiff asserts that the investment contracts, as well as the amount of the commissions and fees charged to the Fund as a result of those contracts, were not disclosed to non-complicit Board members.[60] (*Id.* at 75, Doc. 484-1 at 93.)  Third, Plaintiff argues that the fact that

---

[60]Plaintiff argues that the former Board members used two means by which they deliberately concealed the investment contracts, their terms and fees.  First, the former Board members violated the Sunshine Act, holding clandestine meetings to approve the investment contracts. (Pl.'s Br. In Opp'n at 76, Doc. 484-1 at 93.)  Plaintiff avers that all of the contracts other than the QPA-2 and the First Provident Annuity were signed by the former Board members outside of public meetings, without open discussion of the merits of these investments, and without approval of a majority of the

Williamson and ASCO were to share commissions with the Joyces was not disclosed, thus concealing the Joyces' involvement in the scheme.[61] (*Id.*)

Defendants assert that they are entitled to summary judgment because Plaintiff's theory of honest services fraud based on non-disclosure lacks evidentiary support in the record.  Defendants point out that annual reports were prepared by the Fund's accountants, auditors and actuaries, as well as ASCO.  These reports disclosed (1) all of the investment contracts and money managers and (2) all of the commissions and fees associated with the investments. (Makowski, Pizano, Crossin and Jones Mem. of Law at 62-63, Doc. 415 at 70-71.)  Defendants also contend that the fact that the Joyces would be sharing in the commissions received by Williamson and ASCO was disclosed to Plaintiff.

### (B)      Legal Standard

"A public official's non-disclosure of material information has . . . been held to satisfy the fraud element" of mail and/or wire fraud. *United States v. Bohonus*, 628 F.2d 1167, 1171 (9th Cir. 1980).  The United States Court of Appeals for the Third Circuit has

---

Board. (*Id.*)  Plaintiff again points to the lack of Board minutes evidencing that meetings or discussions took place concerning these investments. (*Id.*)

Second, the former Board members directed that all documents and account statements reflecting commissions paid to Williamson/ASCO and the Joyces pursuant to the investment contracts were sent directly to Williamson/ASCO, and not to Plaintiff. (*Id.* at 72, Doc. 484-1 at 89.) This practice concealed the contracts, as well as their terms and fees, from the Board members whom Plaintiff does not allege to have been a part of the scheme. (*Id.*)

[61]According to Plaintiff, its non-complicit members did not know that the Joyces were to and did in fact share in the commissions Williamson/ASCO received from work on the Fund. (Pl.'s Br. in Opp'n at 11, Doc. 484-1 at 28.)  Plaintiff contends that the Joyces did not perform any services related to the management of the Fund. (*Id.*)  These facts, Plaintiff argues, when combined with Williamson's charging a commission on deposits, support the conclusion that Williamson/ASCO made investment decisions that were in their own, as well as the Joyces', best interests, and not what was in the best interests of the Fund and its participants, for whom Williamson/ASCO served as a fiduciary. (*Id.* at 12, Doc. 484-1 at 29.)

held that "where a public official takes discretionary action that the official knows will directly benefit a financial interest that the official has concealed in violation of a state criminal law, that official has deprived the public of his honest services under 18 U.S.C. § 1346." *Panarella*, 277 F.3d at 690.  "Fraud in its elementary common law sense of deceit- and this is one of the meanings that fraud bears in the [mail fraud] statute . . . -includes the deliberate concealment of material information in a setting of fiduciary obligation.  A public official is a fiduciary toward the public . . . ." *Id.* (citing *United States v. Holzer*, 816 F.2d 304, 307 (7th Cir. 1987)).

However, the United States Court of Appeals for the Third Circuit has cautioned that, so as to not allow an overreaching interpretation of the mail and/or wire fraud statutes, in order to establish honest services mail and/or wire fraud, the government or a private plaintiff generally must prove a violation of state disclosure law, *Panarella*, 277 F.3d at 693 (emphasizing the need to establish a violation of state disclosure law, but not deciding whether such a violation was always necessary), as well as breach of a fiduciary duty imposed by state or federal law, *United States v. Murphy*, 323 F.3d 102, 104 (3d Cir. 2003) (stating that, in addition to a violation of a state disclosure statute, there must also be a fiduciary relationship in order to prosecute local public officials for honest services mail fraud).

Accordingly, the Court concludes that Plaintiff must prove, or, to survive summary judgment, create a genuine issue of material fact, that (1) the defendant had a duty to disclose material information to the public based on some state disclosure law or fiduciary obligation; (2) the defendant deliberately concealed information from the public; and (3) this information was material. *See Id.* at 696.

### (C)      Analysis

Here, a Pennsylvania law imposes fiduciary obligations.  The County Pension Law

provides that Board members are trustees of the Fund and serve as its fiduciaries. 16

P.S. § 11659.  As such, former Board members Makowski, Crossin, Pizano and Jones

owed fiduciary duties to the Fund.  The Court assumes arguendo that the other

Defendants, as financial advisors and money managers, owed fiduciary duties to the

Fund as well.  Therefore, the Court concludes that Defendants owed a duty to disclose

material information.

However, the Court concludes that there is no evidence that would allow a

reasonable jury to find that any of the Defendants deliberately concealed material

information from the public or from Plaintiff.

### (1)      The Investment Contracts

Many of the investment contracts which Plaintiff claims were concealed from it

were in fact known about by Board members other than Makowski, Crossin, Pizano and

Jones.

First, Plaintiff acknowledges that the QPA-2 and the First Provident Annuity were

approved at public meetings.[62]  As these contracts were matters of public record, they

were certainly not concealed from Plaintiff or the public.  In addition, a year after it was

entered into, all five (5) Board members – Crossin, Tucker, Tirpak, Phillips and Morreale

– signed a letter authorizing an additional investment of the Fund's money into the First

---

[62]As mentioned in footnote 10, supra, Plaintiff does point out that only Crossin signed the First
Provident Annuity.  However, all Board members voted in favor of the resolution authorizing Crossin's
signature. Moreover, in January 1992, Morreale wrote a letter to Provident informing them that
Williamson was authorized to make withdrawals to pay pension benefits. (*See* Def.'s Ex. 58 at Flood
6066, Doc. 441-8 at 1.)

Provident Annuity.

Second, the Resource Variable Account A and the Safeflex Allocated Group Variable Annuity were signed by Tirpak and Morreale, whom Plaintiff does not contend were involved in the alleged pay-to-play scheme.  Pickering, of the Hay Group, Plaintiff's actuary, also signed the Resource Variable Account A.  Aside from the issue of whether these contracts were entered into at public meetings, Board members whom Plaintiff does not contend were involved in alleged pay-to-play scheme knew about them.  As such, they certainly were not concealed from Plaintiff.

Third, both Manulife annuity contracts were known about by Morreale.  He signed the First Manulife Annuity Contract as a witness.  He knew about the Second Manulife Annuity Contract because he signed a document authorizing the withdrawal of Fund assets from this account.[63]

**(2)**     **Statements of Account and Other Financial Statements**

The summary judgment record also contains evidence that Plaintiff received documentation disclosing facts to which it claims ignorance.  For example, it appears that

---

[63]Two additional facts regarding the other investment contracts are worth noting.  First, Plaintiff has settled with FSI, Wells, FSC, Rochdale and LPL and does not seek damages with respect to these investment contracts. (Pl.'s Br. in Opp'n at 33-34, Doc. 484-1 at 50-51.)  Second, copies of the Second, Third and Fourth Provident Annuities were produced by Plaintiff itself, or Flood, during the discovery process.  As such, it appears that these investment contracts were within Plaintiff's possession. *See Judson Atkinson Candies, Inc.*, 476 F. Supp. 2d at 922 (Bates numbers on exhibits confirmed which party produced them).  Even if, as Plaintiff claims (*see* Letter from Carl A. Solano, Counsel for Plaintiff, to the Honorable A. Richard Caputo, U.S. District Judge (Oct. 8, 2007) Doc. 533), these investment contracts were first given to Plaintiff by Provident during Flood's investigation of the Fund, the record rOctober 22, 2007eveals other evidence that Plaintiff had knowledge of commissions and fees of which it claims it was ignorant.  For instance, Plaintiff received statements of account and other financial statements containing this information, and over the years Plaintiff also received accounting, auditing, and actuarial reports from third parties that documented the investment fees the Fund was paying.  *See* (I)(A)(2)(b)(ii)(C)(2)&(3), infra.

Plaintiff received account statements from Manulife, as these statements were addressed to Plaintiff, not ASCO. (*See* Pl.'s Ex. 101 at Manulife 01321-01322, 01282-01283, Doc. 455 at 1-4.)  One of these account statements, for the year 1995, disclosed that two hundred forty two thousand twenty-two dollars ($242,022) was paid to JJJA as commission. (*Id.* at Manulife 01283, Doc. 455 at 4.)  Both of these account statements disclosed some of the administration fees charged by Manulife to the Fund. (*Id.* at Manulife 01322, 01283, Doc. 455 at 2, 4.)

Plaintiff also appears to have received at least two account statements from Wells. (*See* Def.'s Ex. 163 at LCRB 18691-18692, Doc. 445-17 at 1-2.)  These account statements are addressed to the Board, not ASCO. (*See id.*)  These account statements also bear a Bates stamp numbers prefaced by the letters "LCRB," confirming that they were produced by Plaintiff itself. (*See id.*)[64]  These account statements also disclose that, as of December 31, 2000, the Fund held two accounts with Wells, one containing one million one hundred thirty-five thousand twenty-one dollars ($1,135,021) of Fund assets, and the other holding ten million seven hundred sixty-three thousand, six hundred eighty-four dollars ($10,763,684). (*See id.*)  These account statements also list the brokers for the account as Perfilio and Michael Joyce. (*See id.*)

In May 1998, Plaintiff received a fee statement from FSC for the first quarter of 1998. (*See* Def.'s Ex. 159 at LCRB 28569, Doc. 445-13 at 1.)  This statement was addressed to Plaintiff, or, more specifically, Kammerer, and was produced by it during

---

[64]  As discussed earlier in this opinion, Plaintiff disputes the relevance of LCRB Bates stamps only on certain contracts between Defendant Board members and insurance companies; it does not dispute the relevance of LCRB Bates stamps on other documents, such as these account statements.

discovery.  Kammerer recognized the "Received" stamp in the bottom corner of the document. (Kammerer Dep. 123:6-14, Doc. 434-18 at 32.)  This statement disclosed that FSC held one million nine hundred seventeen thousand two hundred seventy-seven dollars ($1,917,277) in Fund assets. (*See id.*)  This statement also disclosed the annual fee of one and one-half percent (1.50%), but that the Fund was given a sixty percent (60%) discount. (*See id.*)

In February 1999, Plaintiff received an investment performance statement for the fourth quarter of 1998 from Mellon Bank. (*See* Def.'s Ex. 160 at LCRB 28407-28409, Doc. 445-14 at 1-3.)  This statement was addressed to Kammerer at the Retirement Office, and bears her "Received" stamp mark. (*See id*. at LCRB 28407, Doc. 445-14 at 1; Kammerer Dep. 125:18-22, Doc. 434-18 at 32.)  This statement discloses the Fund's investment returns for not only 1998, but the previous five (5) years as well. (*See id*. at LCRB 28409, Doc. 445-14 at 3.)

In June 2000, Plaintiff also received a quarterly account statement from LPL. (*See* Def.'s Ex. 161 at LCRB 28546-28551, Doc. 445-15 at 1-6.)  This statement was addressed to Plaintiff, or, more specifically, Kammerer, and was produced by it during discovery. (*See id*.; Koehler Dep. 443:6-22, Doc. 434-19 at 112.)  While this statement does not bear a "Received" stamp, Kammerer testified that she did not doubt that it was received by her office. (Kammerer Dep. 128:19-129:6, Doc. 434-18 at 33.)  This statement disclosed that LPL was managing one million six hundred seven thousand one hundred sixty-eight dollars ($1,607,168) of the Fund's assets, how those assets were invested, and how much LPL charged for managing those assets. (Def.'s Ex. 161 at

LCRB 28546-28551, Doc. 445-15 at 1-6.)

### (3)    The Reports

The substantial accounting, auditing and actuarial services performed for the Fund by Snyder & Clemente, Zavada & Associates, and the Hay Group make it unreasonable to conclude that Defendants deliberately concealed any material information from Plaintiff.

Snyder & Clemente, Plaintiff's accountants, compiled financial statements so that the Hay Group could perform actuarial services. (*See, e.g.,* Def.'s Ex. 128 at ASCO 030928, Doc. 444-6 at 1.)  Snyder & Clemente compiled these financial statements from broker statements received from ASCO and, sometimes, the investment managers themselves. (Flaherty Dep. 17:7-20, Doc. 434-12 at 5.)  The compilations disclose the investment managers and the investment management fees charged to the Fund. (Flaherty Dep. 93:1-24, Doc. 434-12 at 24.)  One such statement prepared for the year 2001, called an "Investment and Administrative Expense Worksheet," has a line-by-line breakdown of the fees charged by each investment manager. (*See* Def.'s Ex. 129 at SC 001745, Doc. 444-8 at 1.)

Moreover, and perhaps most critical, is the fact that if any member of the Board had asked for an explanation of investment expenses, Snyder & Clemente could have given one. (Flaherty Dep. 93:18-24, Doc. 434-12 at 24.)  That is, if a member of the Board "said Hey, wait a minute, you know, we spent $1,568,274 on investment expenses, gee, that seems high to me," Snyder & Clemente could walk that Board member through exactly how that money was spent. (Flaherty Dep. 94:2-12, Doc. 434-12 at 25.)  The fact that no Board member asked for an explanation does not mean there was intentional

concealment of any material information from Plaintiff.  Snyder & Clemente was able to obtain all of the documentation needed to prepare the compilation, and all of this information was available to any Board member who asked for it. (Flaherty Dep. 18:8-10, 94:2-12, Doc. 434-12 at 6, 25.)

Zavada & Associates performed an audit every year during the relevant period, 1988 through 2002. (Zavada Dep. 15:16-19, Doc. 435-22 at 6.)  Every year, Zavada & Associates has given the Fund a "clean" opinion. (Zavada Dep. 14:7-12, Doc. 435-22 at 5.)  Zavada & Associates' audit reports, which were given to Plaintiff, included, among other things, charts displaying the Fund's expenses by type, including administrative and investment fees. (*See, e.g.,* Def.'s Ex. 128 at ZAV5448-5449, Doc. 444-7 at 13-14.)  In addition, Zavada & Associates verified the figures contained in the spreadsheets prepared by Snyder & Clemente, those disclosing the investment managers and the investment management fees charged to the Fund by each manager. (Zavada Dep. 74:6-9, Doc. 435-22 at 20.)

More important perhaps than the audit report and clean auditing opinion, however, is the fact that, in performing the audit, Zavada & Associates obtained some of the very documents Plaintiff claims were concealed.  For example, during discovery, Zavada & Associates produced documents it apparently received from Provident disclosing commissions paid to ASCO and JJJA, as well as Provident's charges on the Third and Fourth Provident Annuities. (*See* Def.'s Ex. 133 at ZAV0550-0573, Doc. 444-12 at 1-23; Def.'s Ex. 138 at ZAV1305, Doc. 444-17 at 1; Def.'s Ex. 139 at ZAV1273, Doc. 444-18 at 1.)  The same is true with regard to commissions from the Manulife Annuity Contracts. (*See, e.g.,* Def.'s Ex. 198 at ZAV1044-1052, Doc. 446-8 at 1-9.)  Indeed, every year

Zavada & Associates received a statement of account from Provident, statements which disclosed the commissions and fees related to the Provident annuities, as well as the fact that JJJA was receiving a portion of them. (Zavada Dep. 65:24-66:8, Doc. 435-22 at 18; *see, e.g.,* Def.'s Ex. 133 at ZAV0550-0573, Doc. 444-12 at 1-23.)

The Hay Group performed actuarial valuations for the Fund during the relevant period. (Pickering Dep. 68:2-7, Doc. 435-6 at 18.)  The actuarial reports prepared by the Hay Group disclosed the total amount of administrative and investment management expenses charged to the Fund. (*See, e.g.,* Def.'s Ex. 91 at ZAV3391, Doc. 442-21 at 6.) The actuarial reports also contained charts explaining how the Fund's assets were allocated among different types of investments – cash, stocks, bonds, real estate, etc. (*See, e.g.,* Def.'s Ex. 92 at Urban 01158, Doc. 442-22 at 7.)  Pickering also testified that he kept a chart of all of the investment fees, as well as the investment returns, for all sixty (60) of the counties in Pennsylvania for which the Hay Group provided actuarial services. (Pickering Dep. 92:21-93:24, Doc. 435-6 at 24.)  The fees paid by the Fund, while a little high, were still within a reasonable range. (Pickering Dep. 92:21-95:4, Doc. 435-6 at 24-25.)

Plaintiff attempts to marginalize this financial oversight, contending that the accounting, auditing, and actuarial statements do not disclose the investment contracts, the terms of those contracts, or the commissions and fees related to them.  Plaintiff also argues that the Fund's accountants, auditors and actuaries were not responsible for the Fund's investments – that is, it was not their function to uncover the pay-to-play scheme but just to verify transactions.  Plaintiff, however, does not contend, nor is there any evidence, that documents were concealed, from Plaintiff's accountants, auditors or

109

actuaries, or worse, altered by any of the Defendants.

Plaintiff simply misses the mark.  First, Plaintiff's contention is not accurate with regard to the investment management fees, as Snyder & Clemente prepared spreadsheets which explicitly disclose the investment managers, how much of the Fund's money each managed, and their investment management fees. (Flaherty Dep. 93:1-24, Doc. 434-12 at 24; Zavada Dep. 72:24-73:15, Doc. 435-22 at 19; *see, e.g.,* Def.'s Ex. 129 at SC 001745, Doc. 444-8 at 1.)

More importantly, however, is that Plaintiff's argument overlooks the fact that all of the material information which Plaintiff claims was concealed from it – the investment contracts, as well as the account, commission and fee statements – was made available to, and were obtained by, Plaintiff's accountants, auditors and actuaries. Otherwise, they would not have been able to prepare their reports.  Indeed, it matters little what functions the accountants, auditors and actuaries performed and what their reports disclosed. Rather, the key is that they did in fact perform them.  The documents were not concealed from, nor were they altered by, any of the Defendants.  Any Board member could have asked for and received an explanation of certain investments or their associated fees from Plaintiff's outside accountants. (Flaherty Dep. 93:18-94:12, Doc. 434-12 at 24-25.)

Morreale and Flood both testified that ASCO submitted an annual report every year. (Morreale Dep. 152:6-10, Doc. 435 at 39; Flood Dep. 266:6-14, Doc. 434-13 at 68.) Indeed, financial reports for the years 1989 through 1992, 1994 through 1996, and 1999 through 2002 are contained in the record. (*See* Def.'s Ex. 73 at LCRB 00664-00667, Doc. 442-3 at 1-4; Def.'s Ex. 74 at LCRB 00709-00714, Doc. 442-4 at 1-6; Def.'s Ex. 75 at LCRB 00741-00744, Doc. 442-5 at 1-4; Def.'s Ex. 76 at LCRB 00775-00780, Doc. 442-6

at 1-6; Def.'s Ex. 77 at ASCO 032564-03271, Doc. 442-7 at 1-8; Def.'s Ex. 78 at ASCO

031906-031910, Doc. 442-8 at 1-5; Def.'s Ex. 79 at LCRB 00802-00815, Doc. 442-9 at 1-

14; Def.'s Ex. 83 at LCRB 00818-00836, Doc. 442-13 at 1-19; Def.'s Ex. 84 at ASCO

030962-030979, Doc. 442-14 at 1-15; Def.'s Ex. 85 at LCRB 00874-00892, Doc. 442-15

at 1-19; Def.'s 86 at LCRB 00929-00953, Doc. 442-16 at 1-25; Def.'s 87 at LCRB 00961-

00976, Doc. 442-17 at 1-16; Def.'s Ex. 88 at LCRB 00977-01002, Doc. 442-18 at 1-26.)

ASCO's reports fully, clearly, and, in some cases, graphically, disclose the portfolio

managers, the amounts deposited with each manager, and the total administrative,

operational and investment management fees charged to the Fund. (*See, e.g.,* Pl.'s Ex.

110 at LCRB 00879, 00889-00890, Doc. 491-2 at 6, 16-17.)  ASCO's reports also

disclosed how the Fund's assets were allocated for the previous year, as well as the

target allocation for the Fund's assets for the following year. (*See id.* at LCRB 00885,

Doc. 491-2 at 12.)

### (4)    The cases cited by Plaintiff

The cases cited by Plaintiff (Doc. 504-2, -3) do not support its conclusion that

Defendants committed honest services mail and/or wire fraud.  In *United States v. Linder*,

Civ. A. No. 06-CR-50038 (N.D. Ill. 2006), the defendant, Linder, served as a consultant to

a union pension plan. (*See* Doc. 504-3 at 6.)  He recommended that the pension plan

invest in group annuity contracts rather than no-commission mutual funds, thus enabling

himself to collect substantial fees. (*See id.*)  Linder also caused all documentation

regarding his fees, commissions and compensation derived from the group annuity

contracts to be sent to himself in order to hide that information from the pension plan

111

trustees. (*See id.* at 7.)  While this behavior is analogous to that alleged by Plaintiff,

Linder did not stop there.  Linder also signed and forged the signatures of the pension

plan's trustees in order to conceal from them the fact that he had entered into other

contracts. (*See id.* at 6.)  Linder also created materially false and fraudulent new reports

and statements to disguise the fact that the pension plan's funds were invested in fee-

generating group annuity contracts instead of no-commission mutual funds. (*See id.* at 7.)

This misconduct – forging signatures and creating fraudulent reports – goes far beyond

even what Plaintiff has alleged.  As such, *Linder* is inapposite.

Plaintiff has also submitted the complaint in an action commenced by the New

York Attorney General against The Hartford Financial Services Group, Inc. and Hartford

Life, Inc. (collectively "The Hartford"). (Doc. 504-2.)  Therein, it is alleged that The

Hartford conceived of and perpetrated a scheme to preserve and grow its share of the

market for single premium group annuities by secretly compensating brokers in return for

the brokers steering their pension plan clients to The Hartford for the purchase of single

premium group annuities. (*Id.* at 2.)  The New York Attorney General set forth state law

claims of fraud and unjust enrichment. (*Id.* at 47.)  There were no RICO or mail and/or

wire fraud claims.  The Hartford entered into a settlement agreement prior to any court

making any findings of fact or conclusions of law as to the allegations contained therein.

(Pl.'s Br. in Opp'n at 65, Doc. 484-1 at 82.)  The Hartford did not admit to liability or

wrongdoing. (*Id.*)  As such, the Court finds this complaint of little moment.

### (D)  Conclusion as to Failure to disclose a Conflict of interest

Accordingly, the Court concludes that no reasonable jury could find that material

information regarding the Fund – its investment contracts, and the fees and commissions related to those contracts – was deliberately concealed by Defendants.[65]

### iii.    Conclusion as to Scheme to Defraud

Without evidence of quid pro quo, no reasonable jury could find that bribery took place. Without evidence that material information was deliberately concealed by Defendants, no reasonable jury could find that there was a failure to disclose a conflict of interest. Accordingly, there is insufficient evidence as a matter of law to establish a scheme to defraud, the first element of mail and/or wire fraud.

### c.    Conclusion as to Count III

The mail and/or wire fraud statutes do "not encompass every instance of official misconduct that results in [a public] official's personal gain." *United States v. Sawyer*, 85 F.3d 713, 725 (1st Cir. 1996). There may potentially be violations of the Sunshine Act and the County Pension Plan Best Practices, and maybe even breaches of fiduciary obligations. However, "[n]ot every breach of every fiduciary duty works a criminal fraud." *United States v. George*, 477 F.2d 508, 512 (7th Cir. 1973); *see also United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993) (rejecting the idea that all deceits are criminal frauds). "The right to honest services is not violated by every breach of contract, breach

---

[65]While it is obviously possible that, because of the shear number of documents involved over a fourteen (14) year period, certain documents were not shown to, or certain facts were not known by, certain Board members, there is simply nothing to suggest that any of the Defendants deliberately concealed anything from Plaintiff so as to constitute honest services fraud.

Additionally, certain documents may have simply been lost due to time and disorganization. Indeed, many of the documents in Plaintiff's possession could not be found during the investigation of the Fund in the fall of 2002, but were then found in the Luzerne County annex building in 2004. (*See* Koehler Dep. 98:16-24, Doc. 434-19 at 26.) This is a more reasonable inference to draw than mail and/or wire fraud.

of duty, conflict of interest, or misstatement made . . . ." *United States v. Welch*, 327 F.3d 1081, 1107 (10th Cir. 2003); *see Sawyer*, 85 F.3d at 728 ("To allow every transgression of state governmental obligations to amount to mail fraud would effectively turn every such violation into a federal felony; this cannot be countenanced").

In sum, the PSLRA bars Plaintiff's RICO claims.  Even if Plaintiff's RICO claims were not barred by the PSLRA, there is insufficient evidence as a matter of law to allow a reasonable jury to find that Defendants violated the mail and/or wire fraud statutes.  As such, as a matter of law, no predicate acts were committed which would subject Defendants to liability under 18 U.S.C. § 1962(c).  Therefore, the Court will grant summary judgment in favor of all Defendants as to Count III of Plaintiff's Complaint.

### 3.    RICO Conspiracy Claims (Counts IV and VI)

In Count IV, Plaintiff alleges that Defendants conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).  In Count VI, Plaintiff alleges that Defendants conspired to violate 18 U.S.C. § 1962(b) in violation of 18 U.S.C. § 1962(d).[66]

To sustain an action under section 1962(d), a plaintiff must prove that: (1) the defendant adopted the goal of furthering or facilitating the criminal endeavor; (2) the conspiracy, if completed, would satisfy all of the elements of either section 1962(a), (b) or (c); and (3) an injury resulted from an act related to the conspiracy which is enumerated in section 1961(1). *See Smith v. Berg*, 247 F.3d 532, 536 (3d Cir. 2001).

---

[66]While Count V of Plaintiff's Complaint, which alleged a violation of section 1962(b), was dismissed for failure to adequately state an injury from Defendants' acquisition or control of an interest in a RICO enterprise, the substantive allegations of a section 1962(b) violation can still sustain a claim for a section 1962(d) violation. *Rehkop v. Berwick Healthcare Corp.*, 95 F.3d 285, 290 (3d Cir. 1996).

### a.      Count IV

Defendants cannot be held liable for a conspiracy to violate RICO based on a

violation of section 1962(c) because Plaintiff's evidence is insufficient as a matter of law

to establish a violation of section 1962(c). *Healthguard of Lancaster, Inc. v. Gartenberg*,

No. Civ. A. 02-2611, 2004 WL 632722, at *14 (E.D. Pa. Mar. 5, 2004) (citing *State Farm

Mut. Auto. Ins. Co. v. Makris*, No. 01-5351, 2003 U.S. Dist. LEXIS 3374 (E.D. Pa. Mar. 4,

2003)).[67]  As such, summary judgment will be granted as to Count IV of Plaintiff's

Complaint.

### b.      Count VI

Under section 1962(b), "[i]t shall be unlawful for any person through a pattern of

racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or

control of any enterprise which is engaged in, or the activities of which affect, interstate or

foreign commerce."  Like section 1962(c), section 1962(b) requires that a plaintiff

establish that the defendant engaged in "a pattern of racketeering activity" – i.e., that two

predicate acts were committed within a ten year period. *Adena, Inc. V. Cohn*, 162 F.

Supp. 2d 351, 358 (E.D. Pa. 2001).  The Court has already concluded that Defendants

did not commit any violations of the mail or wire fraud statutes.  As such, no violation of

section 1962(b) took place as a matter of law.  Consequently, Defendants cannot be held

liable for a RICO conspiracy based on a violation of section 1962(b). *Lightning Lube*, 4

---

[67]*See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) (holding that, because defendants' actions did not constitute violations of subsections (a), (b) or (c), these actions could not serve as the object of a section 1962(d) conspiracy); *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989) (an element of a section 1962(d) claim involves "knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b) or (c)"); *Dugan v. Bell Telephone of Pa.*, 876 F. Supp. 713, 721 (W.D. Pa. 1994) ("the Third Circuit has clarified that any 'claim under § 1962(d) necessarily must fail if the substantive claims . . . are themselves deficient'").

F.3d at 1191; *Healthguard of Lancaster*, 2004 WL 632722, at *14.  Consequently, the

Court will grant summary judgment in favor of Defendants as to Count VI of Plaintiff's

Complaint.

### B.    Violation of the Investment Advisors Act (Count VII)

#### 1.    Introduction

In Count VII, Plaintiff alleges that Williamson and ASCO violated several sections

of the Investment Advisors Act of 1940 ("IAA"), 15 U.S.C. § 80b-1 *et seq*.  Williamson and

ASCO contend that they were not "investment advisers" under section 202(a)(11) of the

IAA, 15 U.S.C. § 80b-2(a)(11), and thus the IAA does not apply to them.  As such, they

argue that they are entitled to summary judgment on this count.

#### 2.    Legal Standard

Section 202(a)(11) of the IAA provides in pertinent part:

> "Investment adviser" means any person who, for
> compensation, engages in the business of advising others . . .
> as to the value of securities or as to the advisability of
> investing in, purchasing, or selling securities . . . but does not
> include . . . (C) any broker or dealer whose performance of
> such services is solely incidental to the conduct of his
> business as a broker or dealer and who receives no special
> compensation therefor . . . .

15 U.S.C. § 80b-2(a)(11).

The Securities and Exchange Commission ("SEC") has published an interpretive

release to clarify its position on the applicability of the IAA to financial planners, pension

consultants and other financial service providers.  The SEC advises:

> Whether a person providing financially related services of the
> type discussed in this release is an investment adviser within
> the meaning of the Advisers Act depends upon all the relevant

116

> facts and circumstances. . . .  A determination as to whether a
> person providing financial planning, pension consulting, or
> other integrated advisory services is an investment adviser will
> depend upon whether such person: (1) Provides advice, or
> issues reports or analyses, regarding securities; (2) is in the
> business of providing such services; and (3) provides such
> services for compensation.

Applicability of the Investment Advisers Act to Financial Planners, Pension Consultants, and Other Persons Who Provide Investment Advisory Services as a Component of Other Financial Services, Investment Advisers Act Release No. IA-1092, 52 Fed. Reg. 38400, 38401-02 (Oct. 8, 1987) ("SEC Release").

### 3.    Analysis

Williamson and ASCO submit that they were not investment advisers within that definition because, even assuming that Williamson offered investment advice to Plaintiff, Williamson and ASCO did not receive any "special compensation" from Plaintiff. (Williamson and ASCO Mem. of Law at 50-52, Doc. 429-2 at 50-52.)  Williamson and ASCO argue that they only received commissions and fees from the vendors and/or providers of the investments purchased by the Board. (*Id.* at 51, Doc. 429-2 at 51.)  They did not receive compensation specifically in exchange for giving investment advice to the Board. (*Id.*)[68]  As such, the third element of the three-part test espoused by the SEC is not satisfied.

Conversely, Plaintiff points to language in the ASCO Agreement providing that Williamson and ASCO were being retained to provide guidance and advice with respect

---

[68]Williamson and ASCO also point to Article XIII of the ASCO Agreement in support of their contention.  Article XIII provides that "[i]t is understood by the Pension Board that the Consultant is not registered with the Securities and Exchange Commission as a Registered Investment Advisor and clearly does not hold himself out to be such for purposes of this agreement." (Def.'s Ex. 56 at FLOOD 5457, Doc. 441-6 at 5.)

to investment management. (Pl.'s Br. in Opp'n at 145, Doc. 484-1 at 162.)  Plaintiff also

cites to deposition testimony attesting to Williamson's and ASCO's role as investment

advisers to the Board. (*Id.*)[69]

Plaintiff, however, does not point to any evidence that Williamson and ASCO

received compensation specifically in return for providing investment advice to the Board.

Rather, Plaintiff makes a roundabout argument that, because Williamson and ASCO

were, according to the ASCO Agreement, being retained to provide "investment

management services," they must have received compensation for such services.[70]

Even ignoring the contradictory provisions in the ASCO Agreement, which have

been set forth in the margin, the fact that Williamson and ASCO were being retained to

provide guidance and advice with regard to investments merely goes to the first two

factors in the three part test set forth by the SEC.  In order to survive summary judgment,

Plaintiff must point to some evidence that Williamson and ASCO actually received

compensation in exchange for the investment advice it arguably was hired to provide.

However, the record does not reveal any evidence that the Board paid Williamson

and ASCO any compensation in exchange for the rendering of investment advice.

Instead, it appears clear that all of the compensation received by Williamson and ASCO

---

[69]Plaintiff, however, also inexplicably points to language in the ASCO Agreement which provides that "the Consultant will be compensated for all services rendered" through its fee arrangement with Safeco. (Pl.'s Br. in Opp'n at 146, Doc. 484-1 at 163.)  This provision, however, appears to undermine Plaintiff's argument because compensation received by Williamson from Safeco is that of a broker receiving commission from a vendor.

[70]Plaintiff also argues that, in the ASCO Agreement, Williamson and ASCO state that they intend to fully comply with the IAA. (*Id.* at 144, Doc. 484-1 at 161.)  This language in the agreement would be relevant to whether Williamson and ASCO were in the business of providing investment advice. However, this language is of no import as to whether Williamson and ASCO actually received special compensation specifically in exchange for the rendering of investment advice to the Board.

was in exchange for either (1) transaction-related services – that is, commissions, or (2) administration of the Fund.[71]  There simply is no evidence of "special compensation" received by Williamson and ASCO in exchange for whatever advice they were retained to give, or did in fact give, to the Board.  Therefore, the Court concludes that, as a matter of law, Williamson and ASCO were not "investment advisers" under section 202(a)(11) of the IAA. *See Kaufman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 464 F. Supp. 528, 538 (D. Md. 1978) (brokerage firm and broker were not "investment advisers" because, even assuming they provided investment advice to the plaintiffs, they did not receive compensation specifically for rendering such advice, and thus such advice was merely incidental to their position as broker for the plaintiffs' accounts).  Accordingly, the IAA does not apply.  The Court will thus grant summary judgment in favor of Williamson and ASCO as to Count VII of Plaintiff's Complaint.[72]

## II.    State Law Claims, Counter Claims and Third-party Claims

Given that the Court will grant summary judgment in favor of Defendants as to Plaintiff's federal law claims, which formed the basis for federal subject matter jurisdiction, the Court will decline to exercise supplemental jurisdiction over: (1) Plaintiff's state law claims for breach of fiduciary duty (Count I) and unjust enrichment (Count VIII); (2) the third-party claims and counterclaims against Morreale, Flood and Plaintiff for

---

[71]Indeed, Plaintiff itself characterizes all of the compensation received by Williamson and ASCO as commissions on investments. (*See, e.g.,* Pl.'s Br. in Opp'n at 21, Doc. 484-1 at 38.)

[72]Because summary judgment will be granted in favor of Williamson and ASCO on other grounds, the Court need not address the issue of the IAA's statute of limitations.

contribution, indemnification and breach of fiduciary duty.[73] 28 U.S.C. § 1367(c) (a federal district court may decline to exercise supplemental jurisdiction over state law claims when the court has dismissed all claims over which it has original jurisdiction); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (stating that "if the federal claims are dismissed before trial . . . the state claims should be dismissed as well").  Accordingly, the Court will dismiss Counts I (breach of fiduciary duty) and VIII (unjust enrichment) of Plaintiff's Complaint (Doc. 1).  The Court will also dismiss: (1) the ASCO Defendants' counterclaims against Flood and Plaintiff for contribution and indemnification (Doc. 201); (2) the ASCO Defendants' third-party claims against Morreale for contribution and indemnification (Doc. 212); (3) former Board members Makowski, Pizano, Crossin and Jones' counterclaim against Plaintiff for indemnification (Doc. 203); and (4) former Board members Makowski, Pizano, Crossin and Jones' third-party claims against Morreale for breach of fiduciary duty and contribution (Doc. 206).  These state law claims will be dismissed without prejudice. *See* 28 U.S.C. § 1367(d) (tolling the state statute of limitations for thirty (30) days after the dismissal of supplemental state law claims).

## CONCLUSION

For the reasons stated above, the Court will: (1) grant summary judgment in favor of Defendants as to Counts III (RICO section 1962(c)), IV (RICO conspiracy to violate

---

[73]Because the third-party claims and counterclaims will be dismissed, the Court need not decide the motions for summary judgment filed by Morreale (Docs. 400, 406), Flood (Doc. 403), and Plaintiff (Doc. 409).

section 1962(c)), VI (RICO conspiracy to violate section 1962(b)), and VII (violation of the

IAA) of Plaintiff's Complaint; (2) dismiss without prejudice Counts I (breach of fiduciary

duty) and VIII (unjust enrichment) of Plaintiff's Complaint; and (3) dismiss without

prejudice all counterclaims and third-party claims.

An appropriate Order follows.

November 27, 2007          /s/ A. Richard Caputo
Date                       A. Richard Caputo
                           United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

121

THE LUZERNE COUNTY RETIREMENT
BOARD,

      Plaintiff,

          v.

THOMAS MAKOWSKI, et al.,

      Defendants.

CIVIL ACTION NO. 3:CV-03-1803

(JUDGE CAPUTO)

## <u>ORDER</u>

**NOW**, this  27th  day of November, 2007, **IT IS HEREBY ORDERED** that:

(1)    Defendants' motions for summary judgment as to Counts III, IV, VI, and VII of Plaintiff's Complaint are **GRANTED**;

(2)    **JUDGMENT** is entered in favor of Defendants and against Plaintiff as to Counts III, IV, VI and VII of Plaintiff's Complaint;

(3)    Counts I and VIII of Plaintiff's Complaint are **DISMISSED** without prejudice;

(4)    All Counterclaims and Third-party claims are **DISMISSED** without prejudice;

(5)    The Clerk of the Court shall mark this case as **CLOSED**.

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge